**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALABAMA ASSOCIATION OF REALTORS®, *et al.*, <br><br>                    *Plaintiffs,* <br>     *v.* <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br>                    *Defendants.* | Civil Action No. 20-3377 |

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF EXPEDITED MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ii

INTRODUCTION ..............................................................................................................1

STATEMENT OF UNDISPUTED FACTS .........................................................................4

I.   The COVID-19 Pandemic and the CARES Act Eviction Moratorium .......................4

II.  The President's Executive Order and the CDC's Eviction Moratorium .....................5

III. The Eviction Moratorium's Impact ..........................................................................6

LEGAL STANDARD .........................................................................................................8

ARGUMENT .....................................................................................................................9

I.   The CDC Did Not Follow Rulemaking Procedures Required by Statute ...................9

    A.   The Eviction Moratorium Violates the APA's Notice-and-Comment
        Requirement .........................................................................................................9

    B.   The Eviction Moratorium Violates the Regulatory Flexibility Act ................... 12

II.  The Eviction Moratorium Exceeds the CDC's Statutory Authority ........................ 13

    A.   Congress Has Not Clearly Authorized the CDC to Impose a Nationwide
        Moratorium on Evictions .................................................................................. 14

    B.   Congress Unambiguously Foreclosed the CDC From Issuing an
        Eviction Moratorium .......................................................................................... 17

    C.   The CDC's Interpretation of Section 361 of The Public Health Service
        Act Is Unpersuasive .......................................................................................... 22

III. The Eviction Moratorium is Arbitrary and Capricious ............................................ 26

IV.  Section 361 of the Public Health Service Act Violates the Nondelegation Doctrine .............. 30

V.   The Eviction Moratorium is Unconstitutional ........................................................ 32

    A.   The Eviction Moratorium Effectuates An Unconstitutional Taking ................. 32

    B.   The Eviction Moratorium Violates Due Process ............................................... 36

    C.   The Eviction Moratorium Deprives Landlords of Access to Courts ................. 37

VI.  The Court Should Vacate the Eviction Moratorium on an Expedited Basis ............. 40

CONCLUSION ................................................................................................................ 41

CERTIFICATE OF SERVICE ......................................................................................... 43

i

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*A.L.A. Schechter Poultry Corp. v. United States.*
  295 U.S. 495 (1935) ......................................................................................................31

*Aeronautical Repair Station Ass'n v. FAA,*
  494 F.3d 161 (D.C. Cir. 2007) ..............................................................................12, 13

*Am. Mining Cong. v. Mine Safety & Health Admin.,*
  995 F.2d 1106 (D.C. Cir. 1993) ...................................................................................11

*AT&T Corp. v. FCC,*
  369 F.3d 554 (D.C. Cir. 2004) .....................................................................................19

*Azar v. Allina Health Servs.,*
  139 S. Ct. 1804 (2019) ..................................................................................................11

*Barnhart v. Walton,*
  535 U.S. 212 (2002) ......................................................................................................22

*BE & K Constr. Co. v. NLRB,*
  536 U.S. 516 (2002) ................................................................................................38, 40

*\*Bell Atl. Tel. Cos. v. FCC,*
  24 F.3d 1441 (D.C. Cir. 1994) ...............................................................................32, 36

*\*Bill Johnson's Rests., Inc. v. NLRB,*
  461 U.S. 731 (1983) .........................................................................................38, 39, 40

*Bond v. United States,*
  572 U.S. 844 (2014) ......................................................................................................24

*Brown v. Azar,*
  No. 1:20-CV-03702, 2020 WL 6364310 (N.D. Ga. Oct. 29, 2020) .........................25, 26

*Capital Area Immigrants' Rights Coal. v. Trump,*
  --- F. Supp. 3d ---, ---, 2020 WL 3542481 (D.D.C. June 30, 2020) ......................8, 9, 40

*Cement Kiln Recycling Coal. v. EPA,*
  255 F.3d 855 (D.C. Cir. 2001) .....................................................................................13

*Christopher v. Harbury,*
  536 U.S. 403 (2002) ......................................................................................................38

*Clean Wis. v. EPA,*
  964 F.3d 1145 (D.C. Cir. 2020) ...................................................................................28

*Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n,*
  466 F.3d 134 (D.C. Cir. 2006) .....................................................................................26

*Corley v. United States,*
  556 U.S. 303 (2009) ......................................................................................................20

*Dist. of Columbia v. Dep't of Labor,*
    819 F.3d 444 (D.C. Cir. 2016) ............................................................... 15, 17, 22

*Environmentel, LLC v. FCC,*
    661 F.3d 80 .............................................................................................. 26

*Envt'l Def. Fund, Inc. v. EPA,*
    716 F.2d 915 (D.C. Cir. 1983) .................................................................. 11

*FCC v. Fox Television Stations,*
    567 U.S. 239 (2012) ................................................................................. 37

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ........................................................................... *passim*

*First English Evangelical Lutheran Church v. Cnty. of Los Angeles,*
    482 U.S. 304 (1987) ................................................................................. 33

*Fogo De Chao (Holdings) Inc. v. DHS,*
    769 F.3d 1127 (D.C. Cir. 2014) ................................................................ 22

*Fox Television Stations v. FCC,*
    280 F.3d 1027 (D.C. Cir. 2002) ................................................................ 41

*Gen. Elec. Co. v. EPA,*
    290 F.3d 377 (D.C. Cir. 2002) .................................................................. 10

*Gerber v. Norton,*
    294 F.3d 173 (D.C. Cir. 2002) .................................................................. 27

*Getty v. Fed Sav. & Loan Ins. Corp.,*
    805 F.2d 1050 (D.C. Cir. 1986) ................................................................ 27

*Gonzales v. Oregon,*
    546 U.S. 243 (2006) ................................................................................. 16

*Gundy v. United States,*
    139 S. Ct. 2116 (2019) ................................................................. 15, 30, 31

*Humane Soc'y of the U.S. v. Zinke,*
    865 F.3d 585 (D.C. Cir. 2017) .................................................................. 41

*Ill. Pub. Telecomms. Ass'n v. FCC,*
    123 F.3d 693 (D.C. Cir. 1997) .................................................................. 40

*Ind. Boxcar Corp. v. R.R. Ret. Bd.,*
    712 F.3d 590 (D.C. Cir. 2013) .................................................................. 26

*Indep. Ins. Agents of Am., Inc. v. Hawke,*
    211 F.3d 638 (D.C. Cir. 2000) .................................................................. 19

*Indep. Turtle Farmers of La., Inc. v. United States,*
    703 F. Supp. 2d 604 (W.D. La. 2010) ................................................. 23, 24

*Ipsen Biopharm., Inc. v. Azar,*
    943 F.3d 953 (D.C. Cir. 2019) .................................................................. 10

*Johnson v. United States,*
    576 U.S. 591 (2015)....................................................................................................37

*Kaiser Aetna v. United States,*
    444 U.S. 164 (1979)....................................................................................................33

*Kaufman v. Nielsen,*
    896 F.3d 475 (D.C. Cir. 2018)....................................................................................22

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019)................................................................................................10

*La. Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986)....................................................................................................24

*Lee v. City of Chicago,*
    330 F.3d 456 (7th Cir. 2003).......................................................................................33

*Local Union No. 25, A/W Int'l Bhd. of Teamsters v. NLRB,*
    831 F.2d 1149 (1st Cir. 1987)...............................................................................38, 40

*Lorretto v. Teleprompter Manhattan CATV Corp.,*
    458 U.S. 419 (1982)....................................................................................................33

*Louisiana v. Mathews,*
    427 F. Supp. 174 (E.D. La. 1977)...............................................................................24

*Louisville Joint Stock Land Bank v. Radford,*
    295 U.S. 555 (1935)....................................................................................................33

*\*Loving v. IRS,*
    742 F.3d 1013 (D.C. Cir. 2014)....................................................................14, 15, 17

*Mack Trucks, Inc. v. EPA,*
    682 F.3d 87 (D.C. Cir. 2012)......................................................................................11

*Mathews v. Eldridge,*
    424 U.S. 319 (1976)....................................................................................................36

*MCI Telecomms. Corp. v. AT&T Co.,*
    512 U.S. 218 (1994)....................................................................................................15

*\*Merck & Co. v. HHS,*
    962 F.3d 531 (D.C. Cir. 2020).............................................................................passim

*Metlife, Inc. v. Fin. Stability Oversight Council,*
    177 F. Supp. 3d 219 (D.D.C. 2016)............................................................................28

*\*Michigan v. EPA,*
    576 U.S. 743 (2015)..............................................................................................26, 28

*Mine Workers v. Ill. Bar Ass'n,*
    389 U.S. 217 (1967)....................................................................................................38

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,*
    463 U.S. 29 (1983)................................................................................................26, 27

*Murr v. Wisconsin,*
    137 S. Ct. 1933 (2017) ............................................................................... 34, 35

*\*N.Y. Stock Exch. LLC v. SEC,*
    962 F.3d 541 (D.C. Cir. 2020) ............................................................... 14, 25, 26

*N.Y. Times Co. v. United States,*
    403 U.S. 713 (1971) ........................................................................................ 39

*Nat. Res. Def. Council v. Wheeler,*
    955 F.3d 68 (D.C. Cir. 2020) ......................................................................... 10

*Nat'l Ass'n of Clean Water Agencies v. EPA,*
    734 F.3d 1115 (D.C. Cir. 2013) ...................................................................... 28

*\*Nat'l Env'l Dev. Ass'n Clean Air Project v. EPA,*
    752 F.3d 999 (D.C. Cir. 2014) ....................................................................... 26

*\*Nat'l Mining Ass'n v. U.S. Army Corps of Engr's,*
    145 F.3d 1399 (D.C. Cir. 1998) ...................................................................... 40

*P.J.E.S. v. Wolf,*
    No. 1:20-cv-2245, 2020 WL 5793305 (D.D.C. Sept. 25, 2020) ...................... 25

*Pa. Coal Co. v. Mahon,*
    260 U.S. 393 (1922) ........................................................................................ 33

*Palazzolo v. Rhode Island,*
    533 U.S. 606 (2001) ........................................................................................ 34

*Penn Cent. Transp. Co. v. City of New York,*
    438 U.S. 104 (1978) ........................................................................................ 35

*Pennell v. City of San Jose,*
    485 U.S. 1 (1988) ............................................................................................ 34

*\*Perez v. Mortgage Bankers Ass'n,*
    575 U.S. 92 (2015) .......................................................................................... 10

*Propert v. Dist. of Columbia,*
    948 F.2d 1327 (D.C. Cir. 1991) ................................................................ 36, 37

*Pub. Citizen v. Heckler,*
    602 F. Supp. 611 (D.D.C. 1985) .................................................................... 24

*Ralls Corp. v. CFIUS,*
    758 F.3d 296 (D.C. Cir. 2014) ....................................................................... 36

*S. Bay Pentecostal Church v. Newsom,*
    140 S. Ct. 1613 (2020) .................................................................................... 24

*Sessions v. Dimaya,*
    138 S. Ct. 1204 (2018) .................................................................................... 37

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944) ........................................................................................ 22

*Sorenson Comm'cns Inc. v. FCC,*
   755 F.3d 702 (D.C. Cir. 2014) ........................................................................11

