## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ALABAMA ASSOCIATION OF REALTORS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>Defendants. | No. 20-cv-3377 (DLF) |

## <u>MOTION FOR SUMMARY JUDGMENT</u>

Defendants United States Department of Health and Human Services; Alex M. Azar II, in his official capacity as Secretary of Health and Human Services; United States Department of Justice; William P. Barr, in his official capacity as Attorney General; Centers for Disease Control and Prevention; Robert R. Redfield, in his official capacity as Director of the Centers for Disease Control and Prevention; and Nina B. Witkofsky, in her official capacity as Acting Chief of Staff, Centers for Disease Control and Prevention, by and through undersigned counsel, respectfully move for summary judgment pursuant to Federal Rule of Civil Procedure 56. As explained in the accompanying memorandum of points and authorities, the Order at issue in this case satisfies all relevant legal requirements, and Defendants are entitled to judgment as a matter of law. A proposed order is attached.

Dated: December 21, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ERIC BECKENHAUER
Assistant Director, Federal Programs Branch

/s/ Steven A. Myers
STEVEN A. MYERS
Senior Trial Counsel (NY Bar No. 4823043)
LESLIE COOPER VIGEN
Trial Attorney (DC Bar No. 1019782)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel:  (202) 305-8648
Fax:  (202) 616-8470
E-mail:  steven.a.myers@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ALABAMA ASSOCIATION OF REALTORS, *et al.*,<br><br>    Plaintiffs,<br><br>       v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>    Defendants. | No. 20-cv-3377 (DLF) |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND
<u>IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ....................................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 2

I.      Statutory and Regulatory Background ............................................................ 2

II.     The COVID-19 Pandemic ................................................................................ 4

III.    The CDC Order ................................................................................................ 6

ARGUMENT .............................................................................................................. 8

I.      CDC Acted Within Its Statutory And Regulatory Authority. ......................... 8

        A.      Plain Statutory Language Demonstrates That The Order Falls Within CDC's
                Broad Authority To Prevent the Spread Of Disease. ........................... 9

        B.      Congress Authorized CDC To Take Measures Like The Order At Issue Here. ....... 11

        C.      Canons Of Construction Do Not Negate Congress's Clear Intent To Provide
                CDC Broad Authority To Prevent The Spread Of Disease. .................. 16

        D.      At A Minimum, CDC's Reasonable Interpretation Of The Statute Is Entitled To
                Deference. ............................................................................................ 21

II.     CDC Complied With All Rulemaking Requirements ..................................... 25

        A.      The Order Is Not Subject To Notice And Comment Under The APA. ..... 25

        B.      The CDC Order Is Not Arbitrary Or Capricious. ............................... 27

III.    Plaintiffs' Constitutional Claims Fail ........................................................... 33

        A.      Section 361(a) Contains An Intelligible Principle And Is Thus A Valid
                Delegation. ........................................................................................... 33

        B.      The Order Does Not Effect A Taking Of Plaintiffs' Property. ............ 35

        C.      Plaintiffs Have Identified No Due Process Violation. ........................ 40

        D.      The Order Does Not Interfere With Plaintiffs' Access To Courts. ...... 41

IV.     Any Remedy Should Be Narrowly Tailored. ................................................ 43

CONCLUSION ........................................................................................................ 45

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Baptise v. Kennealy,*
   --- F. Supp. 3d ---, No. 20-11335, 2020 WL 5751572 (D. Mass. Sept. 25, 2020) ....................*passim*

*Air Transp. Ass'n of Am. v. FAA,*
   169 F.3d 1 (D.C. Cir. 1999)................................................................................... 26, 30

*Ali v. Fed. Bureau of Prisons,*
   552 U.S. 214 (2008) ....................................................................................18, 19, 20

*Alliance for Natural Health v. Sebelius,*
   775 F. Supp. 2d 114 (D.D.C. 2011) .....................................................................30

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
   988 F.2d 146 (D.C. Cir.1993) ..............................................................................44

*Am. Hosp. Ass'n v. Azar,*
   964 F.3d 1230 (D.C. Cir. 2020) ...........................................................................16

*Am. Textile Mfrs. Inst., Inc. v. Donovan,*
   452 U.S. 490 (1981) .............................................................................................29

*Amador Cty., Cal. v. Salazar,*
   640 F.3d 373 (D.C. Cir. 2011) .............................................................................29

*Ass'n for Cmty. Affiliated Plans v. U.S. Dep't of Treasury,*
   392 F. Supp. 3d 22 (D.D.C. 2019) ......................................................................13

*Ass'n of Am. Railroads v. ICC,*
   978 F.2d 737 (D.C. Cir. 1992) .............................................................................16

*Auracle Homes, LLC v. Lamont,*
   No. 20-00829, 2020 WL 4558682 (D. Conn. Aug. 7, 2020) ............................*passim*

*Babbitt v. Sweet Home Chapter of Communities for a Greater Or.,*
   515 U.S. 687 (1995) .............................................................................................20

*Barnhart v. Walton,*
   535 U.S. 212 (2002) .............................................................................................16

*Bell Atlantic Telephone Cos. v. FCC,*
   24 F.3d 1441 (D.C. Cir. 1994) .............................................................................39

*Bill Johnson's Restaurants, Inc. v. NLRB,*
   461 U.S. 731 (1983) .............................................................................................42

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
    239 U.S. 441 (1915) ............................................................................................................. 40

*Bowen v. Am. Hosp. Ass'n*,
    476 U.S. 610 (1986) ............................................................................................................. 21

*\*Brown v. Azar*,
    2020 WL 6364310 (N.D. Ga. Oct. 29, 2020) ............................................................... *passim*

*Catawba Cnty. N.C. v. EPA*,
    571 F.3d 20 (D.C. Cir. 2009) ............................................................................................. 12

*\*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) .......................................................................................................... 8, 9

*Chickasaw Nation v. United States*,
    534 U.S. 84 (2001) ............................................................................................................. 16

*Citizens to Preserve Overton Park v. Volpe*,
    401 U.S. 402 (1971) ........................................................................................................... 27

*City of Arlington v. FCC*,
    569 U.S. 290 (2013) ............................................................................................................. 9

*City of Portland v. EPA*,
    507 F.3d 706 (D.C. Cir. 2007) ........................................................................................... 29

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ........................................................................................................... 32

*Clark v. Martinez*,
    543 U.S. 371 (2005) ........................................................................................................... 24

*Council of S. Mountains, Inc. v. Donovan*,
    653 F.2d 573 (D.C. Cir. 1981) ........................................................................................... 26

*Davis v. Goord*,
    320 F.3d 346 (2d Cir. 2003) ............................................................................................... 43

*Dist. Intown Props. Ltd. P'ship v. District of Columbia*,
    198 F.3d 874 (D.C. Cir. 1999) ........................................................................................... 38

*District of Columbia v. Dep't of Labor*,
    819 F.3d 444 (D.C. Cir. 2016) ........................................................................................... 13

*Dole Food Co. v. Patrickson*,
    538 U.S. 468 (2003) ........................................................................................................... 44

iv

*Elmsford Apartment Assocs. v. Cuomo,*
  469 F. Supp. 3d 148 (S.D.N.Y. 2020) ............................................................*passim*

*Emory v. United Air Lines, Inc.,*
  821 F. Supp. 2d 200 (D.D.C. 2011) ............................................................40

*English v. Trump,*
  279 F. Supp. 3d 307 (D.D.C. 2018) ............................................................17

*FCC v. Fla. Power Corp.,*
  480 U.S. 245 (1987) ............................................................37

*FCC v. Fox Television Stations,*
  556 U.S. 502 (2009) ............................................................32

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ............................................................13, 14, 17

*Fla. Bankers Ass'n v. U.S. Dep't of Treas.,*
  19 F. Supp. 3d 111 (D.D.C. 2014) ............................................................30

*Fla. Indep. Colls. & Univs. Risk Mgmt. Ass'n, Inc. v. United States,*
  850 F. Supp. 2d 125 (D.D.C. 2012) ............................................................24

*Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.,*
  493 U.S. 331 (1990) ............................................................44

*Franklin-Mason v. Mabus,*
  742 F.3d 1051 (D.C. Cir. 2014) ............................................................39

*Freeman United Coal Min. Co. v. Fed. Mine Safety & Health Review Comm'n,*
  108 F.3d 358 (D.C. Cir. 1997) ............................................................41

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018) ............................................................45

*Gonzalez v. Oregon,*
  546 U.S. 243 (2006) ............................................................9

*Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson,*
  559 U.S. 280 (2010) ............................................................19

*Great Lakes Comnet, Inc. v. FCC,*
  823 F.3d 998 (D.C. Cir. 2016) ............................................................18

*Gundy v. United States,*
  139 S. Ct. 2116 (2019) ............................................................11, 33, 34

*HAPCO v. City of Philadelphia,*
  No. 20-3300, 2020 WL 5095496 (E.D. Pa. Aug. 28, 2020) ..................................................39

*Hartman v. Acton,*
  No. 20-1952, 2020 WL 1932896 (S.D. Ohio Apr. 21, 2020) ..............................................41

*Holland v. Nat'l Mining Ass'n,*
  309 F.3d 808 (D.C. Cir. 2002) ..........................................................................................45

*Household Credit Servs., Inc. v. Pfennig,*
  541 U.S. 232 (2004) ..........................................................................................................16

*Howard v. Pritzker,*
  775 F.3d 430 (D.C. Cir. 2015) ..........................................................................................17

*\*Indep. Turtle Farmers of La. v. United States,*
  703 F. Supp. 2d 604 (W.D. La. 2010) ........................................................................10, 18

*Indus. & Fin. Markets Assoc. v. U.S. Commodity Futures Trading Comm'n,*
  67 F. Supp. 3d 373 (D.D.C. 2014) ....................................................................................44

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.,*
  448 U.S. 607 (1980) ..........................................................................................................34

*Int'l Union UMW v. FMSHA,*
  920 F.2d 960 (D.C. Cir. 1990) ..........................................................................................44

*Inv. Co. Inst. v. CFTC,*
  720 F.3d 370 (D.C. Cir. 2013) ..........................................................................................29

*Jifry v. FAA,*
  370 F.3d 1174 (D.C. Cir. 2004) ........................................................................................25

*Jones v. Air Line Pilots Ass'n,*
  713 F. Supp. 2d 29 (D.D.C. 2010) ....................................................................................40

*Kaufman v. Nielsen,*
  896 F.3d 475 (D.C. Cir. 2018) ..........................................................................................21

*KC Tenants v. Byrn,*
  No. 20-784, 2020 WL 7063361 (W.D. Mo. Nov. 30, 2020) ..........................................8, 42

*Keystone Bituminous Coal Ass'n v. DeBenedictis,*
  480 U.S. 470 (1987) ..........................................................................................................38

*Knick v. Twp. of Scott,*
  139 S. Ct. 2162 (2019) ......................................................................................................39

*Lamie v. U.S. Trustee,*
540 U.S. 526 (2004) ...................................................................................................18

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer,*
814 F. App'x 125 (6th Cir. 2020) ...............................................................................21

*Loretto v. Teleprompter Manhattan CATV Corp.,*
458 U.S. 419 (1982) ............................................................................................ 36, 39

*\*Louisiana v. Mathews,*
427 F. Supp. 174 (E.D. La. 1977) ...................................................................10, 29, 32

*Loving v. IRS,*
742 F.3d 1013 (D.C. Cir. 2014) ........................................................................... 13, 14

*Lucas v. S. Carolina Coastal Council,*
505 U.S. 1003 (1992) .................................................................................................37

*Madsen v. Women's Health Ctr., Inc.,*
512 U.S. 753 (1994) ...................................................................................................45

*Marshall v. United States,*
414 U.S. 417 (1974) ...................................................................................................10

*Merck & Co. v. U.S. Dep't of Health & Human Servs.,*
962 F.3d 531 (D.C. Cir. 2020) ...................................................................................13

*Michigan v. EPA,*
576 U.S. 743 (2015) ...................................................................................................29

*Minn. State Bd. for Cmty. Colleges v. Knight,*
465 U.S. 271 (1984) ...................................................................................................40

*\*Mistretta v. United States,*
488 U.S. 361 (1989) ............................................................................................ 33, 35

*\*Motor Vehicle Mfrs. Ass'n v. State Farm,*
463 U.S. 29 (1983) .............................................................................................. 27, 31

*Mozilla Corp. v. FCC,*
940 F.3d 1 (D.C. Cir. 2019) .........................................................................................8

*N.Y. Cent. Secs. Corp. v. United States,*
287 U.S. 12 (1932) .....................................................................................................34

*National Ass'n of Broadcasters v. FCC,*
740 F.2d 1190 (D.C. Cir. 1984) .................................................................................32

*NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.,*
  513 U.S. 251 (1995) ......................................................................................23

*Nat'l Ass'n for Fixed Annuities v. Perez,*
  217 F. Supp. 3d 1 (D.D.C. 2016) ..................................................................14

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
  551 U.S. 644 (2007) ......................................................................................17

*Nat'l Ass'n of Home Builders v. EPA,*
  682 F.3d 1032 (D.C. Cir. 2012) ....................................................................29

*Nat'l Broadcasting Co. v. United States,*
  319 U.S. 190 (1943) ......................................................................................34

*\*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
  545 U.S. 967 (2005) .................................................................................passim

*Neinast v. Bd. of Trs. of Columbus Metro. Library,*
  346 F.3d 585 (6th Cir. 2003) ........................................................................40