*Sure-Tan, Inc. v. NLRB,*
   467 U.S. 883 (1984) ..............................................................................38, 40

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,*
   535 U.S. 302 (2002) ......................................................................................33

*Touby v. United States,*
   500 U.S. 160 (1991) ......................................................................................31

*U.S. House of Representatives v. Mnuchin,*
   976 F.3d 1 (D.C. Cir. 2020) ..........................................................................17

*United States v. Lopez,*
   514 U.S. 549 (1995) ......................................................................................24

*United States v. Mead Corp.,*
   533 U.S. 218 (2001) ......................................................................................22

*United States v. Regenerative Scis., LLC,*
   878 F. Supp. 2d 248 (D.D.C. 2012) ........................................................22, 24

*United States v. Williams,*
   553 U.S. 285 (2008) ......................................................................................20

*\*Util. Air Regulatory Grp. v. EPA,*
   573 U.S. 302 (2014) ...............................................................................*passim*

*\*Wash. All. of Tech. Workers v. DHS,*
   202 F. Supp. 3d 20 (D.D.C. 2016) ..........................................................11, 12

*\*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) .................................................................................15, 30

*Yates v. United States,*
   574 U.S. 528 (2015) .................................................................................20, 21

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

U.S. Const. amend. V ...........................................................................................32

U.S. Const. art. I ..................................................................................................30

5 U.S.C. § 551 .....................................................................................................10

5 U.S.C. § 553 ...............................................................................................6, 9, 10

5 U.S.C. § 601 .......................................................................................................6

5 U.S.C. § 604 ................................................................................................12, 13

5 U.S.C. § 605 ................................................................................................12, 13

5 U.S.C. § 704 .....................................................................................................10

5 U.S.C. § 706 .......................................................................................................9

5 U.S.C. § 804 ................................................................................................6, 16

26 U.S.C. § 6673 ....................................................................................................................... 39

42 U.S.C. § 264 .................................................................................................................... *passim*

42 U.S.C. § 265 ....................................................................................................................... 25

Pub. L. 116-136, 134 Stat. 281 (2020) ................................................................................ *passim*

**OTHER AUTHORITIES**

Administrative Order (Ala. Fifteenth Cir. Ct. Sept. 10, 2020) ....................................... 7, 30, 39

Black's Law Dictionary (11th ed. 2019) .................................................................................. 39

21 C.F.R. § 1240.30 ................................................................................................................. 23

42 C.F.R. § 70.2 ........................................................................................................... 1, 3, 23, 27

Center for Disease Control and Prevention,
  "HHS/CDC Temporary Halt in Residential Evictions to Prevent the Further
  Spread of COVID-19 Frequently Asked Questions" ................................................... 30, 40

Control of Communicable Diseases; Apprehension and Detention of Persons With
  Specific Diseases; Transfer of Regulations, 65 Fed. Reg. 49,906 (Aug. 16, 2000) ................ 22, 23

Dep't of Health and Human Servs., "Determination That A Public Health
  Emergency Exists" (Jan. 31, 2020) ......................................................................................... 4, 11

Exec. Order No. 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993) ................................................. 28

Fed. R. Civ. P. 57 ...................................................................................................................... 41

Fighting the Spread of Covid-19 by Providing Assistance to Renters and
  Homeowners, Exec. Order 13945, 85 Fed. Reg. 49,935 (Aug. 8, 2020) ........................... 5, 17

National Association of REALTORS®, *COVID-19 Industry Impact Watch*
  (Nov. 5, 2020) .......................................................................................................................... 16

Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19,
  85 Fed. Reg. 55,292 (Sept. 4, 2020) ................................................................................... *passim*

## INTRODUCTION

Without question, COVID-19 presents serious challenges, and a moratorium on evictions may prevent the spread of COVID-19.  "Regardless of how serious the problem an administrative agency seeks to address, however, it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'"  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (quotation omitted).

Congress addressed the challenges presented by COVID-19 when it passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") in March 2020.  In particular, the CARES Act included a 120-day moratorium on evictions, which expired by operation of law on July 24, 2020.

Two weeks later, the President issued an executive order lamenting Congress's failure to extend the eviction moratorium and directing the Centers for Disease Control and Prevention ("CDC") to afford renters even broader relief than what Congress allowed to expire.

A short time later, the CDC followed through on the President's directive by issuing a nationwide moratorium on evictions.  Backed by criminal penalties, the CDC's Eviction Moratorium prohibits landlords from evicting certain tenants, on a nationwide basis, from September 4, 2020, until at least December 31, 2020.  By the CDC's own estimate, the Eviction Moratorium will prevent the evictions of 30-40 million people.  As authority for the Eviction Moratorium, the CDC invoked Section 361 of the Public Health Service Act, 42 U.S.C. § 264, and a regulation implementing that statute, 42 C.F.R. § 70.2, without any explanation of how these authorities enabled the CDC to take such action.  Further, the CDC made the Eviction Moratorium effective immediately without issuing a notice of proposed rulemaking seeking comment on this new rule.

The CDC's failure to give notice or solicit comment before issuing this rule requires that the Eviction Moratorium be vacated.  The Eviction Moratorium is a legislative rule with the force and effect of law because the nation's 10-11 million landlords face criminal penalties if they evict a

nonpaying tenant entitled to the protections of the Eviction Moratorium.  The CDC's excuse for bypassing the Administrative Procedure Act's ("APA") notice-and-comment rulemaking procedures—the public health emergency created by COVID-19—does not withstand scrutiny. Although the federal government declared COVID-19 an emergency in January 2020, the CDC delayed issuing the Eviction Moratorium for eight months.  The CDC had ample time to conduct a rulemaking throughout 2020—before passage of the CARES Act, during the time period in which the CARES Act's temporary eviction moratorium was effective, after the President's Executive Order, and even now during the effective dates of the Eviction Moratorium.  Similarly, the CDC's decision to bypass the requirements of the Regulatory Flexibility Act—in particular, the requirement to consider the impact on small businesses, a category that includes millions of landlords like Plaintiffs— cannot be justified.

More fundamentally, the CDC exceeded its statutory authority by issuing the Eviction Moratorium, which fails under both the "major rules" doctrine and the traditional *Chevron* two-step framework.  There can be no dispute that the CDC issued a "major rule" requiring a clear delegation of statutory authority from Congress.  The Eviction Moratorium has a massive economic impact because it shifts the pandemic's financial burdens from 30-40 million renters to 10-11 million landlords—most of whom are small businesses like the Plaintiffs in this case.  The economic harm that the nation's landlords will suffer from the Eviction Moratorium amounts to an estimated $55-76 billion during the time period that landlords are legally barred from evicting nonpaying tenants.  The economic harm to landlords will rise to hundreds of billions of dollars if the CDC extends the Eviction Moratorium into 2021.

Congress never delegated to the CDC clear statutory authority to make a decision of such "vast 'economic and political significance.'"  *Util. Air Regulatory Grp. v. EPA (UARG)*, 573 U.S. 302, 324 (2014).  Congress enacted Section 361 of the Public Health Service Act in 1944, but the CDC has

never attempted to use this authority to regulate all rental properties in the United States through an eviction moratorium. "When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' [courts] typically greet its announcement with a measure of skepticism." *Id.* (internal citation omitted).

Even under the *Chevron* framework, Congress unambiguously foreclosed the CDC from issuing an eviction moratorium in Section 361 of the Public Health Service Act and in the CARES Act. Congress spoke clearly to the one measure that the CDC can use to regulate the interstate movement of individuals who might spread a communicable disease—quarantine. And in the CARES Act, Congress spoke precisely to the question of a nationwide eviction moratorium during COVID-19, but Congress decided that such relief should not extend beyond 120 days and should apply only to properties supported by certain federal funding programs. The CDC's interpretation of Section 361(a) as authorizing an eviction moratorium would eviscerate any limits on the CDC's authority.

The Eviction Moratorium is also arbitrary and capricious under the APA. It not only fails to meet the requirements of the CDC's own implementing regulation, 42 C.F.R. § 70.2, which calls for a finding that eviction relief measures taken by state health authorities have proven insufficient, but the Eviction Moratorium also fails to reasonably explain how the CDC's implementing regulation authorizes it to regulate the entire U.S. rental property market. The Eviction Moratorium fails entirely to weigh its costs against its benefits. And the CDC failed to reasonably explain its definitions for the two key terms in the Eviction Moratorium—"covered persons" and "eviction."

Finally, the Eviction Moratorium raises serious constitutional questions. Section 361 of the Public Health Service Act would violate the separation of powers if it contains a legislative delegation of power so expansive as to authorize economic regulation in the form of an eviction moratorium. The Eviction Moratorium additionally violates the Takings Clause and the Due Process Clause by restricting the ability of landlords to evict nonpaying tenants from their own properties. It also

unconstitutionally restricts the ability of landlords to access the state courts for the purpose of seeking lawful eviction remedies against nonpaying tenants.

For all these reasons, the Court should declare unlawful and set aside the Eviction Moratorium on an expedited basis. Plaintiffs seek expedited review of the Eviction Moratorium because CDC has indicated that it may extend this relief into 2021—causing billions of additional damages to the nation's landlords and casting a cloud over the entire U.S. rental property market. The Court should rule on the legality of the Eviction Moratorium on an expedited basis to afford the CDC the benefit of this Court's judgment before it decides to extend the Eviction Moratorium.

## STATEMENT OF UNDISPUTED FACTS

### I.     The COVID-19 Pandemic and the CARES Act Eviction Moratorium.

The COVID-19 pandemic has taken a devastating toll on Americans' lives and livelihoods in 2020. Hundreds of thousands have died as a result of the virus. Millions of workers have lost their jobs; and in many cases their employers have permanently shuttered their businesses—in particular small businesses—affecting employers and employees alike. The Department of Health and Human Services declared that a public health emergency existed as of January 27, 2020. *See* Dep't of Health and Human Servs., "Determination That A Public Health Emergency Exists" (Jan. 31, 2020) ("HHS Emergency Declaration"), https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx.

In response to the COVID-19 pandemic and its economic effects, in March 2020, Congress passed and the President signed the CARES Act, a $2.2 trillion economic stimulus bill. *See* Pub. L. 116-136, 134 Stat. 281 (2020). Among its measures, the CARES Act provided for a 120-day federal eviction moratorium. *See id.* § 4024. Specifically, the CARES Act prohibited landlords of certain "covered dwellings" from initiating eviction proceedings or "charg[ing] fees, penalties, or other charges" against a tenant for the nonpayment of rent for 120 days following the statute's March 27,

2020 enactment.  *See id.* § 4024(b).  The CARES Act also prohibited landlords from issuing notices to vacate during the same 120-day period.  *See id.* § 4024(c).  Significantly, the CARES Act's prohibition on eviction from "covered dwelling[s]" applied only to properties covered by federal assistance programs or subject to federally-backed loans.  *See id.* § 4024(a).

The CARES Act eviction moratorium expired by operation of law on July 24, 2020.