*New York Stock Exchange LLC v. SEC,*
  962 F.3d 541 (D.C. Cir. 2020) ......................................................................24

*Nicopure Labs, LLC v. FDA,*
  266 F. Supp. 3d 360 (D.D.C. 2017) ..............................................................30

*Norman v. Baltimore & Ohio R.R. Co.,*
  294 U.S. 240 (1935) ................................................................................35, 36

*Omnia Commercial Co. v. United States,*
  261 U.S. 502 (1923) ......................................................................................36

*Palmyra Pac. Seafoods, LLC v. United States,*
  561 F.3d 1361 (Fed. Cir. 2009) ...............................................................35, 36

*Penn Cent. Transp. Co. v. City of N.Y.,*
  438 U.S. 104 (1978) ......................................................................................38

*Pension Benefit Guaranty Corp. v. Gray,*
  467 U.S. 717 (1984) ......................................................................................35

*Propert v. District of Columbia,*
  948 F.2d 1327 (D.C. Cir. 1991) ....................................................................40

*Pub. Citizen, Inc. v. Rubber Manufacturers Ass'n,*
  533 F.3d 810 (D.C. Cir. 2008) ......................................................................16

*Ralls Corp. v. Committee on Foreign Inv. in U.S.*,
   758 F.3d 296 (D.C. Cir. 2014) ...............................................................................................40

*Rith Energy, Inc. v. United States*,
   247 F.3d 1355 (Fed. Cir. 2001) ..............................................................................................39

*Sebelius v. Auburn Reg'l Med. Ctr.*,
   568 U.S. 145 (2013) .................................................................................................................22

*Serono Labs., Inc. v. Shalala*,
   158 F.3d 1313 (D.C. Cir. 1998) .............................................................................................22

*Simpson v. Young*,
   854 F.2d 1429 (D.C. Cir. 1988) .............................................................................................28

*Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*,
   641 F.3d 197 (6th Cir. 2011) ...........................................................................................40, 41

*Smith v. Turner*,
   48 U.S. 283 (1849) .....................................................................................................................2

*Stand up for California v. U.S. Dep't of Interior*,
   204 F. Supp. 3d 212 (D.D.C. 2016) ......................................................................................29

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002) .................................................................................................44

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) .................................................................................................................45

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
   535 U.S. 302 (2002) ...........................................................................................................36, 37

*Third Ave. Assocs. v. United States*,
   48 F.3d 1575 (Fed. Cir. 1995) ................................................................................................35

*TJM 64, Inc. v. Harris*,
   No. 20-02498, 2020 WL 4352756 (W.D. Tenn. July 29, 2020) ..........................................21

*Touby v. United States*,
   500 U.S. 160 (1991) ............................................................................................................12, 34

*U.S. Telecom Ass'n v. FCC*,
   855 F.3d 381 (D.C. Cir. 2017) ....................................................................................11, 12, 15

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ...........................................................................................................21, 22, 23

*United States v. Williams*,
  553 U.S. 285 (2008) ...............................................................................41

*Utility Air Regulatory Group v. EPA*,
  573 U.S. 302 (2014) ......................................................................... 13, 15

*Vaden v. Vill. of Maywood, Ill.*,
  809 F.2d 361 (7th Cir. 1987) ...............................................................40

*Verizon v. FCC*,
  740 F.3d 623 (D.C. Cir. 2014) .................................................12, 13, 14

*Vill. of Barrington v. Surface Transp. Bd.*,
  636 F.3d 650 (D.C. Cir. 2011) ........................................................ 9, 12

*West Virginia v. EPA*,
  362 F.3d 861 (D.C. Cir. 2004) .............................................................27

*Whitman v. Am. Trucking Ass'n*,
  531 U.S. 457 (2001) .................................................... 12, 30, 34, 35

*Williamson v. Lee Optical,
  Co.*, 348 U.S. 483 (1955) ......................................................................32

*Yee v. City of Escondido*,
  503 U.S. 519 (1992) ......................................................................37, 38

**Statutes**

5 U.S.C. § 553 ...............................................................................25, 27

5 U.S.C. § 604 ....................................................................................27

5 U.S.C. § 611 ....................................................................................44

5 U.S.C. § 704 ....................................................................................25

5 U.S.C. § 706 ...............................................................................15, 23

5 U.S.C. § 804 ....................................................................................30

21 U.S.C. § 811 ..................................................................................12

*42 U.S.C. § 264 .........................................................................passim

42 U.S.C. § 361 ..................................................................................21

Pub. L. No. 96-88, § 509(b), 93 Stat. 695 (1979) ............................................................2

Pub. L. No. 116-136, § 4024, 134 Stat. 281 (2020) ........................................................6

Pub. L. No. 76-861, 54 Stat. 1178 (1940) .....................................................................64

## Regulations

*42 C.F.R. § 70.2 ..........................................................................................*passim*

11 Fed. Reg. 9389 (Aug. 27, 1946) ...............................................................................4

12 Fed. Reg. 3189 (May 16, 1947) ................................................................................4

12 Fed. Reg. 6210 (Sept. 16, 1947) ..............................................................................4

65 Fed. Reg. 19772 (Apr. 12, 2000) .............................................................................4

65 Fed. Reg. 49906 (Aug. 16, 2000) ........................................................................ 3, 4

68 Fed. Reg. 62353 (Nov. 4, 2003) .............................................................................32

85 Fed. Reg. 15337 (Mar. 13, 2020) .............................................................................5

85 Fed. Reg. 55292 (Sept. 4, 2020) .....................................................................*passim*

## Other Authorities

Executive Order No. 13945 ..........................................................................................14

Executive Order No. 12866 ..........................................................................................30

*The authorities upon which we principally rely are marked with asterisks.*

## INTRODUCTION

These are extraordinary times.  The United States is affected by a global pandemic, during which the respiratory disease COVID-19 has infected tens of millions worldwide and resulted in the deaths of more than 315,000 people within our borders.  *See* Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55292, 55292 (Sept. 4, 2020).  The disease spreads easily between persons within close contact.  *Id.*  It can cause severe illness but may also be transmitted by persons who are pre-symptomatic or asymptomatic—meaning that infected persons have the potential to infect others unknowingly.  *Id.*  Despite drastic measures by federal, state, and local governments, COVID-19 continues to spread.  *Id.*

In light of these rare circumstances, the Centers for Disease Control and Prevention (CDC) exercised its authority under the Public Health Service Act (PHSA) and its implementing regulations to order a temporary halt in residential evictions to prevent the further spread of COVID-19 (the Order).  *Id.*  CDC determined that this moratorium is an effective public health measure because it facilitates self-isolation by ill and at-risk persons, eases implementation of stay-at-home and social distancing measures, and decreases the likelihood that persons will experience homelessness or move to congregate settings.  *Id.* at 55295–96.  It does not excuse any tenant's obligation to pay rent or impair any landlord's ability to impose fees, interest, or other penalties short of eviction.  *Id.* at 55292.  Nor does it prevent evictions for reasons other than failure to pay rent.  *Id.* at 55294.

Plaintiffs are several corporate entities that lease apartments, the owners of those corporate entities, and two trade associations representing landlords in Alabama and Georgia, all of whom seek to invalidate the Order.  Yet Plaintiffs' claims fail as a matter of law:  CDC had authority to issue the Order; it complied with all procedural requirements in doing so; and Plaintiffs' constitutional arguments fail.  The Court should therefore enter summary judgment in Defendants' favor.

## STATEMENT OF FACTS

### I.  Statutory and Regulatory Background

The federal government has a long history of acting to combat the spread of communicable disease.  Congress enacted the first federal quarantine law in 1796 in response to a yellow fever outbreak, authorizing the President to direct federal officials to help states enforce quarantine laws. Act of May 27, 1796, ch. 31, 1 Stat. 474 (1796) (repealed 1799); *see Smith v. Turner*, 48 U.S. 283, 300 (1849).  Following a subsequent yellow fever outbreak, Congress replaced this Act with a federal inspection system for maritime quarantines.  Act of Feb. 25, 1799, ch. 12, 1 Stat. 619 (1799).  And in 1893, Congress authorized the Secretary of the Treasury to adopt additional regulations to prevent the introduction of disease into the United States or across state lines where the Secretary considered state or local regulation inadequate.  Act of Feb. 15, 1893, ch. 114, 27 Stat. 449 (1893).

In 1944, Congress enacted the provision at issue here, section 361 of the PHSA, as part of a broader effort to consolidate and clarify existing public health laws.  H.R. Rep. No. 78-1364, at 1 (1944).  In section 361(a), Congress broadened the federal government's "basic authority to make regulations to prevent the spread of disease into this country or between the States."  *Id.* at 24.  For example, Congress removed references to specific diseases to provide federal health authorities flexibility to respond to new types of contagion and "expressly sanction[ed] the use of conventional public-health enforcement methods" by the government in disease-control efforts.  *Id.* at 24–25.

The resulting statute, 42 U.S.C. § 264—part of a broader statutory scheme authorizing the Department of Health and Human Services (HHS) to take wide-ranging public health actions, *see* 42 U.S.C. §§ 264–272—authorizes the Secretary of HHS[1] "to make and enforce such regulations as in

---

[1] Although the statute assigns authority to the Surgeon General, all statutory powers and functions of the Surgeon General were transferred to the Secretary of HHS in 1966, 31 Fed. Reg. 8855, 80 Stat. 1610 (June 25, 1966), *see also* Pub. L. No. 96-88, § 509(b), 93 Stat. 695 (1979) (codified at 20 U.S.C. § 3508(b)).  The Secretary has retained these authorities despite the reestablishment of the Office of the Surgeon General in 1987.

his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 42 U.S.C. § 264(a). Subsection (a) further clarifies that "[f]or purposes of carrying out and enforcing such regulations," the Secretary "may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary." *Id.* Subsection (b) imposes specific limits on the Secretary's ability to "provide for the apprehension, detention, or conditional release of individuals"— a power not referenced in subsection (a)—permitting such impositions on a person's physical movement only for diseases specified by Executive Order. *Id.* § 264(b). Subsections (c) and (d) set further limits on the detention of individuals. *See id.* § 264(c)–(d). The final subsection provides that the statute and any regulation adopted thereunder supersede state law "to the extent that such a provision conflicts with an exercise of Federal authority." *Id.* § 264(e).

The Secretary of HHS has promulgated regulations implementing these provisions and delegating their enforcement to CDC. *See* 42 C.F.R. pt. 70; 65 Fed. Reg. 49906, 49907 (Aug. 16, 2000). The Secretary appears to have first promulgated the regulation entitled "measures in the event of inadequate local control" in 1947, *see* 12 Fed. Reg. 3189 (May 16, 1947) (codified at 42 C.F.R. § 12.3 (1947)), following publication of a "general notice of proposed rule making" in the Federal Register, *see* 11 Fed. Reg. 9389 (Aug. 27, 1946).[2] The regulation has been relocated within the Code of Federal Regulations a number of times over the years without substantive change. *See, e.g.*, 12 Fed. Reg. 6210 (Sept. 16, 1947) (recodifying provision at 42 U.S.C. § 73.2). In 2000, again without any alteration to

---

[2] This "general notice of proposed rulemaking" does not specifically seek comments on the "measures in the event of inadequate local control" provision, *see* 11 Fed. Reg. at 9389, but is referenced as the relevant notice for that regulation in subsequent Federal Register publications, *see* 12 Fed. Reg. at 3189.

its substance, the regulation was repromulgated to transfer, in part, authority from the Food & Drug Administration (FDA) to CDC, *see* Final Rule, Control of Communicable Diseases; Apprehension and Detention of Persons With Specific Diseases; Transfer of Regulations, 65 Fed. Reg. 49906 (Aug. 16, 2000), and the agency provided a notice-and-comment period during which interested parties could comment on the repromulgation, *see* Proposed Data Collections Submitted for Public Comment and Recommendations, 65 Fed. Reg. 19772 (Apr. 12, 2000).  Although the notice specifically requested comments regarding proposed data collection projects, *see* 65 Fed. Reg. at 19772, it referenced the provision at issue here, stating that "[t]he regulations . . . being assumed by CDC were developed to facilitate Federal action in the event of large outbreaks of disease requiring a coordinated effort involving several States, or in the event of inadequate local control," *id.*

That regulation, now codified at 42 C.F.R. § 70.2, provides the CDC Director (or his or her authorized representative) with discretion to take measures to address uncontrolled contagion. Specifically, where the CDC Director "determines that the measures taken by health authorities of any State or possession (including political subdivisions thereof) are insufficient to prevent the spread of any of the communicable diseases" between or among states, he is empowered to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary."  42 C.F.R. § 70.2. These measures include, but are not limited to, "inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection."  *Id.*  Other regulations authorize CDC to limit interstate travel, *see id.* § 70.3, apprehend and detain persons, *id.* § 70.6, and conduct medical examinations, *id.* § 70.12, to control the spread of disease.  The regulations also provide for penalties for their violation.  *Id.* § 70.18.

## II.    The COVID-19 Pandemic

In December 2019, the novel coronavirus later named SARS-CoV-2 was first detected in Wuhan, Hubei Province, in the People's Republic of China.  *See* Declaring a National Emergency

4

Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15337 (Mar. 13, 2020).  The virus causes a respiratory disease known as COVID-19.  *Id.*

COVID-19 is a serious illness that spreads easily.  COVID-19 poses a risk of "severe" respiratory illness, meaning that persons who have the disease may require hospitalization, intensive care, or the use of a ventilator.  85 Fed. Reg. at 55292.  Severe cases may be fatal.  *Id.*  The likelihood of becoming severely ill is greater among certain vulnerable populations.  *Id.* at 55295.  CDC has cautioned that the virus that causes COVID-19 transmits "very easily and sustainably" between people within "close contact"—approximately six feet—of one another.  *Id.* at 55293.  Persons not displaying symptoms are capable of transmitting the virus.  *Id.* at 55292.