## II.   The President's Executive Order and the CDC's Eviction Moratorium.

On August 8, 2020, the President issued an Executive Order complaining that Congress had failed to extend the CARES Act eviction moratorium.  "With the failure of the Congress to act, my Administration must do all that it can to help vulnerable populations stay in their homes in the midst of this pandemic. . . . Unlike the Congress, I cannot sit idly and refuse to assist vulnerable Americans in need."  Fighting the Spread of Covid-19 by Providing Assistance to Renters and Homeowners, Exec. Order 13945, 85 Fed. Reg. 49,935 (Aug. 8, 2020) (the "Executive Order").  He directed the CDC to "consider whether any measures temporarily halting residential evictions of any tenants for failure to pay rent are reasonably necessary to prevent the further spread of COVID-19 from one State or possession into any other State or Possession."  *Id.* § 3(a).

Nearly a month after the Executive Order, the CDC issued a "Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19" (the "Eviction Moratorium").  *See* 85 Fed. Reg. 55,292 (Sept. 4, 2020).  The Eviction Moratorium provides that "a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action shall not evict any covered person from any residential property in any jurisdiction to which this Order applies," through at least December 31, 2020.  *Id.*  It defines "evict" as "any action by a landlord, owner of a residential property, or other person with a legal right to pursue eviction or a possessory action, to remove or cause the removal of a covered person from a residential property."  *Id.* at 55,293.  A "covered person" is "any tenant, lessee, or resident of a residential property who provides to their landlord, the owner

of the residential property, or other person with a legal right to pursue eviction or a possessory action, a declaration under penalty of perjury indicating that" the person meets certain criteria. *Id.*

To invoke these protections, a covered person must execute and return to the landlord a declaration provided in the form of an attachment to the Eviction Moratorium. *See id.* & Attachment A. After the covered person does so, "[u]nless the CDC order is extended, changed, or ended," a covered person may not be "evicted or removed from where they are living through December 30, 2020." *Id.* at 55,292. The Eviction Moratorium threatens landlords with harsh criminal penalties—a fine of up to $100,000 for individuals or $200,000 for organizations—to be enforced by the Department of Justice. *See id.* at 55,296.

The Eviction Moratorium is economically significant. As it explains, the Office of Information and Regulatory Affairs "has determined that [the Eviction Moratorium] would be a major rule under the Congressional Review Act (CRA)," *see id.*, which defines a "major rule" as one with "an annual effect on the economy of $100,000,000 or more," 5 U.S.C. § 804(2)(a). The CDC made the Eviction Moratorium effective immediately without following the APA's notice-and-comment procedures. *Id.* § 553. Nor did the CDC conduct an analysis of the Eviction Moratorium's effects on small businesses as required by the Regulatory Flexibility Act. *Id.* § 601.

## III.    The Eviction Moratorium's Impact.

The CDC estimates that "as many as 30–40 million people in America could be at risk of eviction" absent the Eviction Moratorium. 85 Fed. Reg. at 55,295. There are 12.6 to 17.3 million rental households at risk of eviction that are likely to take advantage of the CDC's Eviction Moratorium. Declaration of Scholastica Cororaton ("Cororaton Decl.") ¶ 14. For the four month duration of the Eviction Moratorium, the rent not paid by these rental households likely to take advantage of the Eviction Moratorium amounts to $55.3 to $76 billion. *Id.* ¶ 16. The longer it takes for landlords to initiate eviction proceedings, the more the economic harm to landlords will increase.

If the Eviction Moratorium is extended for twelve months, the rent not paid by these 12.6 to 17.3 million rental households likely to take advantage of the CDC's Eviction Moratorium would increase to $165.9 to $228.1 billion. *Id.* ¶ 17.

The Plaintiffs in this case are two landlords affected by the Eviction Moratorium.  Plaintiff Danny Fordham is a licensed real estate professional who manages 75 properties in Montgomery County, Alabama, through two limited liability companies: Plaintiff Fordham & Associates, LLC and Plaintiff H.E. Cauthen Land and Development, LLC.  Fordham is a member of Plaintiff Alabama Association of REALTORS®.  *See* Declaration of Danny Fordham ("Fordham Decl.") ¶ 1.

In September 2020, Fordham began the eviction process under state law by delivering written notices to two tenants who collectively owe approximately $5,700.  In response, these tenants submitted declarations pursuant to the Eviction Moratorium, preventing him from continuing to pursue the evictions by filing and serving a summons and complaint in state court.  *Id.* ¶ 9.

Fordham would also pursue eviction of at least seven other tenants, each of whom owe him more than $2,000 in unpaid rent, but he cannot do so because the Eviction Moratorium has effectively halted eviction proceedings in state courts throughout Alabama.  *See id.* ¶¶ 14-16.  In fact, the Presiding Judge of the Circuit Court of the Fifteenth Judicial Circuit in Montgomery County has issued an order requiring landlords seeking to commence eviction proceedings to verify that the tenant is not a "covered person" under the Eviction Moratorium.  *See* Administrative Order (Ala. Fifteenth Cir. Ct. Sept. 10, 2020), https://montgomery.alacourt.gov/media/1063/cdc-administrative-order.pdf  (the "Montgomery County Administrative Order").  And since the Eviction Moratorium went into effect, lawyers that Fordham has contacted have stated that they are unwilling to file eviction actions because they are banned by the Moratorium.  Fordham Decl. ¶ 12.

Plaintiff Robert Gilstrap is a licensed real estate professional in Georgia and the sole member of Plaintiff Title One Management, LLC ("Title One").  Gilstrap is the beneficiary of a trust that owns

approximately 40 properties managed by Title One.  *See* Declaration of Robert Gilstrap ("Gilstrap Decl.") ¶ 4.  Gilstrap is a member of Plaintiff Georgia Association of REALTORS®.  *See id.* ¶ 1.

A tenant of one of the properties that Title One manages, located in Marietta, Georgia, owes approximately $10,000 in unpaid rent.  *See id.* ¶ 6.  These tenants make nearly $97,000 a year and have also refused to allow maintenance on their property.  *Id.*  These tenants were initially entitled to eviction forbearance under the CARES Act.  *Id.* ¶ 7.  Once the federal eviction moratorium in the CARES Act expired, Title One sought to proceed with eviction proceedings, but could not do so because the tenants submitted a declaration under the Eviction Moratorium.  *Id.*

Title One has also received such declarations from other tenants.  Another tenant of one of the properties that Title One manages, located in Riverdale, Georgia, owes approximately $7,500 in unpaid rent.  *Id.* ¶ 8.  Title One initiated eviction proceedings against this tenant and obtained a writ of possession, which the court rescinded after the tenant submitted a declaration under the Eviction Moratorium.  *Id.* ¶ 9.

But for the Eviction Moratorium, Plaintiffs would evict tenants who have not paid rent and lease  their properties to tenants who will pay.  *See* Fordham Decl. ¶ 13; Gilstrap Decl. ¶ 10.  Because of the Eviction Moratorium, Plaintiffs have been prevented from doing so.  *See* Fordham Decl. ¶ 12; Gilstrap Decl. ¶ 7.

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *Capital Area Immigrants' Rights Coal. v. Trump*, --- F. Supp. 3d ---, ---, 2020 WL 3542481, at *5 (D.D.C. June 30, 2020) (internal quotation marks and citations omitted).  In "a case involving review of a final agency action under the Administrative Procedure Act," summary judgment "serves as the mechanism for deciding, as a matter

of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* (internal quotation marks and citations omitted). Under the APA, a court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2).

## ARGUMENT

This Court should declare unlawful and vacate the Eviction Moratorium because it is procedurally and substantively unlawful. The Eviction Moratorium is procedurally unlawful because the CDC did not follow the APA's notice-and-comment requirement or consider its impact on small businesses, like Plaintiffs, as required by the Regulatory Flexibility Act. Substantively, the Eviction Moratorium exceeds the CDC's statutory authority, reflects arbitrary and capricious decision-making, and raises serious constitutional questions.

## I.    The CDC Did Not Follow Rulemaking Procedures Required by Statute.

The Eviction Moratorium is a rule issued "without observance of procedure required by law" because it is a rule the CDC issued without complying with the APA's notice-and-comment procedures and without conducting the analysis required by the Regulatory Flexibility Act. *Id.*

### A.    The Eviction Moratorium Violates the APA's Notice-and-Comment Requirement.

The Eviction Moratorium is procedurally invalid because it violates the APA's notice-and-comment requirement. The APA requires agencies to issue rules through a notice-and-comment process prescribed by statute. *See id.* § 553. The Eviction Moratorium was subject to the APA's notice-and-comment requirement because it is final agency action in the form of a legislative rule, *see id.* §§ 551(4), 704, and because no good cause excuses the CDC's failure to comply, *see id.* § 553(b)(3).

9

*First*, the Eviction Moratorium is final agency action subject to judicial review under the APA. *See id.* § 704. "Agency actions are final if two independent conditions are met: (1) the action marks the consummation of the agency's decision-making process . . . and (2) it is an action by which rights or obligations have been determined, or from which legal consequences will flow." *Ipsen Biopharm., Inc. v. Azar*, 943 F.3d 953, 955–56 (D.C. Cir. 2019) (citations omitted) (concluding designation of pricing information was final agency action). The Eviction Moratorium marks "the consummation" of the CDC's decision-making process with respect to whether to prohibit evictions in response to the COVID-19 pandemic. *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020) (holding EPA rule was final agency action). The Eviction Moratorium also determines Plaintiffs' rights and obligations with respect to their property in a way that carries criminal consequences. *See Ipsen*, 943 F.3d at 957 ("increased risk of prosecution and penalties constitutes a 'legal consequence'").

*Second*, the Eviction Moratorium is a "legislative rule" subject to the APA's notice-and-comment requirement. Under the APA, "substantive" or "legislative" rules having the "force and effect of law" must be issued through the APA's notice-and-comment process. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96, 101 (2015). The Eviction Moratorium indisputably has the force and effect of law because it uses mandatory language—"shall not evict"—to prohibit landlords from initiating eviction proceedings, subject to criminal enforcement and penalties. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2420 (2019) ("An enforcement action must . . . rely on a legislative rule, which (to be valid) must go through notice and comment."); *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382–83, 385 (D.C. Cir. 2002) (noting a "change in substantive law or policy," imposed through "binding obligations," makes a rule legislative). In doing so, the Eviction Moratorium expressly invokes Congress's delegation of legislative authority in Section 361 of the Public Health Service Act. *See* 85 Fed. Reg. at 55,293; *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993) (noting invocation of delegated legislative authority characterizes a legislative rule). The CDC's decision to label the

Eviction Moratorium as an "order" is irrelevant because "courts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*, when deciding whether statutory notice-and-comment demands apply." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019).

*Third*, no good cause excuses the CDC's failure to follow the APA's notice-and-comment procedures. The D.C. Circuit has made clear that "the good cause exception 'is to be narrowly construed and only reluctantly countenanced.'" *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (internal quotation marks and citations omitted). The CDC contends that it "would be impracticable and contrary to the public health, and by extension the public interest," to subject the Eviction Moratorium to notice and comment during the COVID-19 emergency. 85 Fed. Reg. at 55,296. But this is nothing more than a blanket and "unsupported assertion" that good cause excuses its compliance with the APA. *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 707 (D.C. Cir. 2014). The CDC's failure to explain its own delay is telling.