COVID-19 spread quickly across the globe.  *See* 85 Fed. Reg. at 15337.  On January 31, 2020, the Secretary of HHS declared a public health emergency.  HHS, Determination that a Public Health Emergency Exists (Jan. 31, 2020), https://www.phe.gov/emergency/news/healthactions/ phe/Pages/2019-nCoV.aspx.  On March 11, 2020, the World Health Organization classified the COVID-19 epidemic as a pandemic.  85 Fed. Reg. at 15337.  And on March 13, 2020, the President declared the outbreak a national emergency.  *Id.*  By late August 2020, the virus had spread to all 50 states.  *Id.* at 55292.  To date, it has infected more than 17 million and killed more than 315,000 persons within the United States.  *See* CDC COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker (last visited Dec. 21, 2020).  Thousands of new deaths and hundreds of thousands of new cases are now reported daily, *see id.*, and CDC has called COVID-19 "a historic threat to public health."  85 Fed. Reg. at 55294.

To combat the spread of this highly contagious, widespread, deadly virus, governments at all levels have taken "unprecedented or exceedingly rare actions" to protect the public.  *Id.*  These include border closures, travel restrictions, stay-at-home orders, and mask requirements.  *Id.*  In March 2020, Congress provided a 120-day moratorium on certain eviction filings to tenants residing in certain

federally financed rental properties.  CARES Act, Pub. L. No. 116-136, § 4024, 134 Stat. 281 (2020) (A.R. 973).  This measure expired on July 24, 2020.  85 Fed. Reg. at 55294.  And while certain states implemented their own temporary eviction moratoria, *see, e.g.*, A.R. 966–72, 986–1024, many such measures have expired, *see, e.g.*, *id.* at 966–72, 986–92, 1010–14, 1023–24; *see also* 85 Fed. Reg. at 55296 n.36.  Other states provided no separate protection for renters during the pandemic.  *See* A.R. 966–72; *see also* 85 Fed. Reg. at 55296 n.36.

## III.    The CDC Order

On September 4, 2020, CDC issued an Order under 42 U.S.C. § 264(a) and 42 C.F.R. § 70.2 providing for a temporary halt on residential evictions until December 31, 2020.  85 Fed. Reg. at 55292.  The agency determined that this moratorium is "a reasonably necessary measure . . . to prevent the further spread of COVID-19" and that state and local measures that did not meet or exceed its protections were insufficient to prevent interstate spread.  *Id.* at 55296.  CDC determined that eviction moratoria help reduce the risk of transmission of COVID-19 by facilitating self-isolation for sick and high-risk persons, easing implementation of stay-at-home orders and social distancing measures, reducing the need for congregate housing, and helping to prevent homelessness.  *Id.*  at 55294.

As CDC explained, movement of evicted renters could lead to "multiple outcomes that increase the risk of COVID-19 spread."  *Id.*  First, evicted renters are likely to move in with friends or family, leading to potential household crowding.  *Id.*  This increases the risk of spreading COVID-19 because "transmission occurs readily within households," and "household contacts are estimated to be 6 times more likely to become infected by an index case of COVID-19 than other close contacts."  *Id.*  Second, the risk of transmission in shared housing increases exponentially if evicted persons move into congregate settings, such as homeless shelters, transitional housing, or domestic violence shelters.  *Id.*  Maintaining social distance may be difficult in these settings, especially where residents must share small spaces, like stairwells and elevators, or equipment, such as kitchen or

laundry facilities. *Id.* Indeed, "[e]xtensive outbreaks of COVID-19 have been identified in homeless shelters," including in Seattle, Boston, and San Francisco. *Id.* at 55295. These public health risks "may increase seasonally" as persons experiencing homelessness seek shelter in colder months. *Id.* at 55296.

In addition, research suggests that persons who would be evicted and become homeless as a result "include many who are predisposed to developing severe disease from COVID-19." *Id.* For example, evicted persons are more likely to experience hypertension, an underlying condition associated with severe COVID-19. *Id.* And among patients with COVID-19, homelessness has been associated with an increased likelihood of hospitalization. *Id.* at 55296.

These negative public health consequences could become enormous if evictions were to proceed unchecked during the pandemic. *Id.* at 55294–95. Research suggests that as many as 30 to 40 million people in the United States could be at risk of eviction in the absence of state and local protections, and approximately 15 percent of moves are estimated to be interstate. *Id.* (citing U.S. Census Bureau, CPS Historical Migration/Geographic Mobility Tables (A.R. 476–87)).

CDC thus determined that it was reasonably necessary to prevent the interstate spread of COVID-19 to order that "a landlord . . . shall not evict any covered person from any residential property in any State . . . that provides a level of public-health protections below the requirements listed in [the] Order." *Id.* at 55296. To qualify as "covered persons," tenants must certify under penalty of perjury that they have (1) used best efforts to obtain government assistance to make rental payments; (2) expect to earn less than $99,000 (or $198,000 if filing a joint tax return) in annual income in 2020, were not required to pay income taxes in 2019, or qualified for a stimulus check under the CARES Act; (3) are unable to pay full rent due to "substantial loss of household income, loss of compensable hours of work or wages, lay-offs, or extraordinary out-of-pocket medical expenses"; (4) are using best efforts to make partial payments; (5) would likely experience homelessness or need

to move into a shared residence if evicted; (6) understand that rent obligations still apply; and (7) understand that the moratorium ends on December 31, 2020.  *Id.* at 55297.

The Order does not alter a tenant's obligation to pay rent or comply with any other contractual obligation.  *Id.* at 55294.  It does not prevent the accrual or collection of fees, penalties, or interest. *Id.*  It also does not prevent evictions of persons who do not qualify as "covered persons," or evictions based on circumstances other than nonpayment of rent, including criminal activity, damage to property, or violation of contractual obligations other than the timely payment of rent.  *Id.*

Following the Order's issuance, CDC provided further guidance regarding its operation.  *See* CDC/HHS Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, Frequently Asked Questions, *available at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/ eviction-moratoria-order-faqs.pdf (FAQs).  This guidance confirms that the Order is "not intended to terminate or suspend the operations of any state or local court."  *Id.* at 1.  "The Order does not," for example, "preclude a landlord from challenging the truthfulness of a tenant's declaration in any state or municipal court."  *Id.* at 6.  "Nor is it intended to prevent landlords from starting eviction proceedings, provided that the actual eviction of a covered person for non-payment of rent does NOT take place during the period of the Order."  *Id.* at 1.  The only federal courts to consider the question have each credited the FAQs' interpretation.  *See KC Tenants v. Byrn*, No. 20-784, 2020 WL 7063361 (W.D. Mo. Nov. 30, 2020); *Brown v. Azar*, 2020 WL 6364310, at *15 (N.D. Ga. Oct. 29, 2020).

## ARGUMENT

### I.    CDC Acted Within Its Statutory And Regulatory Authority.

CDC acted within its statutory and regulatory authority in issuing the Order.  This issue is one of straightforward statutory analysis, proceeding under the framework set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  Under a *Chevron* analysis, the Court first asks "whether Congress has directly spoken to the precise question at issue."  *Mozilla Corp. v. FCC,*

940 F.3d 1, 19 (D.C. Cir. 2019) (per curiam) (quoting *Chevron*, 467 U.S. at 842).  If so, both the Court and the agency "must give effect to the unambiguously expressed intent of Congress." *Id.* (quoting *Chevron*, 467 U.S. at 843).  But if there is "statutory ambiguity," the Court "defer[s] to the agency's permissible interpretation" so long as "the agency has offered a reasoned explanation for why it chose that interpretation." *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011).

Here, Congress unambiguously vested the Secretary of HHS with broad authority to take decisive action to control the spread of dangerous infectious diseases.  As the only federal court to rule on the question held, CDC acted pursuant to its delegated authority and in the interest of public health in issuing the Order.  *See Brown*, 2020 WL 6364310, at *6–10.  But even if the Court were to determine that the statute is ambiguous, CDC's reasoned interpretation warrants deference.

## A. Plain Statutory Language Demonstrates That The Order Falls Within CDC's Broad Authority To Prevent the Spread Of Disease.

Section 361 of the PHSA empowers the Secretary "to make and enforce such regulations *as in his judgment are necessary* to prevent the introduction, transmission, or spread of communicable diseases" from abroad or among the states.  42 U.S.C. § 264(a) (emphasis added).  The plain text of the statute thus evinces a legislative determination to defer to the "judgment" of public health authorities about what measures they deem "necessary" to prevent contagion, *see id.*—a determination made in the light of history and experience, given the havoc wreaked by past scourges like smallpox and yellow fever, *see supra* pp. 2-4.  Indeed, Congress's use of the phrase "such regulations as in his judgment are necessary" shows that it intended to defer to agency expertise, as "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013).  And the Supreme Court has recognized that similar congressional delegations that empower agencies to take actions that are "necessary" provide "broad power to enforce all provisions of [a] statute." *Gonzalez v. Oregon*, 546 U.S. 243, 258–59 (2006); *see also, e.g., Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.* (*Brand X*), 545 U.S. 967,

980–81 (2005) (statute permitting agency to "prescribe such rules and regulations as may be necessary in the public interest" undisputedly provided agency authority to promulgate order).  As the *Brown* court explained, "Congress' intent, as evidenced by the plain language of the delegation provision, is clear: Congress gave the Secretary of HHS broad power to issue regulations necessary to prevent the introduction, transmission or spread of communicable diseases."  2020 WL 6364310, at *7; *see also Louisiana v. Mathews*, 427 F. Supp. 174, 176 (E.D. La. 1977) (in § 264, "Congress has granted broad, flexible powers to federal health authorities who must use their judgment in attempting to protect the public against the spread of communicable disease.").  This expansive statutory language comports with the Supreme Court's observation that "[w]hen Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation."  *Marshall v. United States*, 414 U.S. 417, 427 (1974).

The examples Congress gave of specific measures the Secretary may take—which are illustrative, not exhaustive—underscore the breadth of this authority, showing that it may infringe on personal liberties or property rights where appropriate to protect public health.  *See Indep. Turtle Farmers of La. v. United States*, 703 F. Supp. 2d 604, 619–20 (W.D. La. 2010) (explaining that "the list does not act as a limitation upon the types of regulations that may be enacted under Section 361 [of the PHSA]").  Such measures include the authority to impose restrictions on individuals' freedom of movement, including the "apprehension, detention, or conditional release of individuals."  42 U.S.C. § 264(b)–(c).  They also include intrusions on private property, such as its "inspection, fumigation, disinfection, sanitation," and even "destruction."  *Id.* § 264(a).  The terms of the statute—including the examples of measures that the Secretary may adopt—invite the Secretary's exercise of expert judgment to determine what regulations may be appropriate to "prevent the introduction, transmission, or spread of communicable diseases."  *Id.*  This point is bolstered by the fact that, although subsection (a) makes no mention of the Secretary's ability to detain persons, it is plainly

10

contemplated as within the scope of what may be "necessary" in his "judgment," given the restrictions placed on any such regulations in subsections (b) through (d). *See id.* § 264(a)–(d). The *Brown* court agreed: "The presence of the additional subsections governing detainment of individuals means that the list contained in the first subsection is not an exhaustive list of the permissible measures available to the Secretary of HHS." 2020 WL 6364310, at *8.

The regulation is consistent with Congress's intent to provide flexibility in combatting the spread of disease. *See* 42 C.F.R. § 70.2. It allows the CDC Director to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary." *Id.* It further makes clear that, in order to control disease transmission, intrusions on private property, "including inspection, fumigation, disinfection, sanitation," and even "destruction" may be required. *Id.* The *Brown* court correctly observed that "for the same reasons the Secretary of HHS has broad authority to make and enforce regulations as in his judgment are necessary to prevent the spread of disease, the CDC likewise has the same authority."[3] 2020 WL 6364310, at *8.

**B.      Congress Authorized CDC To Take Measures Like The Order At Issue Here.**

Plaintiffs argue that the "major rules doctrine" outweighs Congress's clear intent to delegate broad authority to public health experts. Pls.' Mem. of Law in Supp. Mot. for Expedited Summ. J. 14–17, ECF No. 6-1 (Pls.' Mem.) At the outset, whether such a "doctrine" exists is unclear—the D.C. Circuit has not "resolve[d] the existence or precise contours of the major rules (or major questions) doctrine." *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 383 (D.C. Cir. 2017) (per curiam) (Srinivasan, J., concurring in denial of rehearing en banc). Indeed, the only opinion Plaintiffs cite that mentions something similar is a dissent. *See Gundy v. United States*, 139 S. Ct. 2116, 2141–42 (2019) (Gorsuch, J.,

---

[3] The regulation does impose the additional requirement that CDC "determine[] that the measures taken by the health authorities of state or local governments are insufficient to prevent the spread of disease." *Brown*, 2020 WL 6364310, at *8; *see* 42 C.F.R. § 70.2. CDC has made that finding here. *See id.* at *13–14 (citing 85 Fed. Reg. at 55295–96 & n.36); *see also infra* p. 28.

dissenting). And even proponents of the doctrine concede that "determining whether a rule constitutes a major rule sometimes has a bit of a 'know it when you see it' quality." *U.S. Telecom Ass'n*, 855 F.3d at 423 (Kavanaugh, J., dissenting from denial of rehearing en banc).