"Notice and comment can only be avoided in truly exceptional emergency situations, which notably, *cannot arise as a result of the agency's own delay*." *Wash. All. of Tech. Workers v. DHS*, 202 F. Supp. 3d 20, 26 (D.D.C. 2016) (emphasis added); *Envt'l Def. Fund, Inc. v. EPA*, 716 F.2d 915, 921 (D.C. Cir. 1983) ("[T]he good cause exception does not apply when an alleged 'emergency' arises as the result of an agency's own delay."). The CDC conflates the public health emergency created by the pandemic with the timing emergency created by its own delay. COVID-19 did not become an emergency in September 2020, but months earlier—in January 2020. *See* HHS Emergency Declaration. The CDC knew about the pandemic, and its economic and public health consequences, for months before issuing the Eviction Moratorium. It likewise knew, when Congress enacted the CARES Act eviction moratorium in March 2020, that federal statutory eviction relief would expire in July 2020. In light of this knowledge, the CDC could have initiated notice and comment months earlier, while renters had

the benefit of the CARES Act moratorium as well as numerous state and local eviction relief measures, and there would have been no "emergency."

Instead, the CDC waited months to issue a rule. Tellingly, it waited to issue its procedurally defective regulation until after the President directed it to take action—once the CARES Act eviction moratorium had expired. But a belated executive imperative does not justify circumventing the well-established procedural requirements of the APA. *See Wash. All. of Tech. Workers*, 202 F. Supp. 3d at 26 (an agency cannot "show an 'emergency'" when it "ha[s] been aware of the problem" but "nonetheless failed to take action"). The CDC cannot invoke an emergency justification for avoiding notice and comment.

### B.     The Eviction Moratorium Violates the Regulatory Flexibility Act.

The Eviction Moratorium is also procedurally invalid because the CDC issued its new rule without complying with the Regulatory Flexibility Act ("RFA"). The RFA "set[s] out precise, specific steps an agency must take" to assess the economic impact of rules on small businesses like Plaintiffs. *Aeronautical Repair Station Ass'n v. FAA*, 494 F.3d 161, 178 (D.C. Cir. 2007). It requires agencies, in promulgating rules subject to the APA's notice-and-comment requirement, to "prepare a final regulatory flexibility analysis" addressing, among other considerations, the number of "small entities" to which the rule applies and the steps the agency has taken to "minimize the significant economic impact" on those entities. 5 U.S.C. § 604(a). A regulatory flexibility analysis is excused when an agency head certifies that a rule "will not . . . have a significant economic impact on a substantial number of small entities" subject to its requirements. *Id.* § 605(b).

The CDC was required to conduct a regulatory flexibility analysis or certify that the statute did not require one for the same reasons that the CDC was required to follow the APA's notice-and-comment procedures. *See id.* § 604(a) (requiring a regulatory flexibility analysis "[w]hen an agency promulgates a final rule" subject to notice-and-comment procedure). The CDC indisputably did not

12

comply with the RFA's procedural requirements.  "The statute requires that the agency conduct the relevant analysis or certify 'no impact' for those small businesses that are 'subject to' the regulation, that is, those to which the regulation 'will apply.'"  *Aeronautical Repair Station Ass'n*, 494 F.3d at 177 (quoting *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001)).  The CDC did not take either of these steps.  It did not prepare a final regulatory flexibility analysis in connection with the Eviction Moratorium.  Nor has Director Redfield certified, in order to excuse compliance with this requirement, that the Eviction Moratorium will not "have a significant economic impact on a substantial number of small entities."  5 U.S.C. § 605(b).

Had the CDC conducted this analysis, it would have discovered that the Eviction Moratorium impacts 10-11 million landlords, most of whom are small businesses like the Plaintiffs.  Cororaton Decl. ¶¶ 6–7.  Individual landlords like Plaintiffs in this case—not institutional investors—own and manage 72% of rental properties.  *Id.* ¶ 7.  The CDC also would have discovered that landlords' economic losses as a result of the CDC's Eviction Moratorium amount to $55.3 to $76 billion.  *Id.* ¶ 16.  The CDC should have assessed these economic impacts on Plaintiffs and other small businesses under the RFA before issuing the Eviction Moratorium.

## II.     The Eviction Moratorium Exceeds the CDC's Statutory Authority.

Even if the Eviction Moratorium were procedurally valid, the purported source of authority for the CDC's nationwide Eviction Moratorium—Section 361 of the Public Service Health Act—does not authorize the CDC to regulate all rental properties in the United States.  42 U.S.C. § 264(a).  The CDC cannot demonstrate statutory authority for the Eviction Moratorium under the two methods that courts use to analyze an agency's exercise of its statutory authority: either the "major rules" doctrine or the traditional *Chevron* two-step framework.  *First*, the CDC lacks statutory authority under the major rules doctrine because nowhere in Section 361 did Congress clearly delegate authority for the CDC to make a decision of such political and economic significance.  *Second*, the CDC lacks

statutory authority under the *Chevron* framework because Congress unambiguously foreclosed the CDC from imposing the nationwide Eviction Moratorium in Section 361 and in the temporary eviction moratorium that Congress expressly adopted and allowed to expire in the CARES Act. *Third*, the CDC's interpretation of Section 361 as authorizing the Eviction Moratorium is not entitled to *Chevron* deference because if the CDC is correct, it would have unbounded authority to adopt any type of economic regulation that would serve the public interest. "Regardless of how serious the problem an administrative agency seeks to address . . . it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 546 (D.C. Cir. 2020) (quoting *Brown & Williamson*, 529 U.S. at 125).

### A.   Congress Has Not Clearly Authorized the CDC to Impose a Nationwide Moratorium on Evictions.

The CDC lacks clear authority to block evictions on all rental properties in the United States. The absence of clear authority for such major action is fatal to the Eviction Moratorium

Congress must clearly authorize an agency to issue a major rule (or decide a major question) because courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *UARG*, 573 U.S. at 324 (quoting *Brown & Williamson*, 529 U.S. at 133). An ambiguous delegation of statutory authority is insufficient for an agency to decide a major question because "Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." *Brown & Williamson*, 529 U.S. at 160; *see also Merck & Co. v. HHS*, 962 F.3d 531, 540 (D.C. Cir. 2020); *Loving v. IRS*, 742 F.3d 1013, 1021 (D.C. Cir. 2014). Indeed, courts "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency," *Brown & Williamson*, 529 U.S. at 133, because Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one

14

might say, hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Thus, "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' [courts] typically greet its announcement with a measure of skepticism." *UARG*, 573 U.S. at 324 (quoting *Brown & Williamson*, 529 U.S. at 159).

Under this major rules doctrine, the Supreme Court has "rejected agency demands that [the Court] defer to their attempts to rewrite rules for billions of dollars in healthcare tax credits, to assume control over millions of small greenhouse gas sources, and to ban cigarettes." *Gundy v. United States*, 139 S. Ct. 2116, 2141–42 (2019) (Gorsuch, J., dissenting); *see also MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218 (1994) (eliminating tariff filing requirement for telecommunications carriers). For its part, the D.C. Circuit has applied the major rules doctrine to reject the Department of Labor's interpretation of the Davis-Bacon Act, *Dist. of Columbia v. Dep't of Labor*, 819 F.3d 444, 446 (D.C. Cir. 2016), the Internal Revenue Service's interpretation of a tax statute to authorize new regulation of hundreds of thousands of tax-return preparers, *Loving*, 742 F.3d at 1021, and the Department of Health & Human Service's interpretation of the Social Security Act to require drug manufacturers to disclose their prices, *Merck & Co.*, 962 F.3d at 540.

There is no question that imposing a nationwide moratorium on evictions is likewise a decision of "vast 'economic and political significance.'" *UARG*, 573 U.S. at 324. The Eviction Moratorium impacts nearly 42 million rental units in the United States, which are owned by 10-11 million landlords. Cororaton Decl. ¶¶ 4, 6. The CDC estimates that "as many as 30-40 million people in America could be at risk of eviction" absent the Eviction Moratorium. 85 Fed. Reg. at 55,295. There are 12.6 to 17.3 million rental households at risk of eviction that are likely to take advantage of the CDC's Eviction Moratorium. Cororaton Decl. ¶ 11.

The rental property market in the United States "constitut[es] a significant portion of the American economy." *Brown & Williamson*, 529 U.S. at 159. The Eviction Moratorium is "a major rule

15

under the Congressional Review Act," 85 Fed. Reg. at 55,296, because it will have "an annual effect on the economy of $100,000,000 or more,"  5 U.S.C. § 804(2).  Indeed, rental payments amount to $552.18 billion each year.  Cororaton Decl. ¶ 8.  Accordingly, landlords stand to lose billions of dollars as a result of the Eviction Moratorium.  According to the CDC's own data, the rent not paid by the 12.6 to 17.3 million rental households likely to take advantage of the CDC's Eviction Moratorium amounts to $55.3 to $76 billion.  *Id.* ¶ 16.  If the Eviction Moratorium is extended for twelve months, the rent not paid by these 12.6 to 17.3 million rental households likely to take advantage of the CDC's Eviction Moratorium would increase to $165.9 to $228.1 billion. *Id.*  ¶ 17.

Moreover, eviction moratoria during COVID-19 have been the subject of "earnest and profound debate across the country." *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006).  Forty-two states imposed eviction moratoria since the start of COVID-19.  *See* Nat'l Ass'n of Realtors®, *COVID-19 Industry Impact Watch* (Nov. 5, 2020), *available at* https://realtorparty.realtor/wp-content/uploads/dlm_uploads/2020/11/NAR-IIW-11.19.2020_Final.pdf.   At the federal level, Congress debated and passed into law a nationwide moratorium on evictions as part of the CARES Act, but that moratorium expired by operation of law on July 24, 2020.  Pub. L. 116-136, § 4024.

Yet Section 361 does not "clearly" authorize the CDC to impose a nationwide moratorium on evictions.  *UARG*, 573 U.S. at 324.  The statute says nothing about halting evictions "to prevent the introduction, transmission, or spread of communicable diseases." 42 U.S.C. § 264(a).  Congress knows how to expressly authorize a nationwide eviction moratorium because it did so in the CARES Act. Pub. L. 116-136, § 4024.  If the CDC could suddenly find preexisting authority to impose a nationwide eviction moratorium, it would "bring about an enormous and transformative expansion in [the CDC's] regulatory authority without clear congressional authorization," *UARG*, 573 U.S. at 324, because the CDC now has "jurisdiction to regulate an industry constituting a significant portion of the American economy," *Brown & Williamson*, 529 U.S. at 159.

16

All too often the executive branch attempts to circumvent the legislative process by imposing through executive authority measures that Congress fails to adopt through legislation. *See, e.g., U.S. House of Representatives v. Mnuchin*, 976 F.3d 1, 4 (D.C. Cir. 2020) (border wall). That is precisely what happened here. When the CARES Act eviction moratorium expired, the President directed the CDC to extend it using executive authority: "With the failure of the Congress to act, my Administration must do all that it can to help vulnerable populations stay in their homes in the midst of this pandemic. . . . . Unlike the Congress, I cannot sit idly and refuse to assist vulnerable Americans in need." Executive Order § 1. In response to the Executive Order, the CDC claims to have discovered "in a long-extant statute an unheralded power to regulate" all rental properties in the United States. *UARG*, 573 U.S. at 324. Congress enacted Section 361 of the Public Health Service Act in 1944. Pub. L. 78-410, 58 Stat. 682 (1944). "In the first [75] years after the statute's enactment, the Executive Branch never interpreted the statute to authorize regulation of [rental properties]. But in [2020], the [CDC] decided that the statute in fact did authorize regulation of [rental properties]." *Loving*, 742 F.3d at 1014–15; *see also Dist. of Columbia*, 819 F.3d at 446. The absence of clear authority for the CDC to make a decision of such "vast 'economic and political significance'" is fatal to the CDC's Eviction Moratorium. *UARG*, 573 U.S. at 324.