In any case, Plaintiffs' claim is that an agency regulation with significant economic or political significance cannot stand unless Congress has spoken clearly to the issue. *See* Pls.' Mem. 16. But Plaintiffs' cases do not stand for this proposition, courts in this Circuit have rejected the argument, and it is contrary to well-settled principles of statutory interpretation. Indeed, there is no support for the idea that Congress needs to do more than empower an agency to "make and enforce such regulations as in [the Secretary's] judgment are necessary" to prevent the spread of disease to allow that agency to take measures that meet those criteria. 42 U.S.C. § 264(a). Quite the opposite: the Supreme Court has recognized that "even in sweeping regulatory schemes we have never demanded . . . that statutes provide a 'determinate criterion'" for agency decisions such as "how 'necessary' was necessary enough." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 475 (2001) (citations omitted); *see also Touby v. United States*, 500 U.S. 160, 166 (1991) (upholding statute providing Attorney General authority to regulate where "necessary to avoid an imminent hazard to the public safety" (quoting 21 U.S.C. § 811(h)). Thus, if a clear statement were required to support the issuance of the Order, the statute provides it in its plain invocation of agency judgment and expertise.

Nor do Plaintiffs point to any case in which a court has found that Congress "unambiguously foreclosed [an] agency's statutory interpretation" for the sole reason that a regulation promulgated pursuant to a broad grant of authority had significant economic or political implications. *See Vill. of Barrington*, 636 F.3d at 659 (quoting *Catawba Cnty. N.C. v. EPA*, 571 F.3d 20, 35 (D.C. Cir. 2009)). Instead, their cited decisions turn primarily on courts' findings that an agency interpretation was contrary to the statute's plain meaning, was previously disavowed by the agency itself, or differed from the agency's historic interpretation. *See Verizon v. FCC*, 740 F.3d 623, 638 (D.C. Cir. 2014). For

example, *Utility Air Regulatory Group v. EPA* (*UARG*), 573 U.S. 302 (2014), found that a new Environmental Protection Agency (EPA) interpretation of the phrase "any air pollutant" would not only "bring about an enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization," but also involve a power that the agency itself "admit[ted] the statute [was] not designed to grant," *id.* at 324.  Similarly, in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), the Supreme Court observed that the FDA had reversed a more than 75-year history of representing that it had no authority to regulate tobacco products by determining that nicotine was a "drug" and that cigarettes and smokeless tobacco were "devices" subject to FDA's regulation—despite the fact that Congress had done nothing to counter FDA's previous understanding of its authority, *id.* at 159–60.

The D.C. Circuit case law Plaintiffs cite similarly turns upon issues other than the purported breadth of the economic effects of a regulation.  *See Merck & Co. v. U.S. Dep't of Health & Human Servs.*, 962 F.3d 531, 537–38 (D.C. Cir. 2020) (finding that price disclosure rule was not "necessary" to the "administration" of Medicare or Medicaid because the Secretary had not "demonstrate[d] an actual and discernable nexus between the rule and the conduct or management of [those] programs"); *District of Columbia v. Dep't of Labor*, 819 F.3d 444, 449 (D.C. Cir. 2016) (finding that the term "contract for . . . construction" in Davis-Bacon Act plainly did not include contracts with developers who would then separately enter into contracts for construction); *Loving v. IRS*, 742 F.3d 1013, 1016 (D.C. Cir. 2014) (finding that the statutory term "representative" did not include tax preparers).  As this Circuit has held, that a regulation "involves decisions of great 'economic and political significance'" alone does not signify "that Congress could not have delegated some of those decisions" to an agency. *Verizon*, 740 F.3d at 639 (quoting *Brown & Williamson*, 529 U.S. at 160).  And other courts within this District have rejected the same arguments Plaintiffs advance here.  *See, e.g., Ass'n for Cmty. Affiliated*

*Plans v. U.S. Dep't of Treasury*, 392 F. Supp. 3d 22, 35 (D.D.C. 2019), *aff'd*, 966 F.3d 782 (D.C. Cir. 2020);

*Nat'l Ass'n for Fixed Annuities v. Perez*, 217 F. Supp. 3d 1, 36 (D.D.C. 2016).

Plaintiffs observe that the PHSA has never been used to implement a temporary eviction moratorium. *See* Pls.' Mem. 17. But the agency has never claimed it could *not* do so, *see, e.g., Brown & Williamson*, 529 U.S. at 159, nor has it changed its interpretation of a statutory term after many years, *see, e.g., Loving*, 742 F.3d at 1014; *see also Verizon*, 740 F.3d at 638 (distinguishing *Brown & Williamson* where agency "never disclaimed authority to regulate . . . altogether, nor is there any similar history of congressional reliance on such a disclaimer"). Instead, because section 361 depends on an exercise of "judgment" regarding what is "necessary" to prevent the spread of disease, changing circumstances involving novel diseases (like COVID-19) make new regulations calibrated to combat the spread of those diseases both permissible under the statute and perfectly sensible. In fact, that the agency has not chosen to enact a temporary eviction moratorium for the purpose of disease control before now— in the face of a once-in-a-century global pandemic—demonstrates that the public health experts at CDC have reserved such a measure for a time in which it was truly "necessary" in their "judgment."

Nor does Congress's passage of the CARES Act, or the President's issuance of an Executive Order, alter the facts that Congress provided HHS authority to take measures it deemed necessary to combat the control of disease, and that CDC exercised that judgment in promulgating the Order. Indeed, the expiration of the CARES Act, along with its concomitant public health benefits, was one of the reasons CDC determined its eviction moratorium was necessary. *See* 85 Fed. Reg. at 55294. And the Executive Order did not purport to supplant HHS or CDC's judgment; it simply instructed the agencies to "*consider* whether any measures temporarily halting residential evictions of any tenants for failure to pay rent are reasonably necessary to prevent the further spread of COVID–19." Exec. Order No. 13945, 85 Fed. Reg. 49935, § 3 (Aug. 8, 2020) (A.R. 1025) (emphasis added). Once CDC

did so, the agency properly exercised authority delegated by Congress, informed by scientific evidence and its undisputed expertise.

Even if the Court were to accept the premise that the "vast economic and political significance" of a regulation—without more—triggers a clear statement requirement, *see* Pls.' Mem. 15 (quoting *UARG*, 573 U.S. at 324), Plaintiffs offer neither standards by which the Court may judge whether this Order is such a regulation nor credible evidence that it is. They claim "there is no question" that the Order qualifies, but conclusory assertions aside, Plaintiffs provide nothing more than oversimplified, back-of-the-envelope calculations from their own declarants as to the purported economic effects of the regulation. *See id.* But those are not proper subjects for consideration in an Administrative Procedure Act (APA) case, which must be decided on the administrative record.[4] *See* 5 U.S.C. § 706. Moreover, Plaintiffs provide no case law demonstrating the difference between a regulation that constitutes one of "vast political and economic significance" and one that does not, instead asking this Court to engage in a type of "know it when you see it" analysis. *See U.S. Telecom Ass'n*, 855 F.3d at 423 (Kavanaugh, J., dissenting from denial of rehearing en banc). But this smacks of a request for the Court to weigh in on the wisdom of the regulation, which is not its proper role.

---

[4] Moreover, the figures included in Plaintiffs' brief are demonstrably overbroad, and Defendants dispute them. The overall numbers are based on the simplistic exercise of assuming all "households at risk of eviction" included in a study cited by CDC, *see* A.R. 461, are "likely to take advantage of the CDC's Eviction Moratorium," Decl. of Scholastica Cororaton ¶ 13, ECF No. 6-4 (Cororaton Decl.), and multiplying that number by "the median monthly gross rent . . . nationwide," *id.* ¶ 14, to arrive at a number Plaintiffs describe as the economic effects of the CDC Order, *id.* ¶¶ 15–17. But Plaintiffs' oversimplified math fails to account for, among other things, the CDC Order's limits, including that it (1) applies only in states that lack residential eviction moratoria that provide "the same or greater level of public-health protection than the requirements listed in th[e] Order," 85 Fed. Reg. at 55292; (2) applies only to tenants who qualify as "covered persons" and in fact invoke its protections, *id.* at 55293; and (3) applies only to evictions based on nonpayment of rent, *id.* at 55294. Further, the "median monthly gross rent" figure Plaintiffs use in their calculation appears to include rental rates from across the country, including in areas where the CDC Order does not apply because of local eviction moratoria that provide equivalent or greater protection. Accordingly, Plaintiffs' numbers represent significant overestimates.

*See, e.g., Ass'n of Am. Railroads v. ICC*, 978 F.2d 737, 740 (D.C. Cir. 1992).  And it is difficult to believe that the economic effects of a time-limited regulation could compare to those of a permanent regulation, even if those temporary effects apply broadly.  Nor is the CDC's statement that, were the Order a rule, it would constitute a "major rule" under the Congressional Review Act (CRA) determinative.  *See* 85 Fed. Reg. at 55296.  Despite similar terminology, Plaintiffs' case law and the CRA's procedural requirements are distinct.

Regardless, any determination that section 361 is ambiguous would simply result in moving to *Chevron* step two—not invalidation of the Order.  *See Brand X*, 545 U.S. at 980–81; *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 238–39 (2004).  And as explained below, *see infra* pp. 21-25, were the Court to determine the statute is ambiguous, CDC's reasonable interpretation is owed deference.

C.     **Canons Of Construction Do Not Negate Congress's Clear Intent To Provide CDC Broad Authority To Prevent The Spread Of Disease.**

Despite the plain text of section 361, Plaintiffs contend that canons of statutory construction require a constrained reading of the statute and regulation.  *See* Pls.' Mem. 17–21.  Plaintiffs cannot prevail at *Chevron* step one unless they demonstrate that the statutory language "unambiguously forbid[s]" the agency's action.  *Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1241 (D.C. Cir. 2020) (quoting *Barnhardt v. Walton*, 535 U.S. 212, 218 (2002)).  They have not carried that burden here.

It is important to note that "canons are not mandatory rules," and should not be used to "produce an interpretation that . . . would conflict with the intent embodied in the statute Congress wrote," *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001); *see also Pub. Citizen, Inc. v. Rubber Manufacturers Ass'n*, 533 F.3d 810, 816 (D.C. Cir. 2008) (similar).  Where, as here, congressional intent to empower an agency with wide-ranging authority to regulate for a specific purpose is clear, resort to such "guides" is unnecessary.  *Chickasaw Nation*, 534 U.S. at 94; *accord Brown*, 2020 WL 6364310, at *9 ("the implementing statute (and derivative regulation) demonstrate Congress' unambiguous intent to delegate broad authority to the CDC to enter an order such as the one at issue here").

16

Regardless, the numerous canons of statutory construction that Plaintiffs invoke do not so constrain the measures CDC may take as to preclude a temporary eviction moratorium to prevent the spread of an easily transmissible, potentially deadly disease. As to Plaintiffs' first point, the argument that section 361's separate limitations on regulating the interstate movement of persons somehow preclude the issuance of a temporary eviction moratorium misapprehends the effect of the Order. Pls.' Mem. 18. Simply put, it is not a regulation of the "interstate movement of individuals." *See id.* Although the Order was issued in the interest of preventing the interstate spread of disease, it does not restrict individuals' ability to move interstate. *See* 85 Fed. Reg. at 55296. Therefore, the fact that section 361 elsewhere addresses detention of persons does not impact CDC's authority.

Plaintiffs' second and third points both depend upon the incorrect premise that the eviction moratorium provision in the CARES Act sub silentio limited CDC's ability to utilize otherwise available authority to enact an eviction moratorium for disease-control purposes. *See* Pls.' Mem. 18–19. But this assertion violates two other principles of statutory construction: the "harmonious-reading canon" and the "presumption against implied repeals." *English v. Trump*, 279 F. Supp. 3d 307, 324 (D.D.C. 2018). Indeed, "when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Howard v. Pritzker*, 775 F.3d 430, 437 (D.C. Cir. 2015). And "repeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal is clear and manifest." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662 (2007) (cleaned up). *Brown & Williamson*, upon which Plaintiffs rely, is readily distinguishable. There, the Supreme Court's determination that later-enacted statutes limited FDA's ability to regulate tobacco hinged on an extensive history of congressional action that "effectively ratified the FDA's long-held position" that it lacked jurisdiction to regulate such products. 529 U.S. at 143–44. No such history exists here. Nor does the CARES Act eviction moratorium conflict with the CDC Order; the two are not coextensive, and both could exist

simultaneously.  Given that the CARES Act did not address whether CDC could issue an eviction moratorium under section 361, and there is no conflict between the two, the Court must read the CARES Act and section 361 harmoniously and conclude that the latter does not limit the former.

Plaintiffs finally invoke three separate canons to argue that the list of measures in the second sentence of section 361(a) that the Secretary of HHS "may" implement to prevent the spread of disease—which the regulation likewise includes—limits CDC's authority.  *See* Pls.' Mem. 20–21.  At the outset, it bears emphasis that the only federal courts to have considered this contention have rejected it.  In holding that a ban on the sale of baby turtles fell within the scope of authority granted by Congress, a court in the Western District of Louisiana held that "the list does not act as a limitation upon the types of regulations that may be enacted under Section 361."  *Indep. Turtle Farmers of La.*, 703 F. Supp. 2d at 620.  Likewise, the *Brown* court found that "the clear and broad delegation of authority in the first sentence of § 264(a); the context provided by the subsequent subsections; the parroting language of § 70.2, which specifically uses the term including—a term of enlargement; and persuasive authority from the *Independent Turtle Farmers* court" demonstrate that the grant of authority in the first sentence of subsection (a) is not limited by the second sentence so as to preclude issuance of the Order.  2020 WL 6364310, at *9.