### B. Congress Unambiguously Foreclosed the CDC From Issuing an Eviction Moratorium.

Even setting aside the major rules doctrine, the CDC's rule is invalid under the familiar *Chevron* framework because "Congress has clearly precluded" the CDC from imposing a nationwide moratorium on evictions. *Brown & Williamson*, 529 U.S. at 126. At *Chevron* Step One, the Court applies "ordinary tools of statutory construction to determine 'whether Congress has directly spoken to the precise question at issue.'" *Merck*, 962 F.3d at 535–36 (quotation omitted). "If the statute resolves it, that is the end of the matter" because the Court must "enforce the statute as Congress directs." *Id.*

17

The Court starts with the text of the statute.  Section 361 of the Public Health Services Act authorizes the CDC "to make and enforce such regulations as in [its] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases."  42 U.S.C. § 264(a). "For purposes of carrying out and enforcing such regulations," the CDC "may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in [its] judgment may be necessary."  *Id.*  Subsections (b)–(d) authorize the CDC to quarantine individuals to prevent the spread of a communicable disease under certain conditions.  *Id.* § 264(b)–(d).  Multiple canons of statutory construction confirm that Congress foreclosed the CDC from issuing the Eviction Moratorium.

*First*, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Brown & Williamson*, 529 U.S. at 132–33 (quotation omitted).  Congress clearly addressed the CDC's authority to regulate the interstate movement of individuals who might spread a communicable disease.  The CDC's authority to prevent the interstate movement of individuals is strictly confined to quarantine. *See* 42 U.S.C. § 264.  Although "any individual reasonably believed to be infected with a communicable disease . . . may be detained for such time and in such manner as may be reasonably necessary" if certain criteria are satisfied, *id.* § 264(d), the statute provides no authority to prevent the interstate movement of individuals by requiring landlords to bear the economic costs of healthy individuals staying in their rental properties after they stop paying rent.

*Second*, "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Brown & Williamson*, 529 U.S. at 132–33.  In the CARES Act, Congress spoke precisely to the question of a nationwide eviction moratorium during COVID-19.  "*During the 120-day period beginning on the date of enactment of this Act*,"

landlords may not "make, or cause to be made, any filing with the court of jurisdiction to initiate a legal action to recover possession of the covered dwelling from the tenant for nonpayment of rent or other fees or charges." Pub. L. No. 116-136, § 4024 (emphasis added). "These words clearly indicate that Congress intended for the statute's protections to expire by operation of law on a date certain," *AT&T Corp. v. FCC*, 369 F.3d 554, 560 (D.C. Cir. 2004), because it decided that the nationwide moratorium on evictions due to COVID-19 shall not extend beyond July 24, 2020—120 days after the enactment of the CARES Act. The CDC's decision to extend and expand the nationwide eviction moratorium flies in the face of Congress's decision to terminate its narrower nationwide eviction moratorium after 120 days.

*Third*, "the special mention of one thing indicates that it was not intended to be covered by a general provision which would otherwise include it." *Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 643 (D.C. Cir. 2000) (quotation omitted). Even if Section 361 had "a range of plausible meanings" at the time of its enactment, "subsequent acts" "can shape or focus those meanings," particularly "where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand." *Brown & Williamson*, 529 U.S. at 143. The fact that Congress took the trouble to enact a temporary eviction moratorium for COVID-19 in the CARES Act strongly suggests that the CDC lacks authority to take the same—or broader—action under Section 361. If CDC had preexisting authority to impose a nationwide eviction moratorium through Section 361, a specific legislative enactment in the CARES Act was unnecessary because the CDC could have issued a temporary eviction moratorium without going through bicameralism and presentment. And if Congress had understood that the CDC already possesses such authority in Section 361, Congress could have directed the CDC to exercise its preexisting authority instead of adopting a free-standing ban on evictions in the CARES Act.

*Fourth*, "one of the most basic interpretive canons, [is] that [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quotations omitted).  Interpreting Section 361(a) as authorizing a nationwide eviction moratorium would render the second sentence of that subsection superfluous.  The first sentence of Section 361(a) contains a delegation providing that the CDC "is authorized to make and enforce such regulations as in [its] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases . . . ."  42 U.S.C. § 264(a). The second sentence elaborates on that delegation: "For purposes of carrying out and enforcing *such regulations*, [the CDC] may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in [its] judgment may be necessary."  *Id.* (emphasis added).  The second sentence would be superfluous if the CDC could adopt any regulation "necessary to prevent the introduction, transmission, or spread of communicable diseases" without regard to the specific actions authorized in the second sentence.  By the same token, the list of measures within the second sentence would be superfluous if the CDC could squeeze any action through the phrase "other measures."

*Fifth*, courts "rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress.'"  *Yates v. United States*, 574 U.S. 528, 543 (2015); *see also United States v. Williams*, 553 U.S. 285, 294 (2008) ("a word is given more precise content by the neighboring words with which it is associated").  Here, "[t]he words immediately surrounding" the phrase "other measures" in Section 264 "cabin the contextual meaning of that term."  *Yates*, 574 U.S. at 543.  "[O]ther measures" is the last phrase in a non-exhaustive list that includes "inspection, fumigation, disinfection, sanitation, pest extermination, destruction of

animals or articles." 42 U.S.C. § 264(a). The phrase "other measures," therefore, cannot refer to any other measure, but only "other measures" akin to those in the list. Each item on the list, beginning with "inspection" and ending with "destruction," describes a step in the process of identifying, treating, and destroying "animals and articles" that could spread the infection to "human beings." Obviously, preventing landlords from evicting nonpaying tenants has no role to play in this process.

*Sixth*, "[a] canon related to *noscitur a sociis, ejusdem generis*, counsels: "[W]here general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Yates*, 574 U.S. at 545 (alterations in original) (internal quotation marks and citations omitted). Here, the enumeration of specific measures—"inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles"—indicates that "other measures" refers to other *similar* measures, not *any* other measure. The phrase "other measures" cannot "be interpreted so generically as to capture" measures that are "as dissimilar as" an eviction moratorium and "pest extermination." *Id.* at 545–46. "Had Congress intended the latter 'all encompassing' meaning . . . 'it is hard to see why it would have needed to include the examples at all.'" *Id.* (quotation omitted).

In sum, Congress unambiguously foreclosed the CDC from imposing a nationwide moratorium on evictions in Section 361 of the Public Health Service Act and Section 4024 of the CARES Act.

### C.    The CDC's Interpretation of Section 361 of The Public Health Service Act Is Unpersuasive.

Even if Section 361 were ambiguous, the CDC's interpretation of the statute as authorizing a nationwide eviction moratorium is not entitled to *Chevron* deference. Although Section 361 authorizes the CDC "to make and enforce" regulations, 42 U.S.C. § 264(a), the CDC did not follow APA notice-and-comment rulemaking procedures before issuing the Eviction Moratorium, *United States v. Mead*

*Corp.*, 533 U.S. 218, 226–27 (2001); *Fogo De Chao (Holdings) Inc. v. DHS*, 769 F.3d 1127, 1136 (D.C. Cir. 2014).  Nor does the Eviction Moratorium reflect "careful consideration . . . given the question over a long period of time" because the CDC issued the Eviction Moratorium one month after the President's executive order without providing any analysis of the statute. *Barnhart v. Walton*, 535 U.S. 212, 222 (2002).  "In addition, [courts] generally do not apply *Chevron* deference when the statute in question is administered by multiple agencies," *Kaufman v. Nielsen*, 896 F.3d 475, 484 (D.C. Cir. 2018), and Section 361 is administered by both the CDC and FDA, *see* Control of Communicable Diseases; Apprehension and Detention of Persons With Specific Diseases; Transfer of Regulations, 65 Fed. Reg. 49,906 (Aug. 16, 2000); *United States v. Regenerative Scis., LLC*, 878 F. Supp. 2d 248, 262 (D.D.C. 2012), *aff'd*, 741 F.3d 1314 (D.C. Cir. 2014).  Accordingly, the CDC's interpretation of Section 361 is only entitled to "respect" according to its "power to persuade." *Mead*, 533 U.S. at 235 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).  But it does not persuade.

The breadth and novelty of the CDC's interpretation of Section 361 "strongly buttresses" the conclusion that the statute does not authorize a nationwide eviction moratorium. *Dist. of Columbia*, 819 F.3d at 446.  If Section 361 authorizes the CDC's Eviction Moratorium, the statute "would seem to give it unbridled power to promulgate any regulation . . . that would have the arguable effect of" preventing the spread of a communicable disease. *Merck*, 962 F.3d at 540.  Indeed, there would be no limit to the measures that the CDC could unilaterally impose—a ban on foreclosures, a nationwide lockdown, church and business shutdowns, or a restriction on gatherings.  "This suggests a staggering delegation of power, far removed from ordinary administration." *Id.*

Moreover, the Secretary of HHS did not view Section 361 or 42 C.F.R. § 70.2 as authorizing such sweeping measures when she delegated the relevant authority to the CDC.   Prior to 2000, all Section 361 authority was delegated to the Food & Drug Administration via the Secretary. *See Indep. Turtle Farmers of La., Inc. v. United States*, 703 F. Supp. 2d 604, 619 n.18 (W.D. La. 2010).  Then, in 2000,

the Secretary transferred some Section 361 authority to the CDC.  *See* 65 Fed. Reg. 49,906.  Describing the powers delegated by Section 361 generally, the Secretary's final rule stated that "these regulations provide the Secretary with the authority *to apprehend, detain, or conditionally release individuals* to prevent the spread of specified communicable diseases." *Id.* (emphasis added).  The rule further stated that the "CDC will have *authority for interstate quarantine over persons*, while FDA will retain regulatory authority over animals and other products that may transmit or spread communicable diseases." *Id.* (emphasis added).  This transfer included the authority now contained in 42 C.F.R. § 70.2.  *See id.* (noting, *inter alia*, that 21 C.F.R. § 1240.30 authority would be transferred to 42 C.F.R. § 70.2).  Nothing in this rule suggests that the Secretary ever understood the statute as conferring on HHS (or any of its components) a broad authority encompassing such measures as the Eviction Moratorium, nor that she intended to confer such authority on the CDC by regulation.

Certainly, by its own terms, the regulation disclaims the ability to squeeze the Eviction Moratorium out of the phrase "other measures."  The regulation states that the CDC Director "may take such measures to prevent such spread of the diseases as he/she deems reasonably necessary, including inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection." *Id.*  Thus, the CDC cannot rely upon the statutory reference to "other measures" as a source of authority for the Eviction Moratorium, because its regulatory authority is narrower.