Nor are the canons Plaintiffs invoke determinative where neither the statute nor the regulation uses the type of syntactic structure to which these canons are properly applied.  *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008) (declining to apply ejusdem generis where "[t]he structure of the phrase . . . does not lend itself to application of the canon").  As an initial matter, although the surplusage canon counsels that "when construing a statute courts give effect, if possible, to every clause and word," *Great Lakes Comnet, Inc. v. FCC*, 823 F.3d 998, 1003 (D.C. Cir. 2016), the canon "is not absolute," *Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004).  The ejusdem generis canon is applicable only where "a general term follows a specific one."  *Ali*, 552 U.S. at 223.  And noscitur a sociis is used

to interpret "a string of statutory terms" or "items in a list" harmoniously.  *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 289 (2010).

But the statute at issue here begins with a complete sentence containing a broad grant of authority to the Secretary "to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases."  42 U.S.C. § 264(a). Only in the subsequent sentence does the statute state that "[f]or the purposes of carrying out and enforcing such regulations," the Secretary "may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary."[5]  *Id.*  It would not make grammatical sense for the surplusage canon to apply to a list of inclusive measures, such as those in the second sentence of subsection 361(a), because inclusive measures, by definition, fall within the more general grant of authority.  In addition, because the general grant of authority to make regulations to prevent disease transmission is separate from and precedes the specific list of measures the Secretary may provide for, canons of construction that guide the interpretation of items in a list do not limit that grant of authority.  Moreover, as explained, the statute as a whole makes clear that the authority provided in the first sentence of subsection (a) is not limited to measures closely related to those listed in the second sentence.  *See Ali*, 552 U.S. at 226 (looking to "overall statutory context" instead of narrowly focusing on canons of construction).

---

[5]The fact that the second sentence of subsection 264(a) places the phrase "as in his judgment may be necessary" at the end of the list of possible measures the Secretary may provide for does not alter this result.  As explained, that sentence follows the general grant of authority to regulate, which requires only that regulation be, in the Secretary's judgment, "necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession."  42 U.S.C. 264(a). This reading is underscored by the fact that, in delegating authority to CDC, the Secretary has purposefully chosen phrasing that makes clear the Director's ability to take measures to prevent the spread of disease according to his public health expertise "includ[es]," but is not limited to, the examples of possible measures listed.  42 C.F.R. § 70.2; *accord Brown*, 2020 WL 6364310, at *9.

Instead, subsections (b) through (d) focus on apprehension, examination, and detention of individuals, meaning that such powers are included within the authority granted in the first sentence of subsection (a) despite differing significantly from the measures listed in the second sentence. *Accord Brown*, 2020 WL 6364310, at \*8 ("The presence of the additional subsections governing detainment of individuals means that the list contained in the first subsection is not an exhaustive list of the permissible measures available to the Secretary.").

The structure of the regulation similarly precludes application of these canons. The general phrase "such measures" as are "reasonably necessary" sets out the Director's baseline authority. *See* 42 C.F.R. § 70.2. The ensuing list of measures are examples of things that fall within this authority, not limits on it. Therefore, as the *Brown* court found, "the [ejusdem generis] canon is not applicable to § 70.2 because that regulation does not contain the requisite list of specific terms followed by a general one," but "[i]nstead, the specific terms are preceded by the word 'including,' which signifies a more expansive, non-exhaustive list." 2020 WL 6364310, at \*9; *see also id.* at \*10 (declining to apply noscitur a sociis where plaintiffs "failed to identify the existing ambiguous *word* that must be defined in reference to other similar enumerated words").

Even if CDC's authority were interpreted in light of these canons, the temporary eviction moratorium is not so different from the illustrative actions listed in the statute or regulation as to exceed CDC's authority. The ejusdem generis canon focuses on "the common attribute" of specific items to aid in the interpretation of a "catchall phrase." *Ali*, 552 U.S. at 224-25. The noscitur a sociis canon likewise looks to surrounding words to inform meaning. *Babbitt v. Sweet Home Chapter of Communities for a Greater Or.*, 515 U.S. 687, 702 (1995). Here, the regulation permits CDC to take a number of actions that intrude upon property rights, including "inspection," "fumigation," and even "destruction." 42 C.F.R. § 70.2. The temporary moratorium on evictions is a comparable imposition on property. The scale of the temporary moratorium is "necessary" to prevent the spread of disease

in light of the widespread and "historic" threat to public health COVID-19 poses. *See* 85 Fed. Reg. at 55292. Indeed, this action is entirely consistent with more extensive public health measures taken during this pandemic, such as border closures, travel restrictions, business closures, stay-at-home orders, and other eviction moratoria. *See id.*; *see also, e.g.*, *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 129 (6th Cir. 2020) (granting emergency stay of injunction against state order closing fitness facilities due to COVID-19); *Auracle Homes, LLC v. Lamont*, No. 20-00829, 2020 WL 4558682, at *21 (D. Conn. Aug. 7, 2020) (refusing to enjoin state eviction moratorium); *TJM 64, Inc. v. Harris*, No. 20-02498, 2020 WL 4352756, at *8 (W.D. Tenn. July 29, 2020) (refusing to enjoin local restrictions on businesses). For all of these reasons, the Order falls within CDC's statutory and regulatory authority.

### D. At A Minimum, CDC's Reasonable Interpretation Of The Statute Is Entitled To Deference.

If the Court rejects the foregoing arguments and determines that the statute is ambiguous, *Chevron* step two requires deference to the agency's reasonable interpretation. The rationale underlying *Chevron* deference is that "ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion"—decisions that "involve[] difficult policy choices that agencies are better equipped to make than courts."[6] *Brand X*, 545 U.S. at 980. *Chevron* thus applies where "Congress delegated authority to the agency generally to make rules carrying the force of law and that the agency interpretation was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). In such circumstances, "courts are bound to uphold an agency interpretation as long as it is reasonable—regardless whether

---

[6] Plaintiffs' claim that CDC's interpretation is not entitled to deference because both CDC and FDA have authority to act under the statute is wrong. *See* Pls.' Mem. 22. Both CDC and FDA are subagencies within HHS, to which Congress granted the authority to administer the statute. 42 U.S.C. § 361(a). Plaintiffs' argument is based on cases dealing with situations in which multiple *different* agencies have authority under a single general statute. *See Kaufman v. Nielsen*, 896 F.3d 475, 480 (D.C. Cir. 2018); *see also Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 642 n.30 (1986).

there may be other reasonable, or even more reasonable, views." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1321 (D.C. Cir. 1998); *see also Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 158 (2013).

The prerequisites to applying *Chevron* deference are easily met here. There can be no serious dispute that section 361 reflects a congressional delegation to HHS to make regulations with the force of law. The statute authorizes the Secretary "to make and enforce such regulations as in his judgment are necessary" to prevent the international or interstate spread of disease. 42 U.S.C. § 264(a). It further allows the Secretary to "provide for . . . measures [that] in his judgment may be necessary" in order to "carry[] out and enforc[e] such regulations." *Id.* As explained, the regulation paraphrases this language to delegate to the CDC Director the full authority Congress provided under the statute to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary"— provided he makes the additional determination that state and local disease-control measures are inadequate.[7] 42 C.F.R. § 70.2. The language clearly provides the agency authority to make binding regulations. *Accord Brand X*, 545 U.S. at 980–81 (analyzing a statute empowering an agency to "execute and enforce" an Act and "prescribe such rules and regulations as may be necessary in the public interest to carry out [its] provisions"). Finally, it is clear that the Order at issue here was issued pursuant to that authority and has the force of law. *See* 85 Fed. Reg. at 55297.

The fact that the agency did not engage in notice-and-comment rulemaking does not change the analysis. *See Barnhart v. Walton*, 535 U.S. 212, 221 (2002) ("that the Agency previously reached its interpretation through means less formal than 'notice and comment' rulemaking, . . . does not automatically deprive that interpretation of the judicial deference otherwise its due"); *Mead*, 533 U.S. at 231 ("we have sometimes found reasons for *Chevron* deference even when no such administrative

---

[7] Plaintiffs' unsupported assertion that the regulation provides the agency with narrower authority than Congress provided in the statute, *see* Pls.' Mem. 23, is incorrect because it is inconsistent with the text and structure of the regulation, *see supra* pp. 9-16.

formality was required and none was afforded").  Instead, factors like the clear authority pursuant to which it was promulgated, the fact that the Order carries the force of law, its formality—the Order was published in the Federal Register—and the agency's unquestionable public health expertise demonstrate that deference to the agency's interpretation of the statute is warranted.  *See Mead*, 533 U.S. at 230–31; *see also NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257–58 (1995) (deferring, under *Chevron*, to agency's reasonable position articulated in interpretive letters).

Plaintiffs advance a host of disparate reasons as to why the Court should not defer to the agency's interpretation here.  *See* Pls.' Mem. 22–24.  But the main thrust is that CDC's interpretation is not entitled to deference because such an interpretation is novel and overly broad.  But it is hardly the case that interpreting the statute and regulation to permit a temporary eviction moratorium to prevent contagion during a global pandemic would result in unbounded federal authority.  *See* Pls.' Mem. 22.  The statute and regulation place clear limits on the agency's authority, requiring that regulation be (1) enacted to "prevent the . . . spread of communicable disease[]," 42 U.S.C. § 264(a); 42 C.F.R. § 70.2; (2) considered "necessary" in the "judgment" of public health experts, 42 U.S.C. § 264(a); 42 C.F.R. § 70.2; and (3) conditioned on a finding that local health initiatives are "insufficient to prevent the spread" of disease "from such State or possession to any other State or possession," 42 C.F.R. § 70.2.  These are not empty requirements, but real constraints reviewable by courts under the APA.  *See* 5 U.S.C. § 706(2); *Brown*, 2020 WL 6364310, at *12–14.  And these limitations have proved meaningful in practice: although the PHSA has been law since 1944, HHS has rarely utilized the authority granted for disease-control purposes under section 361.  The fact that CDC has done so here is a direct reflection of the severity of the exceedingly rare threat posed by COVID-19.  And the Order's findings reflect the extraordinary circumstances that prompted the CDC Director to determine that—as required by the statute and regulation—its issuance was necessary in his judgment to prevent the spread of disease.  *See, e.g.*, 85 Fed. Reg. at 55292 (explaining that "the mortality

associated with COVID–19 during the early phase of the outbreak in New York City was comparable to the peak mortality observed during the 1918 H1N1 influenza pandemic," in which "there were approximately 50 million influenza-related deaths worldwide, including 675,000 in the United States"). *Accord Brown*, 2020 WL 6364310, at *12–14.

Two points warrant further discussion. *First*, the canon of constitutional avoidance does not apply because it "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as *a means of choosing between them*." *Clark v. Martinez*, 543 U.S. 371, 385 (2005). Plaintiffs fail to point to two reasonable interpretations of the statute between which the canon could prove the tiebreaker. *See Fla. Indep. Colls. & Univs. Risk Mgmt. Ass'n, Inc. v. United States*, 850 F. Supp. 2d 125, 131 (D.D.C. 2012). And in any case, none of the claimed constitutional issues to which Plaintiffs point has any merit for the reasons discussed below. *See infra* pp. 33-43.

*Second*, the well-reasoned decision of the *Brown* court should be looked to as persuasive authority. Plaintiffs discount its analysis as "simplistic," Pls.' Mem. 25, but its statutory interpretation is supported by decisions of the Supreme Court. *See Brand X*, 545 U.S. at 980–81. It is Plaintiffs' invocation of *New York Stock Exchange LLC v. SEC (NYSE)*, 962 F.3d 541 (D.C. Cir. 2020), that is off-base. The D.C. Circuit there held that SEC's general rulemaking authority "to make such rules and regulations as may be necessary or appropriate to implement the provisions of" the Exchange Act did not permit the agency to implement a pilot program that, rather than implement the provisions of the Act, was intended to gather data for future rulemaking. *Id.* at 553–54. In contrast, the statute here authorizes the agency to "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases," and the Order does exactly that. Plaintiffs are incorrect that *NYSE* conflicts with *Brown*.

For all of these reasons, if the Court determines that the statute and regulation at issue are ambiguous, it should defer to CDC's reasonable interpretation under *Chevron*.

## II.    CDC Complied With All Rulemaking Requirements

### A.    The Order Is Not Subject To Notice And Comment Under The APA.

Plaintiffs contend that the Order is void because CDC did not comply with the notice-and-comment requirements that apply to legislative rules under the APA. *See* Pls.' Mem. 12. That claim fails because the Order is not a rule to which those requirements apply—and even if it were, there was good cause to proceed without notice and comment given the urgent circumstances, as the APA expressly permits. *See* 5 U.S.C. § 553(b)(B).

First, the APA's notice-and-comment requirements apply to "rule making," *see* 5 U.S.C. § 553, with the term "rule" defined to include "statement[s] of general or particular applicability and future effect" that are designed to "implement, interpret, or prescribe law or policy," *id.* § 551(4)). But while the Order is final agency action within the meaning of 5 U.S.C. § 704, *see* Pls.' Mem. 10, it is not a *rule*; it is an "an emergency action taken under the existing authority of 42 CFR 70.2," 85 Fed. Reg. at 55296. In contrast, 42 C.F.R. § 70.2 *is* a duly promulgated rule, and it permits the Director of CDC to take "such measures to prevent such spread of the diseases as he/she deems reasonably necessary" to prevent the further spread of disease. 42 C.F.R. § 70.2. Given that the very purpose of § 70.2 is to enable CDC to take swift steps to prevent contagion, it cannot be that the actions it authorizes are also rules that require another round of notice and comment before they take effect.