The Eviction Moratorium is also far removed from other cases in which courts have upheld notice-and-comment regulations issued pursuant to Section 361.   Courts have upheld the government's authority to regulate the sale of animals and articles that could spread a communicable disease. *Regenerative Scis., LLC*, 878 F. Supp. 2d at 262 (reviewing regulation governing the manufacture of human cell or tissue products); *Pub. Citizen v. Heckler*, 602 F. Supp. 611, 613 (D.D.C. 1985) (recognizing authority to regulate the sale of raw milk); *Louisiana v. Mathews*, 427 F. Supp. 174, 176

(E.D. La. 1977) (reviewing regulation banning the sale of small turtles); *Indep. Turtle Farmers of La., Inc.*, 703 F. Supp. 2d at 619–20 (same).  But a moratorium on evicting individuals from rental properties does not resemble an effort to stop an animal or article from spreading a communicable disease.

Any suggestion that the CDC has the same authority as the states to combat the economic and health challenges posed by COVID-19 is misguided.  "In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder. The States have broad authority to enact legislation for the public good—what [courts] have often called a 'police power.'  The Federal Government, by contrast, has no such authority . . . ."  *Bond v. United States*, 572 U.S. 844, 854 (2014) (quoting *United States v. Lopez*, 514 U.S. 549, 567 (1995)).  "Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials *of the States* 'to guard and protect.'"  *S. Bay Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring) (emphasis added).  For its part, the CDC "literally has no power to act . . . unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), because the CDC's "power to regulate in the public interest must always be grounded in a valid grant of authority from Congress," *Brown & Williamson*, 529 U.S. at 161.  Thus, the state eviction moratoria issued pursuant to police power say nothing about the CDC's authority to take the same action pursuant to delegated authority from Congress.

Moreover, the CDC's interpretation of Section 361 implicates "substantial constitutional question[s]." *Merck*, 962 F.3d at 540–41.  As explained below, Section 264 would violate the separation of powers if it contains a legislative delegation of power so expansive as to authorize an eviction moratorium—what Congress did expressly in the CARES Act.  The Eviction Moratorium also violates the Takings Clause, the Due Process Clause, and the First Amendment.  To avoid these serious constitutional problems, the Court should reject the CDC's interpretation of Section 264 as unreasonable.  *P.J.E.S. v. Wolf*, No. 1:20-cv-2245 (EGS/GMH), 2020 WL 5793305, at *14 (D.D.C.

Sept. 25, 2020) (rejecting the government's "breathtakingly broad" interpretation of Section 362 of the Public Health Service Act, 42 U.S.C. § 265, because "it would raise serious constitutional issues").

Although a federal district court in Georgia recently upheld the CDC's authority to issue the Eviction Moratorium, that decision is not persuasive authority here. *See Brown v. Azar*, No. 1:20-CV-03702, 2020 WL 6364310 (N.D. Ga. Oct. 29, 2020). *First*, the Georgia case arose in a different posture. The Georgia court denied a motion to preliminarily enjoin the CDC's Eviction Moratorium because "Plaintiffs have not *clearly* shown a *substantial* likelihood of success on the merits as to their claim that the Order was promulgated without statutory and regulatory authority." *Id.* at *10 (emphases added). But in this case, Plaintiffs do not need to satisfy a heightened standard to prevail on the merits because they do not seek a preliminary injunction.

*Second*, the Georgia court did not address the major rules doctrine or consider the impact of Congress's enactment of a temporary eviction moratorium in the CARES Act.

*Third*, the Georgia court's analysis of the CDC's authority under Section 361 reflects "a shortsighted view of the applicable law." *N.Y. Stock Exch. LLC*, 962 F.3d at 546. The Georgia court viewed the first sentence in Section 361(a)—"to make and enforce such regulations as in his judgment are necessary," 42 U.S.C. § 264(a)—as granting rulemaking power "not substantially different from statutes that give an agency the authority to 'prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of the Act.'" *Brown*, 2020 WL 6364310, at *7. "Thus, Congress' intent, as evidenced by the plain language of the delegation provision, is clear: Congress gave the Secretary of HHS broad power to issue regulations necessary to prevent the introduction, transmission or spread of communicable diseases." *Id.* But that simplistic analysis would not pass muster in the D.C. Circuit. *N.Y. Stock Exch. LLC*, 962 F.3d at 553 (rejecting SEC's reliance on general rulemaking authority "to make such rules and regulations as may be necessary or appropriate to implement the provisions of [the Act]" without reference to any other authority). As the D.C. Circuit

recently explained, "[a]n agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority." *Id.* (quoting *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006)). "A court does not simply assume that a rule is permissible because it was purportedly adopted pursuant to an agency's rulemaking authority." *Id.* at 546 (citing *Michigan v. EPA*, 576 U.S. 743 (2015)). So too here. The CDC's general authority in Section 361(a) "to make and enforce such regulations as in [its] judgment are necessary," 42 U.S.C. § 264(a), "does not afford the agency authority to adopt regulations as it sees fit with respect to all matters covered by the agency's authorizing statute," *N.Y. Stock Exch. LLC*, 962 F.3d at 554.

In sum, the CDC exceeded its statutory authority when it issued the Eviction Moratorium.

## III.   The Eviction Moratorium is Arbitrary and Capricious.

The APA requires this Court to hold unlawful and set aside agency decisions that are arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 42–43 (1983). Agency action is arbitrary and capricious if it is not "reasonable and reasonably explained." *Ind. Boxcar Corp. v. R.R. Ret. Bd.*, 712 F.3d 590, 591 (D.C. Cir. 2013) (Kavanaugh, J.) (vacating agency determination). Agency action is also arbitrary and capricious if it fails to "comply with [the agency's] own regulations," *Nat'l Env't Dev. Ass'n Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quoting *Environmentel, LLC v. FCC*, 661 F.3d 80, 85) (D.C. Cir. 2011)) (vacating agency directive), or fails to consider an important aspect of the problem, *State Farm*, 463 U.S. at 42. The Eviction Moratorium fails this basic test for several reasons.

*First,* the Eviction Moratorium fails to comply with the CDC's own regulation implementing Section 361 of the Public Health Service Act. That regulation authorizes the Director to take measures to "prevent the spread of . . . communicable diseases" only when he "determines that the measures taken by health authorities of any State . . . are insufficient" to prevent the interstate spread of communicable disease. 42 U.S.C. § 70.2. The Eviction Moratorium fails to satisfy this regulatory

26

requirement because it includes only a conclusory statement that "measures by states, localities, or U.S. territories that do not meet or exceed" its scope are "insufficient to prevent the interstate spread of COVID-19." *See* 85 Fed. Reg. at 55,296. But "[s]tating that a factor was considered . . . is not a substitute for considering [it]." *Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) (quoting *Getty v. Fed Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986)). The agency must instead provide more than "conclusory statements" to demonstrate that it complied with its own regulation. *Getty*, 805 F.2d at 1057.

Second, the CDC failed to explain how the cited regulation authorizes an economic measure like the Eviction Moratorium. The regulation expressly authorizes only "inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection." 42 C.F.R. § 70.2. On its face, like Section 361, Section 70.2 does not authorize the sweeping regulation of economic transactions that the CDC attempted in the Eviction Moratorium, nor does this kind of economic regulation have any relationship with the listed examples of agency action Section 70.2 expressly authorizes. *See supra* pp. 20–21. The CDC does not explain why such sweeping economic measures are necessary under Section 70.2 to prevent the interstate spread of disease, particularly given its note that only 15% of moves in any given year cross state lines. *See* 85 Fed. Reg. 55,295. And these measures have nothing to do with quarantine to stop the interstate spread of disease, the entire purpose of Part 70 of the Code of Federal Regulations. Any explanation that the CDC offers in this litigation will be nothing more than post hoc explanation of counsel. *See, e.g., Clean Wis. v. EPA*, 964 F.3d 1145, 1163, 1167 (D.C. Cir. 2020) (holding EPA designations arbitrary and capricious because "we cannot accept . . . counsel's *post hoc* rationalizations for agency action.") (quoting *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1138 (D.C. Cir. 2013)).

Third, the CDC failed to consider and justify the costs of the Eviction Moratorium. "[C]ost-benefit analysis is a central part of the administrative process." *Metlife, Inc. v. Fin. Stability Oversight*

27

*Council*, 177 F. Supp. 3d 219, 240 (D.D.C. 2016) (invalidating agency designation).  That is because reasoned agency decisionmaking "requires paying attention to the advantages *and* the disadvantages" of the decision.  *Michigan*, 576 U.S. at 753 (holding EPA unreasonably deemed cost irrelevant to its decision to regulate power plants); *see also* Exec. Order No. 12866 §§ 3(f), 6(a)(3)(C), 58 Fed. Reg. 51,735 (Sept. 30, 1993) (directing agencies to weigh costs and benefits of "significant" regulations with an effect on the economy of $100 million or more).  But the CDC undertook no analysis at all of the costs it would impose on the nation's 10-11 million landlords by issuing the Eviction Moratorium.  Had the CDC considered the economic effect that the Eviction Moratorium would have on landlords—especially small businesses, like Plaintiffs, who depend on rental income to pay their mortgages—the CDC would have found that the agency's action unilaterally shifts *billions* of dollars of the pandemic's economic costs from renters to landlords.  *See* Cororaton Decl. ¶ 16.  Despite the fact that the CDC acknowledged that the Eviction Moratorium would impose more than $100 million in costs on the American economy, *see* 85 Fed. Reg. 55,296, it never explained whether these costs are justified by their results.  The CDC also failed to consider the likelihood that a covered person who cannot pay rent now may also not be able to pay rent in the future—potentially depriving landlords of the ability to recover their costs, including late fees and penalties, when the Eviction Moratorium ends.  By failing to consider and reasonably explain its analysis of the costs and benefits of a nationwide Eviction Moratorium, the CDC also failed to consider an important aspect of the problem posed by COVID-19.

*Fourth*, the CDC failed to reasonably explain key terms in the Eviction Moratorium.  For example, the CDC failed to explain why it did not limit the definition of "covered person[s]" under the Eviction Moratorium to those already infected with COVID-19 or the most vulnerable to COVID-19—older adults, those with pre-existing severe illnesses, or those likely to suffer economic consequences as a result of COVID-19.  *See id.* at 55,293.  Nor did the CDC explain why "covered

person[s]" include those who would move to a new location in the same state—by the CDC's estimate, 85% of tenants—if evicted when the purpose of the statute and regulation is to prevent the *interstate* spread of communicable diseases.  *See id.* at 55,295.

The CDC also failed to explain why it excluded from the definition of "covered persons" various other people who might travel or suffer homelessness if forced out of their homes.  The CDC defined "covered person" as one who lives in a "residential property," which excludes individuals at risk of "foreclosure on a home mortgage" and those staying in a "hotel, motel or other guest house rented to a temporary guest or seasonal tenant."  *Id.* at 55,293.  The CDC failed to explain why the rule bars eviction from residential properties, but does not protect homeowners or hotel guests or seasonal tenants—all of whom would contribute to the spread to the spread of COVID-19 if, according to the CDC, they are ejected from their homes.  *See id.*

Moreover, the CDC failed to reasonably explain what it means by "eviction."  The Eviction Moratorium defines "evict" to mean "*any* action . . . to remove or cause the removal of a covered person," which could include any action from the initial step of providing written notice of overdue rent to filing a complaint to ultimately directing the execution of a writ of possession.  *Id.* (emphasis added).  Yet after issuing the Eviction Moratorium, the CDC released an FAQ document that muddies the waters by suggesting that the Eviction Moratorium is not "intended to prevent landlords from starting eviction proceedings."  Centers for Disease Control and Prevention, "HHS/CDC Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19 Frequently Asked Questions," ("FAQ") at 1, *available at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/eviction-moratoria-order-faqs.pdf (last visited Nov. 19, 2020).  As a result of this confusion in the meaning of the term "eviction," some state and local courts have taken the regulation even a step further by requiring a landlord affirmatively to verify before filing an eviction action that the subject tenant is not a "covered person" and has not submitted a declaration under the Eviction

Moratorium.  *See* Montgomery County Administrative Order.  The CDC has failed to provide a clear or workable definition of this essential term.