Second, even if the Order were a rule, notice-and-comment rulemaking is not required "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). This exception excuses notice and comment in emergency situations, or where delay could result in serious harm. *See Jifry v. FAA*, 370 F.3d 1174,

1179 (D.C. Cir. 2004).  The agency's finding here easily meets that standard; as CDC explained, a "delay in the effective date of the Order . . . would defeat the purpose of the Order and endanger the public health.  Immediate action is necessary."  85 Fed. Reg. at 55296.  CDC acted quickly given the "life-saving importance" of the Order, *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981), just as the APA permits.

Plaintiffs appropriately concede that there is a "public health emergency created by the pandemic," Pls.' Mem. 11, and that "a moratorium on evictions may prevent the spread of COVID 19," *id.* at 1.  Their only real argument is that because COVID became an emergency "in January 2020," CDC could have initiated a notice-and-comment process months earlier—while the CARES Act moratorium and various state and local moratoria were still in effect.  *Id.* at 11-12.  Yet CDC could not propose to issue an eviction moratorium without first determining that such a moratorium was necessary and that state and local measures were insufficient.  *See* 42 C.F.R. § 70.2; *see also, e.g.*, *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999) (holding that "critical factual material that is used to support the agency's position on review must have been made public in the proceeding and exposed to refutation" (emphasis omitted)).  But by the time it made those determinations in September 2020, it further determined that delay would undermine the Order's urgent public health goals.  *See* 85 Fed. Reg. at 55296 ("Considering the public-health emergency caused by COVID-19, it would be impracticable and contrary to the public health, and by extension the public interest, to delay the issuance and effective date of this Order.").  Plaintiffs' suggestion that, had CDC made that determination earlier, it would have sat on its hands for months—rather than enacting a moratorium it had determined was necessary to save lives—is unfounded.[8]

---

[8] In any case, during the early months of the pandemic, it was unknown whether Congress would extend the CARES Act moratorium, or whether various states and localities would extend their moratoria, meaning that any eviction moratorium proposed by CDC would have depended on relatively uninformed speculation about what Congress, states, and localities would choose to do.  *See*

Finally, for all the same reasons that the Order was not subject to notice-and-comment under 5 U.S.C. § 553, it is also not subject to the Regulatory Flexibility Act (RFA), 5 U.S.C. § 604. *See* Pls. Mem. 12–13. That statute requires a regulatory flexibility analysis when "an agency promulgates a final rule under section 553 of this title," *but only* "after being required by that section or any other law to publish a general notice of proposed rulemaking." 5 U.S.C. § 604(a). As set out above, CDC was not required to so issue a proposed rulemaking. Plaintiffs' RFA claim is thus entirely duplicative of their notice-and-comment claim under 5 U.S.C. § 553, a point that Plaintiffs appear to concede. *See* Pls.' Mem. 12 (RFA analysis required "for the same reasons that the CDC was required to follow the APA's notice-and-comment procedures.").

### B.   The CDC Order Is Not Arbitrary Or Capricious.

Nor is the Order arbitrary or capricious. *See* Pls.' Mem. 26–30. Under this deferential standard, the agency's decision is presumed valid, and the Court considers only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). An agency's decision may be deemed arbitrary and capricious only where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). The deference is heightened even further in cases like this one, which call for the application of scientific expertise. "We will give an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise," *West Virginia v. EPA*,

---

85 Fed. Reg. at 55294 & n.14 (explaining that the CARES Act "helped alleviate the public health consequences of tenant displacement during the COVID-19 pandemic" but that the effects of its expiration were "expected to manifest" by August 27, 2020); *see also id.* at 55296 & n.36 (indicating that state and local eviction moratoria "have expired and are set to expire in many jurisdictions").

362 F.3d 861, 871 (D.C. Cir. 2004), for "we cannot decide . . . whether technical evidence beyond our ken supports the proposition it is asserted to support," *Simpson v. Young*, 854 F.2d 1429, 1434 (D.C. Cir. 1988).

**1.**    Plaintiffs suggest that the Order fails to comply with 42 C.F.R. § 70.2 because it does not sufficiently explain why measures by states and localities are insufficient to prevent the spread of COVID.  *See* Pls.' Mem. 26–27.  That is little more than a disguised argument that no eviction moratorium is necessary at all—a contention that Plaintiffs themselves nearly disclaim.  *See* Pls.' Mem. 1 (agreeing that "moratorium on evictions may prevent the spread of COVID-19").  CDC specifically found that "the temporary halt in evictions in this Order constitutes a reasonably necessary measure under 42 CFR 70.2 to prevent the further spread of COVID–19 throughout the United States."  85 Fed. Reg. at 55296.  That conclusion was supported by pages of analysis showing why a wave of evictions would lead to increased spread of COVID-19.  *See generally supra* pp. 6-8.  Given CDC's finding that a nationwide eviction moratorium was *necessary* to prevent the spread of COVID-19, it inescapably follows that states and localities that did not provide similar protection had not taken *sufficient* steps to prevent the spread of COVID-19.  And in any case, CDC further noted that "[p]ublicly-available compilations of pending measures indicate that eviction moratoria and other protections from eviction have expired or are set to expire in many jurisdictions," 85 Fed. Reg. at 55296 n.36 (citing Eviction Lab, *COVID–19 Housing Policy Scorecard,* available at: https://evictionlab.org/covid-policy-scorecard) (A.R. 966–72), further underscoring why coordinated national action was appropriate.  *Accord Brown*, 2020 WL 6364310, at *14 ("The CDC referenced the measures in place in various jurisdictions and, based on that knowledge, determined that a moratorium was necessary.").

**2.**    Plaintiffs contend that "CDC failed to explain how the cited regulation authorizes an economic measure like the Eviction Moratorium."  Pls.' Mem. 27.  At the outset, it has been the

government's considered position for decades that its authority under the PHSA includes the ability promulgate regulations with economic effects. *See, e.g.*, *Mathews*, 427 F. Supp. 174 (upholding ban on sale of small turtles). In any case, whether 42 C.F.R. § 70.2 does or does not authorize an "economic measure" is a pure question of law for which the Court "need[s] no agency reasoning." *Amador Cty., Cal. v. Salazar*, 640 F.3d 373, 382 (D.C. Cir. 2011); *accord, e.g.*, *Stand Up for California! v. U.S. Dep't of Interior*, 204 F. Supp. 3d 212, 283 (D.D.C. 2016), *aff'd*, 879 F.3d 1177 (D.C. Cir. 2018). And as set out above, the Order falls well within CDC's statutory and regulatory authority. *See supra* pp. 8-25.

**3.** Equally misplaced is Plaintiffs' contention that CDC improperly "failed to consider and justify the costs of the Eviction Moratorium." Pls.' Mem. 27–28. To start, the extent to which an agency must consider costs is governed by the text of the authorizing statute. *Michigan v. EPA*, 576 U.S. 743 (2015). In general, "[w]hen Congress has intended that an agency engage in cost-benefit analysis, it has clearly indicated such intent on the face of the statute." *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 510 (1981); *see also City of Portland v. EPA*, 507 F.3d 706, 712 (D.C. Cir. 2007); *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 377–78 (D.C. Cir. 2013). Indeed, even where Congress wants an agency to engage in less formal economic analysis—or merely to consider the costs of regulation on a regulated party—it has generally made its intent clear in the statutory text. *See, e.g.*, *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1039 (D.C. Cir. 2012) ("[W]hen Congress . . . authorize[d] regulations addressing lead-paint hazards, it instructed EPA to 'tak[e] into account reliability, effectiveness, and safety'—but did not mention cost."). And while the Court in *Michigan* found that in the context of the statute at issue the phrase "appropriate and necessary" required some consideration of cost, it emphasized that "[t]here are undoubtedly settings in which the phrase 'appropriate and necessary' does not encompass cost." 576 U.S. at 752. The key, it explained, is to read the statutory terms "fairly and in context." *Id.* at 756.

Here, 42 U.S.C. § 264 is silent as to costs, granting the Secretary authority "to make and enforce such regulations as in his judgment are necessary to prevent" contagion.  Congress's silence with respect to costs is powerful evidence that it expected public health officials to exercise their authority based on what would best protect public health, and not on the narrow economic interests of landlords.  The Court should not read into the statute a requirement "to consider costs that has elsewhere, and so often, been expressly granted" by Congress.  *Whitman*, 531 U.S. at 467; *see also, e.g.*, *Nicopure Labs, LLC v. FDA*, 266 F. Supp. 3d 360, 401 (D.D.C. 2017) ("Here the statutory provision at issue does not include the words that led the Supreme Court in *Michigan v. EPA* to call for some assessment of costs as part of the decision that had been delegated to the agency."), *aff'd*, 944 F.3d 267 (D.C. Cir. 2019).[9]

In any event, Plaintiffs' suggestion that CDC was inattentive to potential burdens on landlords is misplaced.  As noted earlier, Plaintiffs' calculations about the economic effects of the Order are erroneous.  *See supra* p. 15 n.4.  Even as Plaintiffs describe it, the Order merely "shift[s] . . . economic costs from renters to landlords," Pls.' Mem. 28.[10]  But any such shifts are only temporary, as landlords may require any back rent to be repaid with interest once the moratorium expires, and may even

_____

[9] Plaintiffs' citation to Executive Order 12866, which requires agencies to conduct a cost-benefit analysis when promulgating certain significant regulations, is a red herring.  *See* Pls.' Mem. 28.  At the outset, Plaintiffs simply assume, without discussion, that Executive Order 12866 would apply to an emergency order issued under 42 C.F.R. § 70.2.  *Cf.* EO 12866 § 3(d) (defining "regulation" and "rule" for purposes of the Executive Order); *id.* § 3(e) (defining "significant regulatory action").  And in any case, the Executive Order does not create judicially enforceable rights.  *Id.* § 10; *see also, e.g.*, *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1 (D.C. Cir. 1999) (finding that similar language in a different executive order precluded judicial review); *Fla. Bankers Ass'n v. U.S. Dep't of Treas.*, 19 F. Supp. 3d 111, 118 n.1 (D.D.C. 2014) (same as to EO 12866), *vacated on other grounds*, 799 F.3d 1065 (D.C. Cir. 2015); *Alliance for Natural Health v. Sebelius*, 775 F. Supp. 2d 114, 135 (D.D.C. 2011) (same).

[10] It is true, as Plaintiffs observe, that CDC acknowledged that the Order would constitute a major rule under the Congressional Review Act if it were considered a rule.  *See* 85 Fed. Reg. at 55,296.  Yet a regulatory action can have an "effect on the economy of $100,000,000 or more," 5 U.S.C. § 804(2)(a), without imposing *costs* on the economy in that amount.

initiate eviction proceedings in the meantime—provisions that reflect a careful tailoring of the Order to mitigate its effects on landlords, *see State Farm*, 463 U.S. at 43 (an agency decision will be sustained so long as its "path may reasonably be discerned")—and, as noted, Plaintiffs point to nothing in the statute that requires the sort of formal economic analysis they apparently seek.

4.      Plaintiffs suggest that CDC failed to explain why it defined various terms in the Order as it did.   Each instance is a second-guessing of a policy choice by CDC that is not appropriate for APA review.   *See State Farm*, 463 U.S. at 43.   First, Plaintiffs question why CDC did not limit the definition of "covered person" to those already infected with or particularly susceptible to severe cases of COVID-19.   Yet CDC expressly noted that "people without symptoms may be able to spread the virus," 85 Fed. Reg. at 55292, such that there is serious risk of people who do not know they are infected spreading the virus.   Limiting the Order's protections to those identified to have COVID-19 could therefore not achieve its public health goals.   And because people who are not themselves at heightened risk of severe COVID-19 can spread the virus to those who are, the Order similarly could not achieve its goals by limiting its protections to those at heightened risk.   In any event, it would plainly raise a host of privacy and administrability issues to require tenants to certify to their landlords that they are suffering from conditions like "cancer, an immunocompromised state, obesity, serious heart conditions, and diabetes," *id.* at 55293-94, to invoke the Order's protections.

Plaintiffs further criticize CDC for failing to limit the definition of covered persons to those who would travel out of state if evicted.   Yet CDC explained that the Order "prevent[s] evicted individuals from potentially contributing to the interstate spread of COVID–19 through movement into close quarters in new congregate, shared housing settings," 85 Fed. Reg. at 55293 n.6—not simply by moving across state lines themselves.   That makes sense, for CDC has long recognized the obvious point that intrastate spread of a contagious disease typically leads quickly to interstate spread, for each new infection within a state creates another case that can leave the state.   *See, e.g.*, HHS, Control of

Communicable Diseases; Restrictions on African Rodents, Prairie Dogs, and Certain Other Animals, 68 Fed. Reg. 62353, 62355 (Nov. 4, 2003) ("[A]n infected animal could transmit the monkeypox virus to other animals within a State, and eventually and inevitably the monkeypox virus would be transmitted to other States as infected wild animals or even infected, domesticated animals crossed State borders.  Effective intrastate controls are, therefore, an integral part of efforts to prevent interstate transmission of communicable disease."); *see also Mathews*, 427 F. Supp. at 176 (ban on intrastate sale "is not only authorized by the law, but, under modern conditions of transportation and commerce is clearly reasonable to prevent the interstate spread of disease").  The Order is not rendered arbitrary and capricious simply because it did not recite this obvious and long-established principle of public health.