## IV.    Section 361 of the Public Health Service Act Violates the Nondelegation Doctrine.

Interpreting Section 361 of the Public Health Service Act as authorizing the CDC to issue the Eviction Moratorium would violate the nondelegation doctrine.  Indeed, if Section 361 can be interpreted so broadly as to authorize the Eviction Moratorium, the statute violates Article I's Vesting Clause and the separation of powers.  Under such an expansive construction, Congress would have delegated legislative power to the CDC with no intelligible principle to guide its unbounded discretion.

Article I of the Constitution provides that "[*a*]*ll* legislative Powers herein granted shall be vested in a Congress of the United States."  U.S. Const. art. I, § 1 (emphasis added).  While Congress "may confer substantial discretion on executive agencies to implement and enforce the laws,'" Congress still must "suppl[y] an intelligible principle to guide the delegee's use of discretion."  *Gundy*, 139 S. Ct. at 2123 (plurality op.) (quotation omitted).  And the Eviction Moratorium is no minor matter, but instead a sweeping regulation of basic economic transactions "affect[ing] the entire national economy."  *Whitman,* 531 U.S. at 475.  Under the intelligible principle test, in setting "standards that affect the entire national economy," Congress must provide "substantial guidance." *Id.*

Under the CDC's reading, Section 361 does not supply an intelligible principle.  It provides no direction to guide the CDC's discretion in taking measures to prevent the spread of communicable diseases.  Section 361 authorizes the CDC "to make and enforce such regulations as in [its] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases" from foreign countries and between states.  42 U.S.C. § 264(a).  To enforce such regulations, the CDC "may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to

30

human beings, and other measures, as in [its] judgment may be necessary." *Id.* In the CDC's view, the second sentence of Section 361(a) does not impose any limitation at all on the CDC's authority to adopt regulations "to prevent the introduction, transmission, or spread of communicable diseases." The unbounded language in subsection (a)—"are necessary" and "may be necessary"—if interpreted to allow sweeping regulation reordering basic economic relationships, does nothing to cabin the CDC's discretion to take practically any action to stop the spread of communicable diseases. *See, e.g.*, *A.L.A. Schechter Poultry Corp. v. United States.* 295 U.S. 495, 530 (1935).

Nor does Section 361 as a whole—if construed as the CDC advocates—allow the CDC to discern Congress's "general policy" for appropriate measures to prevent the spread of diseases, let alone the "boundaries of [its] authority" to do so. *Gundy*, 139 S. Ct. at 2129. Under the agency's expansive interpretation, the statute provides no limit to its discretion besides its own "judgment," which is no limit at all. So construed, it is silent on the scope of the CDC's authority, the standards that apply, and how the CDC must balance the various interests at stake when considering whether and how to take action pursuant to subsection (a)'s residual authority. Under the CDC's reading, the statute does not circumscribe what actions the government may take or even require the agency to weigh certain considerations as "restrictions" on its discretion. *Cf. Touby v. United States*, 500 U.S. 160 (1991). The statute provides more detailed instructions and standards for *other* actions, such as the handling of "animals [and] articles" found to be infected and the apprehension and examination of individuals reasonably believed to be infected. 42 U.S.C. § 264(a), (d). But it does not supply a similar "intelligible principle" with respect to the CDC's supposed residual authority to enact sweeping economic regulations that "are" or "may be necessary" to stop the spread of communicable diseases. *Id.* § 264(a).

Granting such unbridled discretion to an agency violates the nondelegation doctrine.

## V.     The Eviction Moratorium Is Unconstitutional.

The Eviction Moratorium also violates the Constitution: It effectuates a taking of private property without just compensation, violates procedural due process, and infringes on Plaintiffs' right of access to the courts.

### A.     The Eviction Moratorium Effectuates an Unconstitutional Taking.

The CDC's Eviction Moratorium is void because it constitutes an unauthorized taking of private property without just compensation in violation of the Fifth Amendment.

The Takings Clause of the Fifth Amendment provides that no "private property [shall] be taken for public use, without just compensation." U.S. Const. amend. V.  An agency's taking of private property for public use is permissible only if the governing statute provides "a clear warrant" for the agency to do so." *Bell Atl. Tel. Cos. v. FCC*, 24 F.3d 1441, 1445–46 (D.C. Cir. 1994) (citation omitted). Courts must apply a narrowing construction "[w]here administrative interpretation of a statute creates" an "identifiable class of cases in which application of [the] statute will necessarily constitute a taking." *Id.* (citation omitted).  This presumption against a federal agency's takings authority is necessary to "prevent[] executive encroachment on Congress's exclusive powers to raise revenue and to appropriate funds." *Id.* (citations omitted).  If the rule were otherwise, agencies could "use statutory silence or ambiguity to expose the Treasury to liability both massive and unforeseen." *Id.*

The Eviction Moratorium constitutes a physical taking of Plaintiffs' property for which the government has not provided just compensation.  "[P]hysical occupation of an owner's property authorized by government constitutes a 'taking.'" *Lorretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 421 (1982).  The Eviction Moratorium is exactly that: a government-authorized physical occupation of Plaintiffs' properties.  It imposes on Plaintiffs an obligation to allow an entire class of tenants to remain in physical possession of Plaintiffs' residential properties even if they do not fulfill their rental obligations.  It has "taken from [Plaintiffs] without compensation, and given to [tenants],

rights in specific property which are of substantial value." *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 601 (1935).  Pursuant to the Eviction Moratorium, Plaintiffs may not exclude from their properties tenants who qualify as "covered persons" and may not make any other use of such properties except to maintain them for these tenants.  In this respect, the Eviction Moratorium eviscerates the landlords' "'right to exclude,' one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Loretto*, 458 U.S. at 433 (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)).  The fact that the Eviction Moratorium may be "temporary rather than permanent is of no consequence," because "compensation is required even when the government's physical occupation is temporary." *Lee v. City of Chicago*, 330 F.3d 456, 474–75 (7th Cir. 2003) (Wood, J., concurring) (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002); *First English Evangelical Lutheran Church v. Cnty. of Los Angeles*, 482 U.S. 304, 318 (1987)).

The Eviction Moratorium also constitutes a regulatory taking of Plaintiffs' property for which the government has not provided just compensation.  The Supreme Court has long held that, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).  "In all instances, the [regulatory takings] analysis must be driven by the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 617–18 (2001)).

The Eviction Moratorium fails this test, because it shifts the collective economic burdens of tenants who are unable to make rent due to the COVID-19 pandemic entirely onto landlords.  While generally applicable landlord-tenants laws, including rent control laws, do not typically constitute regulatory takings, that is not the case when such laws require landlords to singularly bear the burden of tenants facing unique hardships.  In such circumstances, "a transfer of the landlord's property to

33

individual hardship tenants . . . forces private individuals to shoulder the 'public' burden of subsidizing their poor tenants' housing." *Pennell v. City of San Jose*, 485 U.S. 1, 9 (1988).  In assessing whether a regulation has effected a taking, courts must consider "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr*, 137 S. Ct. at 1943.  All three factors weigh in favor of classifying the Eviction Moratorium as a regulatory taking.

The Eviction Moratorium has caused, and continues to cause, significant economic harm to the Plaintiffs and the rest of the nation's 10-11 million landlords.  The nation's landlords stand to lose $55-76 billion as a result of the Eviction Moratorium.  *See* Cororaton Decl. ¶ 16.  In particular, Plaintiffs Fordham and Gilstrap own residential properties with tenants who are many months past due in their rent payments and owe thousands of dollars in unpaid rent.  Fordham Decl. ¶ 9; Gilstrap Decl. ¶¶ 6, 8.  Plaintiffs have lost streams of rental income from these tenants and have also had to pay regular maintenance and utility costs associated with the properties.  *Id.*  The Eviction Moratorium has prevented Plaintiffs from evicting such tenants and finding new tenants willing and able to pay rent.  *Id.*  Although the Eviction Moratorium does not relieve tenants of their obligation to pay rent, it deprives landlords of an important remedy to mitigate their damages and secure paying tenants.  And the (remote) prospect of collecting a future damages award is not sufficient to address Plaintiffs' present harm.

The Eviction Moratorium directly interferes with Plaintiffs' "investment-backed expectations." *Murr*, 137 S. Ct. at 1943.  Plaintiffs Fordham and Gilstrap each own dozens of residential properties and have invested significant capital in purchasing and maintaining these properties, including taking out mortgages on the properties.  Fordham Decl. ¶ 2; Gilstrap Decl. ¶ 2. Plaintiffs made these investments with the expectation that they would derive consistent rental income from tenants leasing these properties.  *Id.*  The Eviction Moratorium has therefore interfered with

Plaintiffs' investment-backed expectations because it has made unavailable a fundamental legal mechanism through which they could protect themselves from delinquent tenants.

The "character" of the government action also weighs in favor of finding that the Eviction Moratorium has resulted in a taking.  In assessing this factor, the Supreme Court has explained that a taking "may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) (citation omitted).  The Eviction Moratorium is far closer to the former than the latter.  As explained above, the Eviction Moratorium authorizes a physical occupation of Plaintiffs' property over their objection.  *See supra* pp. 32–36.  Nor is the Eviction Moratorium a mere "adjust[ment] [of] the benefits and burdens of economic life" that characterizes ordinary landlord-tenant law.  *Penn Cent.*, 438 U.S. at 124.  Instead, the CDC has responded to the COVID-19 crisis by singularly burdening residential landlords with a significant share of the pandemic's costs.  In sum, the Eviction Moratorium constitutes a regulatory taking for which the government has not provided just compensation.

Because the Eviction Moratorium constitutes a taking for purposes of the Fifth Amendment, it is void unless the governing statute provides a "clear warrant" to the CDC to take such action in order for it to be lawful.  *Bell Atl.*, 24 F.3d at 1446.  But far from providing a "clear warrant," Section 361 does not remotely grant the CDC authority to issue the Eviction Moratorium.  *Supra* pp. 13–26.  While the statute does allow for certain specific actions that might qualify as takings, *see* 42 U.S.C. § 264(a) (allowing the CDC to provide for the "destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings"), the listed examples only underscore that Congress did not confer takings authority over other types of property, let alone a "clear warrant" to issue a nationwide moratorium on tenant evictions, *Bell Atl.*, 24 F.3d at

1446. Because Congress did not clearly authorize the CDC to take the properties at issue here, the Court should hold unlawful and set aside the Eviction Moratorium.