Plaintiffs further fault CDC for failing to explain why it did not adopt a definition of "covered person" that would also include homeowners and hotel guests.  *See* Pls.' Mem. 29.  At the outset, Plaintiffs lack standing to present this argument; they are not hotel guests or homeowners, and CDC's decision not to provide protections for such individuals does not cause them any injury.  *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (Article III injury requirements).  And in any case, if CDC determines in the future that the Order should apply more broadly, it can address the issue at that time.  *See National Ass'n of Broadcasters v. FCC*, 740 F.2d 1190, 1208 (D.C. Cir. 1984) (agencies "need not deal in one fell swoop with the entire breadth of a novel development; instead, 'reform may take place one step at a time, addressing itself to the phase of the problem which seems most acute to the [regulatory] mind.'" (quoting *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 (1955)); *see also, e.g.*, *FCC v. Fox Television Stations*, 556 U.S. 502, 522 (2009) ("Nothing prohibits federal agencies from moving in an incremental manner.").

Finally, Plaintiffs fault CDC for failing to adequately define the term "eviction."  *See* Pls.' Mem. 29.  That contention is meritless, for the Order provides a clear definition.  85 Fed. Reg. at 55293.

"Evict" is also a term with a settled legal meaning.  *See* Black's Law Dictionary (11th ed. 2019) ("[t]o expel (a person, esp. a tenant) from real property, usu. by legal process").  Especially when read in conjunction with the Order's statement of intent—"[m]itigating the spread of COVID-19 within congregate or shared living settings, or through unsheltered homelessness"—these definitions leave no doubt that the Order prohibits removal of covered persons from residential properties for nonpayment of rent, not antecedent steps.  85 Fed. Reg. at 55293.  And if any confusion remained, three federal agencies—including the Department of Justice, the agency charged with enforcing the Order—issued FAQs making clear that the Order is not intended "to prevent landlords from starting eviction proceedings, provided that the actual eviction of a covered person for non-payment of rent does NOT take place during the period of the Order."  FAQs at 1.

## III.  Plaintiffs' Constitutional Claims Fail.

### A.  Section 361(a) Contains An Intelligible Principle And Is Thus A Valid Delegation.

Plaintiffs next argue that, if the Order is within CDC's statutory and regulatory authority, section 361(a) contains an unconstitutional delegation of authority.  Pls.' Mem. 30–31.  But the statute easily meets the constitutional requirements for a delegation to be valid.

Congress may delegate legislative power to the Executive so long as it provides an "intelligible principle" to guide the agency.  *E.g.*, *Mistretta v. United States*, 488 U.S. 361, 372 (1989).  A delegation is "constitutionally sufficient if Congress clearly delineates [1] the general policy, [2] the public agency which is to apply it, and [3] the boundaries of this delegated authority."  *Id.* at 372–73.  Congressional delegations have been struck down as unconstitutional only twice in United States history—both in 1935—and only because "Congress had failed to articulate *any* policy or standard" to confine discretion.  *Gundy*, 139 S. Ct. at 2129 (plurality opinion) (emphasis added).  That is not the case here.

Instead, the Supreme Court has repeatedly recognized that protection of public health and safety are sufficient intelligible principles.  For example, the Court found an intelligible principle in a

statute permitting EPA to set air quality standards "requisite to protect the public health." *Whitman*, 531 U.S. at 475–76. Similarly, a statute permitting the Attorney General to temporarily schedule a drug where he finds that doing so is "necessary to avoid an imminent hazard to the public safety" had an intelligible principle. *Touby*, 500 U.S. at 166; *see also Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980) (statute empowering the Secretary of Labor to determine what constituted a "safe" place of employment). And the Court has, on multiple occasions, "approved delegations to various agencies to regulate in the 'public interest.'" *Gundy*, 139 S. Ct. at 2129 (plurality opinion) (citing *Nat'l Broadcasting Co. v. United States*, 319 U.S. 190, 216 (1943), and *N.Y. Cent. Secs. Corp. v. United States*, 287 U.S. 12, 24 (1932)). In contrast, the only two acts ever struck down for violating nondelegation principles either "provided literally no guidance for the exercise of discretion" or "conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman*, 531 U.S. at 474.

The statute at issue here clearly passes muster under this precedent. The "general policy" articulated in subsection (a) is "to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 42 U.S.C. § 264(a). This authority is delegated to the Secretary of HHS. *Id.* And the requirement that a regulation must be "necessary" in the "judgment" of the HHS Secretary for the purpose of preventing the spread of disease from outside the United States or among the states provides meaningful, judicially reviewable boundaries on this grant of authority. *Id.*

Plaintiffs' contentions do not focus on the intelligible-principle standard, but rather rehash their argument regarding the alleged breadth of the authority granted to HHS and CDC. But "Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors." *Touby*, 500 U.S. at 165. To the contrary, "Congress simply cannot do its job absent an ability to delegate power under broad general directives."

*Mistretta*, 488 U.S. at 372.  And the Supreme Court has noted that it has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Whitman*, 531 U.S. at 474–75 (quoting *Mistretta*, 488 U.S at 416 (Scalia, J., dissenting)).  Here, Congress has permissibly chosen to delegate broad authority, within specified bounds, to public health experts in a fast-moving, complex, and technical area.  And, as explained, there is no support for Plaintiffs' supposition that the requirement that regulations be "necessary" to prevent the "spread of communicable disease" provides a regulatory blank check to CDC.

### B.     The Order Does Not Effect A Taking Of Plaintiffs' Property.

The Court should also find that the Order does not constitute a taking.  *See* Pls.' Mem. 32–36. The Takings Clause of the Fifth Amendment provides, "[n]or shall private property be taken for public use, without just compensation."  U.S. Const. amend. V.

At the outset, the federal government's interference with private contractual rights is not a taking.  *See Palmyra Pac. Seafoods, LLC v. United States*, 561 F.3d 1361, 1365–68 (Fed. Cir. 2009) ("As a general matter, the government does not 'take' contract rights pertaining to a contract between two private parties simply by engaging in lawful action that affects the value of one of the parties' contract rights."); *see also 767 Third Ave. Assocs. v. United States*, 48 F.3d 1575, 1581 (Fed. Cir. 1995) ("no taking occurs when . . . expectations under a contract are merely frustrated by lawful government action not directed against the takings claimant").  It is well settled that "[c]ontracts, however express, cannot fetter the constitutional authority of Congress."  *Norman v. Baltimore & Ohio R.R. Co.*, 294 U.S. 240, 307 (1935).  Although no State may pass a law impairing the obligation of contracts, *see* U.S. Const. art. I, § 10, the Contract Clause does not bind the federal government.  *See Pension Benefit Guaranty Corp. v. Gray*, 467 U.S. 717, 733 (1984) (contrasting "the limitations imposed on States by the Contract Clause with the less searching standards imposed on economic legislation by the Due Process Clauses").  It is also clear that the federal government does not "take" a contract in the Fifth

Amendment sense if it merely limits the contractual remedies available for breach of the contract. Such an action does not amount to a taking unless the federal government appropriates the contract for its own use by substituting itself for the contracting party. As the Supreme Court has explained, "[t]here is no constitutional ground for denying to the Congress the power expressly to prohibit and invalidate contracts although previously made, and valid when made, when they interfere with the carrying out of the policy it is free to adopt." *Norman*, 294 U.S. at 309–10; *see also Omnia Commercial Co. v. United States*, 261 U.S. 502, 507, 511 (1923) (holding that the federal government's direction that a company must end a contract was not a taking, reasoning that the contract "was not appropriated, but ended"). In other words, unless the government becomes the beneficiary of the plaintiff's contract—to the exclusion of the plaintiff—there has been no taking. *See Omnia*, 261 U.S. at 511; *Palmyra Pac. Seafoods*, 561 F.3d at 1365. Because the Order does not make the government the beneficiary of the landlord-tenant contracts it affects, there has been no taking.

Regardless, the Order is not a taking for the same reasons that multiple federal district courts have recently rejected analogous challenges to state eviction moratoria. *See Baptiste v. Kennealy*, --- F. Supp. 3d ---, No. 20-11335, 2020 WL 5751572, at *20–22 (D. Mass. Sept. 25, 2020); *Auracle*, 2020 WL 4558682, at *13–16; *Elmsford Apartment Assocs. v. Cuomo*, 469 F. Supp. 3d 148, 162-68 (S.D.N.Y. 2020). Takings may be either physical or regulatory. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321–22 (2002). A physical taking is "a permanent physical occupation of property" for which just compensation is required per se. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441 (1982). Whether "regulations that prohibit a property owner from making certain uses of her private property" effect regulatory takings, in contrast, depends upon "essentially ad hoc, factual inquiries" and an "examination and weighing of all the relevant circumstances." *Tahoe-Sierra*, 535 U.S. at 321–22 (cleaned up).

Clear Supreme Court precedent forecloses Plaintiffs' arguments that the Order constitutes a physical occupation.  "The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land."  *Yee v. City of Escondido*, 503 U.S. 519, 527 (1992).  In this vein, the Supreme Court has held that no physical taking occurred where regulations prevented owners of mobile home plots from raising rents or evicting tenants from their land, reasoning that "[b]ecause they voluntarily open their property to occupation by others, petitioners cannot assert a per se right to compensation based on their inability to exclude particular individuals."  *Id.* at 531; *see also FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987) ("statutes regulating the economic relations of landlords and tenants are not per se takings").  The same logic applies here, where Plaintiffs voluntarily rented their properties, and the Order does no more than limit the reasons for which or delay the point at which they may evict the current tenants.  *Accord Baptiste*, 2020 WL 5751572, at *20; *Auracle*, 2020 WL 4558682, at *13; *Elmsford*, 2020 WL 3498456, at *7–8.

Second, this is not the "extraordinary" case in which a categorical regulatory taking has occurred.  *Tahoe-Sierra*, 535 U.S. at 330 (quoting *Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1017 (1992)).  The categorical rule was "carved out" for instances where "a regulation *permanently* deprives property of all value."  *Id.* at 332 (emphasis added).  Indeed, the Supreme Court rejected the argument that a per se regulatory taking occurred even where a land-development moratorium impeded all economically beneficial use for over two years.  *Id.* at 337.  In light of this precedent, the categorical rule is inapplicable here.  The Order applies for a few months and, during that time, Plaintiffs may charge rent, apply fees or penalties for nonpayment of rent, or evict their tenants for contractual violations other than nonpayment of rent.  *See* 85 Fed. Reg. at 55294.  Thus, it does not deprive Plaintiffs of the value of their property in the short term, let alone permanently.  *Accord Baptiste*, 2020 WL 5751572, at *20; *Auracle*, 2020 WL 4558682, at *14; *Elmsford*, 2020 WL 3498456, at *9.

Finally, a weighing of factors demonstrates that a regulatory taking has not occurred here. The three factors courts typically examine when making such a determination are "[1] the regulation's economic impact on the claimant, [2] the regulation's interference with the claimant's reasonable investment-backed expectations, and [3] the character of the government action." *Dist. Intown Props. Ltd. P'ship v. District of Columbia*, 198 F.3d 874, 878–79 (D.C. Cir. 1999). An analysis of the economic impact of a regulation "requires [courts] to compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987). Further, "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978).

Here, all three factors weigh against finding that a taking has occurred. Plaintiffs have not attempted to show that the economic impact of the Order outweighs the value left in their property. Moreover, any economic impact is necessarily limited: the Order lasts four months (unless extended), and it neither excuses rent obligations nor precludes landlords from charging penalties or fees, or filing actions seeking unpaid rent. 85 Fed. Reg. at 55292, 55294. Thus, consideration of economic impact does not support a finding that a regulatory taking has occurred. *Accord Baptiste*, 2020 WL 5751572, at *21; *Auracle*, 2020 WL 4558682, at *15; *Elmsford*, 2020 WL 3498456, at *10.

Further, the Order has not interfered unduly with investment-backed expectations. Landlord-tenant relations are heavily regulated in most jurisdictions; it therefore cannot be unexpected that a regulation might affect a landlord's ability to pursue an eviction at his preferred time. *See Yee*, 503 U.S. at 528–29 ("This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation

for all economic injuries that such regulation entails." (quoting *Loretto*, 458 U.S. at 440)); *accord Auracle*, 2020 WL 4558682, at *15; *Elmsford*, 2020 WL 3498456, at *10–11.

The nature of the Order also weighs heavily against a finding that a taking has occurred.  As explained above, the government has not physically occupied Plaintiffs' property, and the purpose of the Order is to promote the common good by preventing the spread of a deadly disease.  Indeed, as another federal district court found in determining that Massachusetts's eviction moratorium was not a regulatory taking, such an order "benefit[s] those tenants, who are now temporarily protected from eviction, and members of the public, who elected officials found would be at greater risk of COVID-19 infection if displaced tenants caused or contributed to the overcrowding of other dwellings and homeless shelters, or were required to live on the streets."  *Baptiste*, 2020 WL 5751572, at *22; *accord Auracle*, 2020 WL 4558682, at *16; *Elmsford*, 2020 WL 3498456, at *11.