### B.      The Eviction Moratorium Violates Due Process.

For similar reasons, the Eviction Moratorium also deprives Plaintiffs of procedural due process.  "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"  *Ralls Corp. v. CFIUS*, 758 F.3d 296, 315 (D.C. Cir. 2014).  The fact that a property interest is recognized under state law "is enough to trigger the protections of the Due Process Clause."  *Id.* at 316.  Plaintiffs here indisputably own and hold the right to institute eviction proceedings from the properties at issue under state law.  *See* Fordham Decl. ¶ 5; Gilstrap Decl. ¶ 2, 4.  And the Eviction Moratorium would subject them to criminal penalties for exercising those rights.

The Eviction Moratorium deprives Plaintiffs of their interests in these properties without satisfying the requirements of due process.  "The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and the opportunity to meet it."  *Propert v. Dist. of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976)).  "[H]owever weighty the governmental interest may be in a given case, the amount of process required can never be reduced to zero."  *Id.* at 1332.  And the Eviction Moratorium does just that.  Landlords are deprived of their property rights—and, potentially, their ability to collect overdue rent in the future—without any hearing or process, including the process prescribed by the APA.

In addition, the Fifth Amendment's Due Process Clause "requires the invalidation of laws that are impermissibly vague" because they do not "give fair notice of conduct that is forbidden or required."  *FCC v. Fox Television Stations*, 567 U.S. 239, 253 (2012).  The "void-for-vagueness" doctrine both "guarantees that ordinary people have 'fair notice'" of the conduct a law proscribes and "guards

against arbitrary or discriminatory law enforcement by insisting" that it provide "standards to govern" enforcement actions. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). As noted above, the CDC's definition of "eviction" does not provide landlords fair notice of what actions they can and cannot take—on pain of civil and criminal penalties—to pursue their property rights under the Eviction Moratorium. *See supra* pp. 36–37. Indeed, the Eviction Moratorium leaves "grave uncertainty about how to estimate the risk posed" by any step a landlord may take toward evicting a non-paying tenant. *Johnson v. United States*, 576 U.S. 591, 597 (2015). The term "*any* action . . . to remove or cause the removal of a covered person," 85 Fed. Reg. at 55,293 (emphasis added), could include even correspondence informing a tenant that he owes overdue rent, the first step in many cases in evicting a tenant under state law. That the CDC has attempted to backtrack from this capacious and confusing rule by issuing a non-binding FAQ that putatively narrows the grounds for liability only underscores its failure to articulate a workable standard in the Eviction Moratorium itself.

## C.     The Eviction Moratorium Deprives Landlords of Access to Courts.

In addition to its other constitutional flaws, the Eviction Moratorium deprives Plaintiffs of their constitutional right of access to state courts to pursue the lawful remedy of eviction. The right of access to courts is "one of 'the most precious of the liberties safeguarded by the Bill of Rights.'" *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002) (quoting *Mine Workers v. Ill. Bar Ass'n*, 389 U.S. 217, 222 (1967)). That right is "an aspect of the First Amendment right to petition the Government for redress of grievances," *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983), and is also grounded in the Article IV Privileges and Immunities Clause, the Due Process Clauses, and the Equal Protection Clause, *Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002). The government violates this right when an "official action is presently denying an opportunity to litigate for a class of potential plaintiffs," such as when a prisoner is denied access to a law library or when a filing fee closes the courthouse door to an indigent plaintiff asserting family-law rights. *Id.* at 413.

When a federal action frustrates a plaintiff's ability to file and prosecute non-frivolous suits in state court, that action both infringes on the right of access to courts and raises serious comity and federalism concerns. *See Bill Johnson's Rests.*, 461 U.S. at 748 (holding that a federal agency could not "halt the prosecution of a state-court lawsuit, regardless of the plaintiff's motive, unless the suit lacks a reasonable basis in fact or law"); *Local Union No. 25, A/W Int'l Bhd. of Teamsters v. NLRB*, 831 F.2d 1149, 1154 n.4 (1st Cir. 1987) (noting that "access to the state courts for purposes of suit" implicates "concerns of comity, federalism , and First Amendment rights"). Thus, "[t]he filing and prosecution of a well-founded lawsuit may not be enjoined as an unfair labor practice, even if it would not have been commenced but for the plaintiff's [retaliatory motive]." *Bill Johnson's Rests.*, 461 U.S. at 743; *see BE & K Constr.*, 536 U.S. at 526–27 (noting the federalism concerns at stake in *Bill Johnson's Restaurants*); *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897–98 (1984) (same).

Here, the Eviction Moratorium deprives Plaintiffs of their right of access to state courts. It expressly prohibits Plaintiffs from taking "*any* action . . . to remove or cause the removal of a covered person from a residential property." 85 Fed. Reg. 55,293 (emphasis added). This broad language suggests Plaintiffs cannot take any action that would "bring about or effect" the removal of a tenant, *Cause*, Black's Law Dictionary (11th ed. 2019)—including pursuing meritorious eviction proceedings in state court—once that tenant has submitted a declaration that conforms with the Eviction Moratorium. Such a prohibition is a prior restraint on Plaintiff's First Amendment right to petition the Court, and Defendants cannot carry their "heavy burden" of justifying such a prohibition, *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971), especially without statutory authority or engaging in the notice-and-comment process, *see supra* pp. 9–12, 13–26.

Even worse, the Eviction Moratorium authorizes criminal penalties, including the possibility of imprisonment, against persons who violate the order by pursuing lawful remedies in state court. *See* 85 Fed. Reg. 55,293. Plaintiffs are unaware of any case where a court has approved the imposition

of federal criminal penalties, based on a federal agency's rule, against a party for pursuing an otherwise valid and meritorious state-law action. Indeed, even when penalties are assessed for *frivolous* federal litigation, they are generally civil penalties and do not include the possibility of jail time. *See* 26 U.S.C. § 6673 (authorizing monetary penalties where taxpayer's position is frivolous or groundless). Unsurprisingly, these harsh after-the-fact penalties have had a chilling effect. *See* Fordham Decl. ¶ 12. Indeed, even if Plaintiff Fordham chose to risk criminal liability, he could not file proceedings in Alabama state court, because judges will not accept them in light of the Eviction Moratorium. *See* Montgomery County Administrative Order. Plaintiffs are thus foreclosed from accessing state courts for the purpose of seeking lawful eviction remedies against nonpaying tenants.

This deprivation of access to courts is unconstitutional. If the federal agency charged with protecting employees from unfair labor practices cannot "halt the prosecution of a state-court lawsuit, regardless of the plaintiff's motive, unless the suit lacks a reasonable basis in fact or law," *Bill Johnson's Rests.*, 461 U.S. at 748, the CDC cannot prohibit Plaintiffs from pursuing meritorious eviction proceedings—and certainly cannot impose criminal penalties on them for doing so.

What is more, all the same federalism concerns that were implicated in *Bill Johnson's Restaurants* are implicated here. *See id.*; *BE & K Constr.*, 536 U.S. at 526–27; *Sure-Tan, Inc. v. NLRB*, 467 U.S. at 897–98; *see also Local Union No. 25*, 831 F.2d at 1154. The CDC's interference with Plaintiffs' right to petition state courts to vindicate their property and contractual rights under state law upsets the delicate balance of our federalist system.

It is no defense for the CDC to argue that the Eviction Moratorium does not deprive Plaintiffs of their access to state courts, because it "is not intended to terminate or suspend the operations of any state or local court." FAQ at 1. The guidance underscores the Eviction Moratorium's authorization of criminal penalties against persons who seek lawful state court remedies, encouraging state courts to "take judicial notice of the CDC Order, and the associated criminal penalties that may

39

be imposed for non-compliance in making a formal judgment about any pending or future eviction action filed." *Id.* Therefore, the guidance does nothing to ameliorate the deprivation of Plaintiffs' right of access to courts. Even under the guidance, Plaintiffs cannot pursue lawful eviction proceedings and risk criminal penalties if they do so.

## VI.    The Court Should Vacate the Eviction Moratorium on an Expedited Basis.

As a remedy for the CDC's procedurally and substantively unlawful agency action, the Court should vacate the Eviction Moratorium. "[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Engr's*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (internal quotation marks and citation omitted); *see also Ill. Pub. Telecomms. Ass'n v. FCC*, 123 F.3d 693, 693 (D.C. Cir. 1997). In particular, an agency's failure to follow the APA's notice-and-comment procedures "is a fundamental flaw" that "almost always" requires vacatur, especially where, as here, the rule in question has an "expansive reach." *Capital Area Immigrants' Rights Coal.*, 2020 WL 3542481, at *22.

Vacatur is also the appropriate remedy because the CDC could not cure its lack of statutory authority on remand. *See Humane Soc'y of the U.S. v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017); *Fox Television Stations v. FCC*, 280 F.3d 1027, 1053 (D.C. Cir. 2002) (vacating rule where "the probability that the [agency] would be able to justify retaining the [rule] is low"). Similarly, the Eviction Moratorium's constitutional defects are not "curable." *Humane Soc'y of U.S.*, 865 F.3d at 615 (vacating rule where defects could not likely be cured).

The Court should also vacate the Eviction Moratorium on an expedited basis. Fed. R. Civ. P. 57 ("The court may order a speedy hearing of a declaratory-judgment action."). Plaintiffs are suffering ongoing economic injury from the Eviction Moratorium, which is causing the nation's landlords billions of dollars in economic harm. Cororaton Decl. ¶ 16. Moreover, the CDC raised the prospect

that the Eviction Moratorium could be "extended" into 2021.  *See* 85 Fed. Reg. at 55,292.  If the Eviction Moratorium is extended, the economic harm caused by the CDC's Eviction Moratorium could increase to more than $200 billion.  Cororaton Decl.  ¶ 17.  Given the scope of the economic harm, the fast-approaching deadline for CDC to extend the moratorium, and the need for certainty about the legal validity of the Eviction Moratorium, the Court should vacate CDC's action on an expedited basis.

## CONCLUSION

For the reasons explained, the Court should grant Plaintiffs' motion for summary judgment, vacate the Eviction Moratorium, and enjoin Defendants from enforcing the Eviction Moratorium.

Dated: November 20, 2020                 Respectfully submitted,

*s/ Brett A. Shumate*
Brett A. Shumate (D.C. Bar No. 974673)
Charlotte H. Taylor (D.C. Bar No. 1024658)
   (application pending)
Megan Lacy Owen (D.C. Bar No. 1007688)
   (*pro hac vice* forthcoming)
Stephen J. Kenny (D.C. Bar No. 1027711)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone:  (202) 879-3939
Facsimile:   (202) 626-1700

Autumn Hamit Patterson
   (Texas Bar No. 24092947)
   (*pro hac vice* forthcoming)
JONES DAY
2727 N. Harwood St.
Dallas, Texas 75201
Telephone:  (214) 220-3939
Facsimile: (214) 969-5100

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2020, a true and correct copy of the foregoing was filed using the Court's CM/ECF system.  In addition, I served the following attorneys via electronic mail on this date:

Eric Beckenhauer
Leslie Cooper Vigen
Steven A. Myers
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-0727
Fax: (202) 616-8470
eric.beckenhauer@usdoj.gov
leslie.vigen@usdoj.gov
steven.a.myers@usdoj.gov

November 20, 2020                          *s/ Brett A. Shumate*
                                          Brett A. Shumate