Finally, even if a taking had occurred, injunctive relief is not a proper remedy.  *See HAPCO v. City of Philadelphia*, No. 20-3300, 2020 WL 5095496, at *12 (E.D. Pa. Aug. 28, 2020).  As the Supreme Court recently reiterated, "Federal courts will not invalidate an otherwise lawful uncompensated taking when the property owner can receive complete relief through a Fifth Amendment claim brought under the Tucker Act."  *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2179 (2019).  And "the Tucker Act . . . create[s] a presumption of exclusive jurisdiction in the Court of Federal Claims," *Franklin-Mason v. Mabus*, 742 F.3d 1051, 1055 (D.C. Cir. 2014), depriving this Court of subject matter jurisdiction over them.[11]

---

[11] Plaintiffs cite *Bell Atlantic Telephone Cos. v. FCC*, 24 F.3d 1441 (D.C. Cir. 1994), for the proposition that courts should not afford *Chevron* deference to an agency interpretation of an ambiguous statute that "creates a broad class of takings claims," *id.* at 1445–46.  But this decision is inapposite here, where, for the reasons explained above, (1) the statute plainly allows the regulation at issue, and (2) the agency action does not effect a taking.  It thus bears emphasis that plaintiffs are required to litigate takings claims on the assumption the "action was both authorized and lawful," *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1366 (Fed. Cir. 2001), but Plaintiffs here contest both.

### C.      Plaintiffs Have Identified No Due Process Violation.

Plaintiffs assert that the Order violates the Fifth Amendment by violating procedural due process and because it is unconstitutionally vague.  Pls.' Mem. 36–37.  The first claim fails because "[i]t is well established that statutes or ordinances of general applicability may condition or even prohibit the right to conduct a business without running afoul of procedural due process." *Emory v. United Air Lines, Inc.*, 821 F. Supp. 2d 200, 222 (D.D.C. 2011), *aff'd*, 720 F.3d 915 (D.C. Cir. 2013) (quoting *Jones v. Air Line Pilots Ass'n*, 713 F. Supp. 2d 29, 36 (D.D.C. 2010)); *accord Minn. State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 284 (1984) ("General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule." (quoting *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915)); *Neinast v. Bd. of Trs. of Columbus Metro. Library*, 346 F.3d 585, 596 (6th Cir. 2003) ("Governmental determinations of a general nature that affect all equally do not give rise to a due process right to be heard."); *Vaden v. Vill. of Maywood, Ill.*, 809 F.2d 361, 364 (7th Cir. 1987) (similar); *see also* Richard J. Pierce, Jr., 2 Administrative Law Treatise § 9.2 (5th ed. 2010) (due process doctrine recognizes a "distinction between individualized deprivations, that are protected by procedural due process, and policy-based deprivations of the interests of a class, that are not protected by procedural due process").

This concept applies to "discretionary[] policymaking decision[s]" that are "general in [their] scope rather than targeted on a specific individual."[12] *Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 216 (6th Cir. 2011).  The "generality" of such actions "provides a safeguard that is a substitute

---

[12] Plaintiffs' cited cases all involve actions targeting individuals, and are thus distinguishable.  *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 306 (D.C. Cir. 2014) (challenge to presidential order regarding acquisition of four individual wind farms); *Propert v. District of Columbia*, 948 F.2d 1327, 1331 (D.C. Cir. 1991) (individual interest in "junk" car taken from plaintiff).

for procedural protections," and therefore "[n]o notice or hearing is required." *Id.*  For example, a federal district court recently held that Ohio's order closing non-essential businesses to prevent the spread of COVID-19 did not violate the plaintiff businesses' due process rights because it "was a generally applicable order affecting thousands of businesses, and not a decision targeting an individual or single business." *Hartman v. Acton*, No. 20-1952, 2020 WL 1932896, at *8–10 (S.D. Ohio Apr. 21, 2020).  That logic applies here with full force.

Nor is the Order void for vagueness.  Statutes struck down for vagueness are those that base liability on "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008); *see also Freeman United Coal Min. Co. v. Fed. Mine Safety & Health Review Comm'n*, 108 F.3d 358, 362 (D.C. Cir. 1997) ("regulations will be found to satisfy due process so long as they are sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require").  That is clearly not the case here: as explained above, the Order provides clear definitions of "evict" and "eviction."  *See supra* pp. 32-33.

### D.    The Order Does Not Interfere With Plaintiffs' Access To Courts.

Nor does the Order unlawfully deny Plaintiffs access to the courts, *contra* Pls.' Mem. 37–40. As the *Brown* court explained in rejecting an identical challenge, three bases support that conclusion: the Order does not prevent landlords from litigating eviction cases and seeking eviction judgments, provided that tenants are not removed from their homes while the Order remains in effect; the Order does not prevent Plaintiffs from suing tenants for unpaid rent and taking all lawful steps to collect a money judgment; and the Order is temporary. *See* 2020 WL 6364310 at *16–17; *see also, e.g.*, *Elmsford*, 2020 WL 3498456, at *16–17; *Baptiste*, 2020 WL 5751572, at *25.

First, the Order does not prevent a landlord from filing an eviction action in state court. While Plaintiffs believe that the Order could be read so broadly as to bar the filing of an eviction suit, *see* Pls.' Mem. 38, CDC has disclaimed that interpretation.  As the FAQs state, the Order does not "prevent landlords from starting eviction proceedings, provided that the actual eviction of a covered person for non-payment of rent does NOT take place during the period of the Order."  FAQs at 1. Nor does the Order prevent landlords from seeking to demonstrate, using ordinary state court procedures, that a tenant has wrongfully claimed its protections.  *See* FAQs at 6 ("The Order does not preclude a landlord from challenging the truthfulness of a tenant's declaration in any state or municipal court.).  Every federal court to consider these FAQs has found that they reasonably construe the Order.  *See Brown*, 2020 WL 6364310, at *15 ("As clarified by the CDC, under the Order, landlords are therefore not precluded from serving their tenants with any required non-payment notices, commencing court proceedings, attending trials or obtaining judgments.  The Order only delays the actual eviction."); *KC Tenants*, 2020 WL 7063361, at *2 ("[I]t seems that it was only certain evictions were forbidden, and not the unmentioned remote preliminaries. . . .  The activity preceding an eviction, including lawsuits, is necessarily permitted under the Moratorium.").  "Plaintiffs can immediately start eviction proceedings now and are only delayed in enforcing any eviction order they might obtain," *Brown*, 2020 WL 6364310, at *16, and this case thus bears no relationship to *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983) (cited in Pls.' Mem. 37), in which the question was whether the NLRB could prohibit the "filing and prosecution of a well-founded lawsuit."  *Id.* at 743.[13]

---

[13] Plaintiffs point to a September 10 administrative order issued by a circuit court in Montgomery County, Alabama, that suggests that landlords cannot even file eviction actions against covered persons under the CDC Order.  *See* Pls.' Mem. 7.  Other state courts do not share this interpretation, including the state court that issued the order that was at issue in the *KC Tenants* case.  In any event, to the extent that certain state courts are providing renters with protections beyond those required by the CDC Order, any injury is caused by those state courts, not CDC.

Second, "the Order does not prohibit Plaintiffs from pursuing a breach of contract action either now or in the future," and thus "Plaintiffs still have some form of relief available to them within the courts." *Brown*, 2020 WL 6364310, at *16. Plaintiffs may prefer a different remedy, but they remain able to seek judicial relief. *See Elmsford*, 2020 WL 3498456, at *16 ("Plaintiffs can still sue their tenants for arrearages through a breach of contract action in the New York Supreme Court—and the fact that is not their preferred remedy is of no moment.").

Third, "the Order is temporary; therefore, Plaintiffs' ability to evict their tenants is only merely delayed until it expires on December 31, 2020, unless extended, modified or rescinded." *Brown*, 2020 WL 6364310, at *16. "'[M]ere delay' to filing a lawsuit cannot form the basis of a Petition Clause violation when the plaintiff will, at some point, regain access to legal process." *Elmsford*, 2020 WL 3498456, at *16 (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)); *see also Baptiste*, 2020 WL 5751572, at *27 (highlighting "temporary" moratorium in rejecting access-to-courts challenge).

Finally, Plaintiffs' fundamental contention—that the federal government is powerless to delay a landlord's eviction of a residential tenant under state law—would have sweeping consequences if accepted. As just one example, for the past eighty years, federal law has provided that members of the armed forces may be entitled to a temporary stay of eviction proceedings under certain circumstances. *See* Soldiers' and Sailors' Civil Relief Act of 1940, Pub. L. No. 76-861, 54 Stat. 1178 (1940) (codified as amended at 50 U.S.C. § 3951(b)(1)). Defendants are unaware of any court that has even contemplated the possibility that this provision is unconstitutional.

## IV.   Any Remedy Should Be Narrowly Tailored.

Even if the Court were to disagree with Defendants' arguments, any relief should be narrowly tailored. Thus, (1) to the extent the Court finds only procedural violations, it should remand to the agency to remedy those violations without vacating the Order; and (2) any vacatur or injunctive relief should extend only to Plaintiffs with standing to sue.

1.      Should the Court determine that CDC committed exclusively procedural errors under the APA (such as by failing to engage in notice and comment or by failing to adequately explain its reasoning), the possible remedies are remand with vacatur or without.  "The decision whether to vacate depends on 'the seriousness of the order's deficiencies . . . and the disruptive consequences of an interim change that may itself be changed.'"  *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,* 988 F.2d 146, 150–51 (D.C. Cir.1993) (quoting *Int'l Union UMW v. FMSHA*, 920 F.2d 960, 966–67 (D.C. Cir. 1990)).   Notwithstanding Plaintiffs' suggestion that a notice-and-comment violation requires vacatur, *see* Pls.' Mem. 40, the D.C. Circuit has "previously remanded without vacating when the agency failed to follow notice-and-comment procedures." *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002).  Here, if the Court determines that CDC committed only procedural errors in promulgating the Order, it should remand without vacatur:  the procedural errors that Plaintiffs assert are minor ones that could be cured on remand, and temporary vacatur of the Order could have extraordinarily disruptive (and deadly) consequences, with landlords rushing to evict tenants in the midst of the pandemic's darkest days.[14]

2.      Should the Court enjoin or vacate the Rule, that relief should extend only to Plaintiffs with standing to sue.[15]  "A plaintiff's remedy must be tailored to redress the plaintiff's particular

---

[14] A similar analysis applies under the Regulatory Flexibility Act.  *See* 5 U.S.C. § 611(a)(4)(B) (remedy should not include deferred enforcement of challenged regulation when "the court finds that continued enforcement of the rule is in the public interest").  For all the reasons set out in this memorandum, continued enforcement of the Order is strongly in the public interest.

[15] Plaintiffs Danny Fordham, Robert Gilstrap, Alabama Association of Realtors, and Georgia Association of Realtors all lack standing.  The individual plaintiffs do not enter into lease agreements with tenants; corporate entities that they own do.  *See* Declaration of Danny Fordham ¶ 2, ECF No. 6-2; Declaration of Robert Gilstrap ¶ 2, ECF No. 6-3.  Yet a "basic tenet of American corporate law is that the corporation and its shareholders are distinct entities," *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003), and there is a "longstanding equitable restriction that generally prohibits shareholders from initiating actions to enforce the rights of the corporation unless the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment." *Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990); *see also, e.g., Sec. Indus. & Fin. Markets Assoc. v. U.S. Commodity Futures Trading Comm'n*, 67 F. Supp. 3d 373, 406 (D.D.C. 2014) ("[T]he

injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).  Nationwide injunctions, in contrast, "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump. v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see also, e.g.*, *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 815 (D.C. Cir. 2002) ("Allowing one circuit's statutory interpretation to foreclose . . . review of the question in another circuit" would "squelch the circuit disagreements that can lead to Supreme Court review.").  The CDC Order at issue here has been challenged in six other districts, underscoring why this Court should not attempt to decide its legality for all parties and for all time.  *See Brown*, No. 20-3702 (N.D. Ga.) (preliminary injunction denied Oct. 29, 2020), *appeal pending*, No. 20-14210 (11th Cir.); *KBW Inv. Props. v. Azar*, No. 20-1852 (S.D. Ohio) (federal defendants dismissed by stipulation after TRO denied); *Tiger Lily*, No. 20-2692 (W.D. Tenn.) (preliminary injunction denied Nov. 6, 2020); *Terkel v. CDC*, No. 20-564 (E.D. Tex.) (preliminary injunction motion pending); *Skyworks, Ltd. v. CDC*, No. 20-2407 (N.D. Ohio) (preliminary injunction motion pending); *Chambless Enters., Inc. v. CDC*, No. 20-1455 (W.D. La.) (preliminary injunction motion pending).

## CONCLUSION

The Court should grant Defendants' motion for summary judgment, deny Plaintiffs' motion for summary judgment, and terminate this case.

---

shareholder standing rule generally precludes a parent corporation—indeed, any sole shareholder—from having standing to bring an action on behalf of its subsidiary . . . .").  Fordham and Gilstrap thus lack individual standing to sue—and because Plaintiffs point to no other members of the two associational plaintiffs with standing to sue, it follows that neither association has standing either.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (requiring associational plaintiff to "identify members who have suffered the requisite harm").

Dated:  December 21, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ERIC BECKENHAUER
Assistant Director, Federal Programs Branch

/s/ Steven A. Myers
STEVEN A. MYERS
Senior Trial Counsel (NY Bar No. 4823043)
LESLIE COOPER VIGEN
Trial Attorney (DC Bar No. 1019782)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel:  (202) 305-8648
Fax:  (202) 616-8470
E-mail:  steven.a.myers@usdoj.gov

*Counsel for Defendants*