**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ALABAMA ASSOCIATION OF
REALTORS®, *et al.*,

              *Plaintiffs,*

    *v.*

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

          *Defendants.*

No. 1:20-cv-03377-DLF

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR EXPEDITED SUMMARY
JUDGMENT AND MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES..................................................................................................ii

INTRODUCTION.................................................................................................................1

ARGUMENT.........................................................................................................................2

I.   The Government Fails To Show That The CDC Lawfully Bypassed Rulemaking
     Procedures Required By Statute .................................................................................2

II.  The Government Fails To Show That The CDC Has Statutory Authority To
     Issue The Eviction Moratorium .................................................................................4

     A.   The Government Fails to Show that Congress Clearly Authorized the
          CDC to Impose a Nationwide Moratorium on Evictions ................................4

     B.   The Government Fails to Show that Section 361(a) of the Public Health Service
          Act Unambiguously Authorizes the Eviction Moratorium.............................. 10

     C.   The Government Fails to Show that the CDC's Interpretation of Section 361
          of the Public Health Service Act is Entitled to Deference.............................. 14

III. The Government Fails To Show That The Eviction Moratorium Reflects Reasoned
     Decision-making ....................................................................................................... 16

IV.  The Government Fails To Show That Section 361(a) Of The Public Health Service
     Act Is Consistent With The Nondelegation Doctrine ................................................ 19

V.   The Government Fails To Show That The Eviction Moratorium Is Constitutional................ 20

     A.   The Government Fails to Show that the Eviction Moratorium is Not a Taking ........... 20

     B.   The Government Fails to Show that the CDC Provided Due Process .......................... 22

     C.   The Government Fails to Show that the Eviction Moratorium Permits
          Access to Courts.......................................................................................... 23

VI.  The Government Fails To Show That Vacatur Is Unwarranted.................................. 25

CERTIFICATE OF SERVICE .......................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*ACA Int'l v. Healey,*
457 F. Supp. 3d 17 (D. Mass. 2020) ................................................................................24

*Anaheim Gardens, L.P. v. United States,*
953 F.3d 1344 (Fed. Cir. 2020) .......................................................................................21

*Apartment Ass'n of L.A. Cnty., Inc. v. Los Angeles,*
2020 WL 6700568 (C.D. Cal. Nov. 13, 2020) .................................................................22

*AT&T Info. Sys., Inc. v. GSA,*
810 F.2d 1233 (D.C. Cir. 1987) (per curiam) .....................................................................8

*\*Azar v. Allina Health Servs.,*
139 S. Ct. 1804 (2019) .......................................................................................................3

*Baptiste v. Kennealy,*
2020 WL 5751572 (D. Mass. Sept. 25, 2020) ..................................................................21

*\*Bell Atl. Tel. Cos. v. FCC,*
24 F.3d 1441 (D.C. Cir. 1994) .........................................................................................20

*Broudy v. Mather,*
460 F.3d 106 (D.C. Cir. 2006) .........................................................................................24

*Butner v. United States,*
440 U.S. 48 (1979) ............................................................................................................22

*\*Christopher v. Harbury,*
536 U.S. 403 (2002) ..........................................................................................................24

*Cienega Gardens v. United States,*
331 F.3d 1319 (Fed. Cir. 2003) .......................................................................................22

*Ciox Health, LLC v. Azar,*
435 F. Supp. 3d 30 (D.D.C. 2020) .....................................................................................3

*City of Arlington v. FCC,*
569 U.S. 290 (2013) ...................................................................................................10, 12

*City of Kansas City v. HUD,*
923 F.2d 188 (D.C. Cir. 1991) .........................................................................................15

*Clean Wis. v. EPA,*
964 F.3d 1145 (D.C. Cir. 2020) .......................................................................................18

*Collins v. NTSB.,*
351 F.3d 1246 (D.C. Cir. 2003) .......................................................................................15

*Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n,*
466 F.3d 134 (D.C. Cir. 2006) ...................................................................................11, 13

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Comcast Corp. v. FCC,*
   600 F.3d 642 (D.C. Cir. 2010) ...................................................................... 12

*Dique v. N.J. State Police,*
   603 F.3d 181 (3d Cir. 2010) ......................................................................... 24

*District of Columbia v. Dep't of Labor,*
   819 F.3d 444 (D.C. Cir. 2016) ....................................................................... 5

*Emory v. United Air Lines, Inc.,*
   821 F. Supp. 2d 200 (D.D.C. 2011) ............................................................. 23

*English v. Trump,*
   279 F. Supp. 3d 307 (D.D.C. 2018) ............................................................. 11

*FCC v. Fla. Power Corp.,*
   480 U.S. 245 (1987) ...................................................................................... 21

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ............................................................................ 5, 6, 14

*Gen. Elec. Co. v. EPA,*
   290 F.3d 377 (D.C. Cir. 2002) ....................................................................... 2

*Gibson v. Superintendent of NJ Dep't of Law & Pub. Safety-Div.,*
   411 F.3d 427 (3d Cir. 2005) ......................................................................... 24

*Gonzales v. Oregon,*
   546 U.S. 243 (2006) ...................................................................................... 12

*\*Gundy v. United States,*
   139 S. Ct. 2116 (2019) ............................................................................. 4, 5

*Indep. Turtle Farmers of La., Inc. v. United States,*
   703 F. Supp. 2d 604 (W.D. La. 2010) .......................................................... 14

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.,*
   448 U.S. 607 (1980) ...................................................................................... 20

*J.D. v. Azar,*
   925 F.3d 1291 (D.C. Cir. 2019) ................................................................... 25

*King v. Burwell,*
   576 U.S. 484-86 (2015) ................................................................................. 5

*Loving v. IRS,*
   742 F.3d 1013 (D.C. Cir. 2014) ............................................................ 5, 8, 15

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ...................................................................................... 25

*Merck & Co. v. HHS,*
   385 F. Supp. 3d 81 (D.D.C. 2019) ............................................................... 12

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Merck & Co. v. HHS,*
 962 F.3d 531 (D.C. Cir. 2020) ................................................................................5, 15

*Michigan v. EPA,*
 213 F.3d 663 (D.C. Cir. 2000) ............................................................................. 19, 20

*Michigan v. EPA,*
 576 U.S. 743 (2015) ......................................................................................................17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
 463 U.S. 29 (1983) ........................................................................................................18

*Murr v. Wisconsin,*
 137 S. Ct. 1933 (2017) ..................................................................................................22

*NAACP v. DeVos,*
 No. 20-cv-1996 (DLF), 2020 WL 5291406 (D.D.C. Sept. 4, 2020) ...........1, 11, 12, 25

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
 145 F.3d 1399 (D.C. Cir. 1998) ...................................................................................25

*Nat'l Venture Cap. Ass'n v. Duke,*
 291 F. Supp. 3d 5 (D.D.C. 2017) ..................................................................................4

*NCTA v. Brand X Internet Servs.,*
 545 U.S. 967 (2005) ......................................................................................................12

*N.Y. Stock Exch. LLC v. SEC,*
 962 F.3d 541 (D.C. Cir. 2020) ............................................................................... 12, 14

*Nicopure Labs, LLC v. FDA,*
 266 F. Supp. 3d 360 (D.D.C. 2017) .............................................................................17

*Palmyra Pac. Seafoods, L.L.C. v. United States,*
 561 F.3d 1361 (Fed. Cir. 2009) ....................................................................................22

*Paul v. United States,*
 140 S. Ct. 342 (2019) ...............................................................................................5, 19

*Perez v. Mortg. Bankers Ass'n,*
 575 U.S. 92 (2015) ..........................................................................................................2

*Purdue Univ. v. Scalia,*
 2020 WL 7340156 (D.D.C. Dec. 14, 2020) ...................................................................3

*Rith Energy, Inc. v. United States,*
 247 F.3d 1355 (Fed. Cir. 2001) ....................................................................................20

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
 No. 20A87, slip op. (U.S. Nov. 25, 2020) (per curiam) ............................................1, 16

*Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.,*
 29 F.3d 655 (D C. Cir. 1994) (en banc) .......................................................................14

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Shea v. Clinton,*
 850 F. Supp. 2d 153 (D.D.C. 2012) .................................................................. 15

*Sierra Club v. EPA,*
 292 F.3d 895 (D.C. Cir. 2002) ........................................................................... 8

*Touby v. United States,*
 500 U.S. 160 (1991) ............................................................................... 6, 19, 20

*U.S. Telecom Ass'n v. FCC,*
 855 F.3d 381 (D.C. Cir. 2017) ........................................................................ 5, 6

*\*Util. Air Reg. Grp. (UARG) v. EPA,*
 573 U.S. 302 (2014) ......................................................................................... 5, 9

*\*Wash. All of Tech. Workers v. DHS,*
 202 F. Supp. 3d 20 (D.D.C. 2016) .................................................................... 4

*Westernworld Servs., Inc. v . United States,*
 No. CIV. A. 91-2152-LFO, 1992 WL 52531 (D.D.C. Feb. 28, 1992) ............... 8

*\*Whitman v. Am. Trucking Assn's,*
 531 U.S. 457 (2001) .......................................................................................... 6, 19

*Yee v. City of Escondido,*
 503 U.S. 519 (1992) ........................................................................................... 21

**STATUTES**

5 U.S.C. § 551 ............................................................................................................ 2, 3

5 U.S.C. § 706 ................................................................................................................ 4

5 U.S.C. § 804 ................................................................................................................ 8

42 U.S.C. § 264 .................................................................................................... *passim*

47 U.S.C. § 201 ............................................................................................................ 12

50 U.S.C. § 3951 ............................................................................................................ 9

Pub. L. No. 116-136, 134 Stat. 281 (2020) ............................................................ 3, 9, 11

Soldiers' and Sailors' Civil Relief Act of 1940,
 Pub. L. No. 76-861, 54 Stat. 1178 (1940) ......................................................... 9

**OTHER AUTHORITIES**

42 C.F.R. § 70.2 ............................................................................................................ 16

Administrative Order (Ala. Fifteenth Cir. Ct. Sept. 10, 2020) ................................... 24

Administrative Order No. 2020-17 – Priority Treatment and New Procedure for
 Landlord/Tenant Cases (Mich. Sup. Ct. Oct. 22, 2020) ................................... 24

## TABLE OF AUTHORITIES
(continued)

Page(s)

CDC, "HHS/CDC Temporary Halt in Residential Evictions to Prevent the Further
Spread of COVID-19 Frequently Asked Questions".........................................................23

Consolidated Appropriations Act, 2021, S. Amdt. 2731 to H.R. 133, Tit. V, Subtitle
A, § 502, 116th Cong. (2020)........................................................................................7

Exec. Order No. 13945, 85 Fed. Reg. 49,935 (Aug. 8, 2020)...............................................9

H.R. Rep. No. 78-1364 (1944) .........................................................................................13

Order, *In re Ongoing Provisions for Coronavirus/COVID-19 Impact on Court Servs.*
(Iowa Sup. Ct. Oct. 2, 2020)........................................................................................24

Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19,
85 Fed. Reg. 55,292 (Sept. 4, 2020) ....................................................................*passim*

## INTRODUCTION

These are extraordinary times, "[b]ut even in a pandemic, the Constitution cannot be put away and forgotten." *Roman Catholic Diocese of Brooklyn v. Cuomo*, No. 20A87, slip op. 5 (U.S. Nov. 25, 2020) (per curiam).  Nor can the Administrative Procedure Act ("APA") and congressional limits on agency authority be disregarded.  *NAACP v. DeVos*, No. 20-cv-1996 (DLF), 2020 WL 5291406 (D.D.C. Sept. 4, 2020).  In this case, the Centers for Disease Control and Prevention ("CDC") asserted authority to regulate the entire rental property market in the United States as a means to prevent the spread of COVID-19.  The Court should reject this unprecedented assertion of executive power.

*First*, the government cannot evade the APA's notice-and-comment requirement or the Regulatory Flexibility Act by characterizing the Eviction Moratorium as an "emergency action."  The Eviction Moratorium is a legislative rule of general applicability and future effect because it creates binding new law and affects Plaintiffs' legal rights.  No good cause excused compliance with the APA's procedural requirement because the CDC could have conducted notice and comment before issuing the Eviction Moratorium.  The COVID-19 state of emergency—now close to a year in length— cannot indefinitely excuse the federal government from the APA's notice-and-comment requirement.

*Second*, the government fails to show that the CDC has statutory authority to issue the Eviction Moratorium.  Section 361(a) of the Public Health Service Act does not contain a clear delegation of statutory authority for the CDC to make a decision of such political and economic significance.  Nor does this general rulemaking statute confer authority to regulate the rental property market.  Congress unambiguously foreclosed the CDC from imposing a nationwide ban on evictions in Section 361(a) and the CARES Act's temporary moratorium on evictions.  Even under *Chevron* step two, the CDC's assertion of unbridled executive power to regulate in the name of public health is unreasonable.

*Third*, the Eviction Moratorium fails the basic requirements that agency decision-making be reasonable and reasonably explained.  The Eviction Moratorium offers only a conclusory assertion

that the CDC satisfied its own regulatory requirement to determine that state and local eviction relief measures are insufficient to curb the interstate spread of COVID-19.  The CDC also failed to assess the costs of the Eviction Moratorium, which it places solely on landlords like Plaintiffs.  And the Eviction Moratorium fails to reasonably explain its key terms.

*Fourth*, the Eviction Moratorium raises serious constitutional questions.  The government's interpretation of Section 361(a) sweeps so broadly as to fail the nondelegation doctrine's "intelligible principle" test.  The Eviction Moratorium also effects an unconstitutional taking, violates due process, and deprives Plaintiffs of their right to access the courts to pursue evictions.

The Court should grant Plaintiffs' motion for summary judgment and deny Defendants' motion.  Because the Eviction Moratorium's flaws cannot be cured, the proper remedy is vacatur.

## ARGUMENT

### I.  The Government Fails To Show That The CDC Lawfully Bypassed Rulemaking Procedures Required By Statute.

The Eviction Moratorium is a legislative rule to which the APA's notice-and-comment requirement applies, and no good cause excuses the CDC's failure to follow the APA.  The Eviction Moratorium is a "rule" because it (1) is a "statement of general … applicability" to all landlords; (2) has "future," not retroactive, "effect;" and (3) is "designed to implement, interpret, or prescribe law or policy" with respect to evictions during the pandemic.  5 U.S.C. § 551(4); *see* Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,292 (Sept. 4, 2020).  It is also a legislative rule with the "force and effect of law" because it prohibits landlords from initiating eviction proceedings, subject to the threat of criminal enforcement and penalties.  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96, 101 (2015); *see also Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382, 385 (D.C. Cir. 2002); 85 Fed. Reg. at 55,296.  The CDC's process for "formulating" this "rule" was a

"rulemaking," 5 U.S.C. § 551(5), to which the APA's notice-and-comment requirement applied, *id.* § 553(b)-(d).  But the CDC undisputedly ignored this procedural requirement.

It is no answer to say, as the government does, that the Eviction Moratorium is not a rule but an "emergency action" authorized under existing regulatory authority.  Defs.' Opp. 25.  The APA does not describe anything called an "emergency action."  5 U.S.C. § 551.  Nor can agencies "avoid notice and comment simply by mislabeling their substantive pronouncements."  *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019).  To the contrary, "courts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*, when deciding whether statutory notice-and-comment demands apply."  *Id.* (citations omitted).  However the government characterizes the Eviction Moratorium, it "works a change in the law" with respect to landlords' property rights, subject to criminal enforcement and penalties.  *Ciox Health, LLC v. Azar*, 435 F. Supp. 3d 30, 66 (D.D.C. 2020).

Nor does good cause justify the CDC's failure to follow the APA's notice-and-comment requirement.  The CDC may dislike the slow pace of notice-and-comment rulemaking, Defs.' Opp. 26, but that is no excuse for issuing a generally applicable rule without following the APA's procedural requirement.  The CDC contends that the expiration of federal and state eviction relief informed its determination that such relief was inadequate.  *Id.*  But the CDC had known for months that the CARES Act eviction moratorium would expire 120 days after its enactment.  *See* Pub. L. No. 116-136, § 4024, 134 Stat. 281 (2020).  Much of the state and local relief the CDC considered was similarly both announced and set to expire months before the CDC issued its Eviction Moratorium.  *See* AR 987, 989, 1010-14, 1023-24.  The CDC apparently made no effort to assess the adequacy of this federal and state relief while it was in effect or as many such measures began to expire in the spring and early summer of 2020.  Instead, it waited *months* to putatively make that assessment—reflected only in a single sentence in the Eviction Moratorium.  *See* 85 Fed. Reg. at 55,296.  Any emergency was therefore created by the CDC itself and does not supply good cause.  *See Purdue Univ. v. Scalia*, 2020 WL 7340156,

at *7-8 (D.D.C. Dec. 14, 2020) (agency failed to demonstrate good cause for six-month delay in implementing wage calculation changes in part because agency was aware of pandemic's consequences by April 2020); *see also Nat'l Venture Cap. Ass'n v. Duke*, 291 F. Supp. 3d 5, 16 (D.D.C. 2017); *Wash. All of Tech. Workers v. DHS*, 202 F. Supp. 3d 20, 26 (D.D.C. 2016).

For the same reasons the Eviction Moratorium was subject to the APA's notice-and-comment requirement, it was also subject to the Regulatory Flexibility Act ("RFA"), including the requirement to assess the impact of the new rule on small businesses like the Plaintiffs in this case. But the CDC ignored this statutory requirement too, as the government effectively concedes. Defs.' Opp. 26. Because the CDC failed to comply with the APA and the RFA, the Eviction Moratorium was issued "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## II.   The Government Fails To Show That The CDC Has Statutory Authority To Issue The Eviction Moratorium.

The Eviction Moratorium is also substantively unlawful. The government's claim that the CDC has authority to regulate the rental property market fails under both the "major rules" doctrine and the *Chevron* framework.

### A.   The Government Fails to Show that Congress Clearly Authorized the CDC to Impose a Nationwide Moratorium on Evictions.

The CDC lacks statutory authority to issue the Eviction Moratorium under the major rules doctrine because Congress did not clearly delegate authority for the CDC to make a decision of such political and economic significance. Pls.' Mem. 13-17.

**1.** The government's attempt to deny the existence of the major rules doctrine defies Supreme Court precedent. Defs.' Opp. 11. As Justice Gorsuch recently explained in an opinion joined by the Chief Justice and Justice Thomas, the Supreme Court applies "the 'major questions' doctrine … when the 'statutory gap' concerns 'a question of deep "economic and political significance" that is central to the statutory scheme.'" *Gundy v. United States*, 139 S. Ct. 2116, 2141 (2019) (Gorsuch, J., dissenting)

4

(quoting *King v. Burwell*, 576 U.S. 484-86 (2015)).  The Court has "rejected agency demands that we defer to their attempts to rewrite rules for billions of dollars in healthcare tax credits, to assume control over millions of small greenhouse gas sources, and to ban cigarettes." *Id.* at 2141-42 (citing *Burwell*, 576 U.S. at 484-86, *Util. Air Reg. Grp. (UARG) v. EPA*, 573 U.S. 302, 324 (2014), and *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–160 (2000)).  "Although it is nominally a canon of statutory construction, we apply the major questions doctrine in service of the constitutional rule that Congress may not divest itself of its legislative power by transferring that power to an executive agency." *Id.* at 2142.

Justice Alito and Justice Kavanaugh agree.  *See UARG*, 573 U.S. at 344 (Alito, J., concurring in part and dissenting in part) (joining part of the Court's opinion discussing the major rules doctrine); *Paul v. United States*, 140 S. Ct. 342 (2019) (Kavanaugh, J., dissenting from the denial of certiorari) (in order for an agency "to exercise regulatory authority over a major policy question of great economic and political importance, Congress must either: (i) expressly and specifically decide the major policy question itself and delegate to the agency the authority to regulate and enforce or (ii) expressly and specifically delegate to the agency the authority both to decide the major policy question and to regulate and enforce" (citations omitted)).

The major rules doctrine is also firmly rooted in D.C. Circuit precedent.  *See U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 421 n.3 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from the denial of rehearing en banc) ("This Court has also employed the major rules doctrine." (citing *District of Columbia v. Dep't of Labor*, 819 F.3d 444, 446 (D.C. Cir. 2016); *Loving v. IRS*, 742 F.3d 1013, 1021 (D.C. Cir. 2014))); *see also Merck & Co. v. HHS*, 962 F.3d 531, 540 (D.C. Cir. 2020).

The government's attempt to lower the standard for an agency to issue a major rule conflicts with these precedents.  As then-Judge Kavanaugh explained: "For an agency to issue a major rule, Congress must *clearly* authorize the agency to do so.  If a statute only *ambiguously* supplies authority for

the major rule, the rule is unlawful." *U.S. Telecom Ass'n*, 855 F.3d at 419 (Kavanaugh, J., dissenting from the denial of rehearing en banc) (emphasis in original); *see also id.* at 421.

The government's authorities do not support lowering the standard for agencies to decide major questions. Defs.' Opp. 12. In *Whitman v. American Trucking Associations*, the Supreme Court rejected a nondelegation challenge to the Clean Air Act, 531 U.S. 457, 475 (2001), but also explained why Congress must clearly delegate authority for an agency to decide a major question: "Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes," *id.* at 468 (citing *Brown & Williamson*, 529 U.S. at 159–160). Likewise, the Court in *Touby v. United States* rejected a nondelegation challenge to the Controlled Substances Act, but nothing in that opinion negates the need for a clear statement from Congress for agencies to decide major questions. 500 U.S. 160, 166 (1991).

**2.** The government's criticism that Plaintiffs offer no standard "by which the Court may judge" whether the CDC decided a major question rings hollow. Defs.' Opp. 15. "To be sure, determining whether a rule constitutes a major rule sometimes has a bit of a 'know it when you see it' quality," *U.S. Telecom Ass'n*, 855 F.3d at 423 (Kavanaugh, J., dissenting from the denial of rehearing en banc), but the "Supreme Court has described major rules as those of 'vast economic and political significance,'" *id.* at 422 (citations omitted). Although the Court "has not articulated a bright-line test that distinguishes major rules from ordinary rules," "the Court's cases indicate that a number of factors are relevant, including: the amount of money involved for regulated and affected parties, the overall impact on the economy, the number of people affected, and the degree of congressional and public attention to the issue." *Id.* at 422-23. "The Court's concern about an agency's issuance of a seemingly major rule is heightened, moreover, when an agency relies on a long-extant statute to support the agency's bold new assertion of regulatory authority." *Id.* at 423.

As Plaintiffs have shown, the Eviction Moratorium undoubtedly qualifies as a major rule under this standard.  Pls.' Mem. 15-16.  As for the amount of money involved, the rent not paid by the 12.6 to 17.3 million rental households likely to take advantage of the CDC's Eviction Moratorium amounts to $55.3 to $76 billion.  ECF 6-4, Cororaton Decl. ¶¶ 11, 16.  As for the overall impact on the economy, rental payments in the United States amount to $552.18 billion each year.  *Id.* ¶ 8.  As for the number of people affected, the Eviction Moratorium impacts nearly 42 million rental units in the United States, which are owned by 10-11 million landlords.  *Id.* ¶¶ 4, 6.  Indeed, the CDC estimates that "as many as 30-40 million people in America could be at risk of eviction" absent the Eviction Moratorium.  85 Fed. Reg. at 55,295.  As for the degree of congressional and public attention, the forthcoming expiration of the Eviction Moratorium has been the subject of extensive debate, prompting Congress to extend it until January 31, 2021.  *See* Consolidated Appropriations Act, 2021, S. Amdt. 2731 to H.R. 133, Tit. V, Subtitle A, § 502, 116th Cong. (2020).

The government cannot, and does not, disprove that the effects of the Eviction Moratorium are "major."  It criticizes the economist's conclusion that the Eviction Moratorium will cause landlords to lose $55.3 to $76 billion in unpaid rent, Defs.' Opp. 15 n.4, but the economist used the CDC's own data to reach this conclusion, ECF 6-4, Cororaton Decl. ¶ 9.  It also complains that the economist ignored the supposed "limits" on the Eviction Moratorium, Defs.' Opp. 15 n.4, but neither during the administrative process nor in its brief has the government specifically evaluated the economic impact of any such exclusions; and meanwhile, the CDC claims authority to regulate the entire rental market.

The government further complains that APA cases are normally decided on the administrative record.  Defs.' Opp. 15.  But because the CDC short-circuited the administrative process, the administrative record does not contain any analysis showing that the Eviction Moratorium would have *less* sweeping economic effects.  In any event, the Court can and should consider the economist's declaration for multiple reasons.  ECF 6-4, Cororaton Decl.  First, the declaration demonstrates the

Association Plaintiffs' standing, which the government disputes, Defs.' Opp. 44 n.15, by quantifying the financial injuries of members harmed by the Eviction Moratorium, *Sierra Club v. EPA*, 292 F.3d 895, 899–900 (D.C. Cir. 2002) (petitioner may "submit additional evidence" beyond the administrative record to establish standing).   Second, the declaration supports Plaintiffs' argument that the CDC failed to consider the Eviction Moratorium's economic impact on the nation's landlords.  Pls.' Mem. 27-28; *AT&T Info. Sys., Inc. v. GSA*, 810 F.2d 1233, 1236 (D.C. Cir. 1987) (per curiam) ("record may be supplemented to provide, for example, background information or evidence of whether all relevant factors were examined by an agency").  Third, the declaration provides "background information," *id.* at 123, to explain the CDC's unexplained conclusion that the Eviction Moratorium is a "major rule," 85 Fed. Reg. at 55,296, that will have "an annual effect on the economy of $100,000,000 or more," 5 U.S.C. § 804(2); *Westernworld Servs., Inc. v . United States*, No. CIV. A. 91-2152-LFO, 1992 WL 52531, at *6 (D.D.C. Feb. 28, 1992) (permitting the government to supplement the record with "affidavits" that "are merely explanatory" regarding "how the information in the record was evaluated").  The government argues that the Congressional Review Act and the "major rule" doctrine are distinct, but it does not show how the Eviction Moratorium, in substance, will have anything other than vast economic effects.

   **3.**  Because the Eviction Moratorium is a "major rule," Congress must have clearly delegated authority to issue it, but the government's argument that the CDC's general rulemaking authority in Section 361(a) provides the requisite clear authority is wildly off-base.  Defs.' Opp. 12.  That statute merely authorizes the CDC to "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases."   42 U.S.C. § 264(a).  There is no clear delegation for the Eviction Moratorium because Section 361(a) does not even mention evictions.  *See, e.g., Loving*, 742 F.3d at 1021 ("Yet nothing in the statute's text or the legislative record contemplates that vast expansion of the IRS's authority.").

The absence of a clear delegation of authority in Section 361(a) is pronounced compared to other statutes in which Congress has clearly limited evictions. For example, Congress adopted a temporary eviction moratorium in the CARES Act. Pub. L. No. 116-136, § 4024 ("During the 120-day period beginning on the date of enactment of this Act," landlords may not "initiate a legal action to recover possession of the covered dwelling from the tenant for nonpayment of rent or other fees or charges."). The government itself cites the Soldiers' and Sailors' Civil Relief Act of 1940, which expressly limits the right to evict. Defs.' Opp. 43 (citing Pub. L. No. 76-861, 54 Stat. 1178 (1940)) (codified as amended at 50 U.S.C. § 3951(b)(1))).

The government's attempt to disclaim the President's role in the Eviction Moratorium is revealing. The President did not just direct the CDC to "consider" an Eviction Moratorium. Defs.' Opp. 14 (quoting Exec. Order No. 13945, 85 Fed. Reg. 49,935, § 3 (Aug. 8, 2020) (A.R. 1025)). In fact, the President criticized Congress for failing to extend the CARES Act's temporary eviction moratorium and promised that his Administration would take action: "Unlike the Congress, I cannot sit idly and refuse to assist vulnerable Americans in need." Exec. Order No. 13945, 85 Fed. Reg. 49935, § 1. The CDC reached the President's desired outcome only three weeks later, but Section 361(a) falls short of the requisite clear statement of authority. The government concedes that (1) Section 361(a) "has never been used to implement a temporary eviction moratorium," (2) "the agency has not chosen to enact a temporary eviction moratorium for the purpose of disease control before now," and (3) "HHS has rarely utilized the authority granted for disease-control purposes under section 361." Defs.' Opp. 13-15, 23. This trifecta of concessions is more than enough to reject the CDC's "discover[y] in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy.'" *UARG*, 573 U.S. at 324. And contrary to the government's contention, a "determination that section 361 is ambiguous would" not result "in moving to *Chevron* step two," Defs.' Opp. 16, but rather is fatal to the Eviction Moratorium, *see UARG*, 573 U.S. at 324.

B.       **The Government Fails to Show that Section 361(a) of the Public Health Service Act Unambiguously Authorizes the Eviction Moratorium.**

Even setting aside the major rules doctrine, the CDC lacks statutory authority under the *Chevron* framework because Congress unambiguously foreclosed the CDC from imposing a nationwide moratorium on evictions.  Defs.' Opp. 17-21.

**1.**  The government treats the canons of statutory construction as an afterthought.  Instead of consulting them at the first step of its analysis, the government addresses them at the last step because it believes (incorrectly) that the CDC's general grant of rulemaking authority contains an unambiguous delegation of broad authority.  Defs.' Opp. 16.  But that approach mistakenly puts *Chevron* step two before step one because a court must "apply[] the ordinary tools of statutory construction" at *Chevron's* first step to "determine 'whether Congress has directly spoken to the precise question at issue.'"  *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013).

All of these canons point in the same direction at *Chevron* step one: Congress foreclosed the CDC from imposing a nationwide ban on evictions.  Section 361 speaks unambiguously to the one measure that the CDC can impose to regulate the interstate movement of individuals who might spread a communicable disease—quarantine.  *See* 42 U.S.C. § 264(b)-(d).  The government's argument that the Eviction Moratorium does not regulate the interstate movement of individuals, Defs.' Opp. 17, misapprehends the purpose of the CDC's order.  "In short, evictions threaten to increase the spread of COVID-19 as *they force people to move*, often into close quarters in new shared housing settings with friends or family, or congregate settings such as homeless shelters."  85 Fed. Reg. at 55,296 (emphasis added); *see also id.* at 55,294, 55,295.  Quarantines and eviction moratoria both aim to prevent the spread a communicable disease by stopping people from moving.  Congress's express authorization of quarantine suggests that Congress did not authorize other measures to prevent the interstate movement of individuals.

10

Unsurprisingly, the government has no effective response to Congress's decision to allow the CARES Act's temporary eviction moratorium to expire on July 24, 2020. Defs.' Opp. 14. For 120 days, that statute prohibited landlords from "initiat[ing] a legal action to recover possession of the covered dwelling from the tenant for nonpayment of rent or other fees or charges." Pub. L. No. 116-136, § 4024. "In enacting [this provision of] the CARES Act, Congress spoke with a clear voice." *NAACP*, 2020 WL 5291406, at *6. Indeed, Congress answered the precise question at issue here by deciding that the nationwide moratorium on evictions due to COVID-19 shall not extend beyond July 24, 2020. "[I]t is difficult to imagine how Congress could have been clearer." *Id.* at *4.

The government's reliance on the "harmonious-reading canon" and the "presumption against implied repeals" does not alter this conclusion. Defs.' Opp. 17. The "harmonious-reading canon" does not help the government because the CARES Act and Section 361(a) easily coexist if Section 361(a) is *not* interpreted to give the CDC vast unstated authority to regulate rental properties. (In fact, the canon helps Plaintiffs, because if the CDC had preexisting authority to impose a nationwide eviction moratorium through Section 361, the CARES Act's temporary eviction moratorium would have been unnecessary.) Similarly, the CARES Act's temporary eviction moratorium could not have impliedly repealed the CDC's preexisting authority to enact an eviction moratorium because—in contrast to the statute at issue in *English v. Trump*, 279 F. Supp. 3d 307, 324 (D.D.C. 2018), which authorized the President to act—Congress never delegated any such authority in Section 361(a).

**2.** Next, the government's claim that the CDC can regulate the entire rental property market through its general rulemaking authority is foreclosed by D.C. Circuit precedent. As this Court recently explained, "'[a]n agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority.' 'Agencies are ... bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.'" *NAACP*, 2020 WL 5291406, at *6 (quoting *Colo. River Indian*

11

*Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006)); *see also New York Stock Exch. LLC v. SEC*, 962 F.3d 541, 546, 554 (D.C. Cir. 2020) (same).

The government's attempt to distinguish the D.C. Circuit's decision in *New York Stock Exchange LLC* fails. Defs.' Opp. 24. In that case, the D.C. Circuit rejected a new SEC rule grounded in nothing more than the agency's general authority "to make such rules and regulations as may be necessary or appropriate to implement the provisions of [the Act]." *N.Y. Stock Exch. LLC*, 962 F.3d at 553. The CDC's general rulemaking authority in Section 361(a) is materially indistinguishable: "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases." 42 U.S.C. § 264(a).

The government's own authorities demonstrate that the CDC's general rulemaking authority does not give it "[c]arte blanche authority" to promulgate any rule it deems necessary. *Merck & Co. v. HHS*, 385 F. Supp. 3d 81, 92 (D.D.C. 2019), *aff'd*, 962 F.3d 531 (D.C. Cir. 2020). Although the Attorney General has "broad power to enforce all provisions" of the Controlled Substances Act, the Supreme Court rejected the Attorney General's attempt to regulate such a major question as physician-assisted suicide. *Gonzales v. Oregon*, 546 U.S. 243, 258, 267 (2006). And although the FCC has authority to "prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions" of the Communications Act, *NCTA v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) (quoting 47 U.S.C. § 201(b)), not every action taken by the FCC falls within the scope of the agency's statutory authority, *see, e.g., Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010) (rejecting attempt to impose net neutrality). Grants of rulemaking authority often contain "capacious terms," but courts must still "tak[e] seriously, and apply[] rigorously, in all cases, statutory limits on agencies' authority." *City of Arlington*, 569 U.S. at 296, 307.

**3.** The "means" that Congress "has deemed appropriate" to prevent the spread of communicable diseases are spelled out in Section 361(a). *NAACP*, 2020 WL 5291406, at *6 (quoting

*Colo. River Indian Tribes*, 466 F.3d at 139).  The first sentence of Section 361(a) contains a grant of authority to "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases," but the second sentence identifies the means that the CDC may use to "carry[] out and enforce[e] such regulations."  42 U.S.C. § 264(a) (emphasis added).  These include "inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles …, and other measures, as in his judgment may be necessary."  *Id.*  The government does not show that the Eviction Moratorium fits among this list or even the catchall "other measures."

Instead, the government tries to erase any limit on Section 361(a) by divorcing its first and second sentences.  Defs.' Opp. 19.  But this approach ignores the statutory text.  The second sentence is tethered to the first sentence through the phrase "[f]or purposes of carrying out and enforcing *such* regulations."  42 U.S.C. § 264(a) (emphasis added).  It thus describes measures that the CDC may use to enforce "such regulations" identified in the first sentence.  The second sentence would be superfluous if the CDC could adopt any regulation "necessary to prevent the introduction, transmission, or spread of communicable diseases."

The government's contention that the Eviction Moratorium is "comparable" to the list of measures identified in the statute's second sentence—"inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles"—is farfetched.  Defs.' Opp. 20.  The government acknowledges that Congress only intended for the CDC to use "conventional public-health enforcement methods" to prevent the spread of diseases.  Defs.' Opp. 2 (quoting H.R. Rep. No. 78-1364, at 24-25 (1944)).  Each measure listed in the second sentence is a step in the process of identifying, cleaning, and eliminating non-human items that may contribute to the spread of a communicable disease among humans.  Regulating the contractual relationship between landlords and tenants has nothing to do with this process and is no "conventional" public-health measure.

The Court should reject the government's reliance on two out-of-circuit district court opinions. Defs.' Opp. 18. The *Brown* decision refusing to preliminarily enjoin the Eviction Moratorium is unpersuasive. Pls.' Mem. 25-26. Likewise, the government's reliance on a Louisiana district court opinion upholding a *regulation* banning the sale of baby turtles is misplaced. *Indep. Turtle Farmers of La., Inc. v. United States*, 703 F. Supp. 2d 604 (W.D. La. 2010). As a threshold matter, the Louisiana court afforded "wide deference" to FDA's regulation interpreting Section 361(a), *id.* at 619-20, but *Chevron* deference is unavailable here, nor is there any regulation entitled to deference in this case, Pls.' Mem. 17. In any event, the Louisiana court deferred to the FDA's interpretation "because there is no express prohibition in the statute evidencing contrary congressional intent," 703 F. Supp. 2d at 620—but that conflicts with controlling D.C. Circuit precedent. "Were courts to presume a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well." *Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc); *see also N.Y. Stock Exch. LLC*, 962 F.3d at 557.

### C.     The Government Fails to Show that the CDC's Interpretation of Section 361 of the Public Health Service Act is Entitled to Deference.

Lacking clear statutory authority for the Eviction Moratorium, the government falls back on *Chevron*. Defs.' Opp. 21. But the CDC is not entitled to *Chevron* deference. Pls.' Mem. 17-26.

A "precondition to deference under *Chevron* is a congressional delegation of administrative authority." *N.Y. Stock Exch. LLC*, 962 F.3d at 552–53 (citation omitted). While the CDC has the power to enact regulations with the force of law, Defs.' Opp. 22, "[m]erely because an agency has rulemaking power does not mean that it has delegated authority to adopt a particular regulation," *N.Y. Stock Exch. LLC*, 962 F.3d at 554. As Plaintiffs have shown, there is no authority in Section 361(a) for the CDC to regulate the rental property market. Even if Section 361(a) contained such a delegation

of authority, the CDC failed to issue the Eviction Moratorium through the APA's notice-and-comment rulemaking procedure contemplated by Section 361(a). 42 U.S.C. § 264(a) ("make and enforce such *regulations*" (emphasis added)). Nor did the CDC offer any interpretation of the statute to which the Court could defer. *See Shea v. Clinton*, 850 F. Supp. 2d 153, 161 (D.D.C. 2012) ("agencies are not entitled to deference for interpretations offered by their counsel in legal briefs" (citing *City of Kansas City v. HUD*, 923 F.2d 188, 192 (D.C. Cir. 1991))). The government's argument that the Court can defer to the CDC because "CDC and FDA are subagencies within HHS," Defs.' Opp. 21 n.6, is also incorrect, *see Collins v. NTSB.*, 351 F.3d 1246, 1253 (D.C. Cir. 2003) (no *Chevron* deference to offices located within the Treasury Department, because "the agencies have specialized enforcement responsibilities but their authority potentially overlaps—thus creating risks of inconsistency or uncertainty").

Even at *Chevron* step two, the CDC's interpretation of its general rulemaking authority in Section 361(a) would fail "because it is unreasonable in light of the statute's text, history, structure, and context." *Loving*, 742 F.3d at 1022. The unprecedented and innovative "nature and scope of the authority being claimed by the" CDC, *id.* at 1021, "would seem to give it unbridled power to promulgate any regulation with respect to" public health, *Merck*, 962 F.3d at 540. Congress could "not [have] intend[ed] to grow such a large elephant in such a small mousehole" when it enacted Section 361 in 1944. *Loving*, 742 F.3d at 1021. The government claims that its authority is limited to measures "enacted to 'prevent the … spread of communicable disease[],'" Defs. Opp. 23, but this is no limitation at all. Above and beyond the "border closures, travel restrictions, business closures, [and] stay-at-home orders" the government admits its interpretation encompasses, Defs.' Opp. 21, the government's reading would also allow it to, for example, order individuals to buy personal protective equipment and donate it to the nearest hospital. The possibilities are endless. The only other limiting principle the government proposes is that the measure must be "considered necessary in the judgment

of public health experts," Defs.' Opp. 23 (cleaned up), but to say that an agency staffed by public health experts is limited to taking actions those experts deem necessary is a mere tautology.

The government's last line of defense is to claim deference to agency expertise given the "exceedingly rare threat posed by COVID-19." *Id.* But while courts "expressed willingness to defer to executive orders in the pandemic's early stages," "that rationale has expired according to its own terms" "as we round out 2020 and face the prospect of entering a second calendar year living in the pandemic's shadow." *Roman Catholic Diocese of Brooklyn*, slip op. at 3 (Gorsuch, J., concurring). Landlords should no longer be saddled with executive action that unfairly shifts the economic costs of the pandemic from one group of Americans to another without Congressional authorization.

## III. The Government Fails To Show That The Eviction Moratorium Reflects Reasoned Decision-making.

Even if the CDC acted within the scope of its statutory authority, the government fails to explain why the Eviction Moratorium is not arbitrary and capricious.  Pls.' Mem. 26-30.

*First*, the CDC did not satisfy its regulatory obligation to explain why state and local measures are insufficient to prevent the interstate spread of communicable disease.  Pls.' Mem. 26-27; 42 C.F.R. § 70.2.  The Eviction Moratorium itself offers only a bald restatement of the regulatory text: "[M]easures by states, localities, or U.S. territories that do not meet or exceed these minimum protections are insufficient to prevent the interstate spread of COVID-19."  85 Fed. Reg. at 55,296. This conclusory assertion does not pass muster as reasoned decision-making, and the government offers no reason why it should.  Instead, the government contends that the CDC reasonably assessed that a wave of evictions could lead to an increase in the spread of COVID-19.  Defs.' Opp. 28.  But it does not follow, let alone "inescapably" follow, *id.*, that states and localities had not taken sufficient measures to address the spread of COVID-19.  The administrative record reflects the CDC's consideration of only a select handful of state measures that were months old at the time the CDC

16

issued the Eviction Moratorium.  *See* AR 986-1023.  And the CDC points to nothing in the record demonstrating that the CDC evaluated conditions in Alabama and Georgia, where Plaintiffs are located.  *Id.*  Nowhere has the government explained what the CDC did to consider the full slate of state and local relief available to renters or to assesses why existing protections are insufficient.

*Second*, the CDC did not explain how the cited regulation authorizes a purely economic measure like the Eviction Moratorium.  The government maintains that the CDC need not explain itself on this point.  Defs.' Opp. 29.  But the regulation does *not* authorize the Eviction Moratorium any more than the statute does.  *See* Pls.' Mem. 22-23.  It is no answer to say, as the government does, that the CDC's authority includes the ability to promulgate regulations with economic effects.  Defs.' Opp. 29.  As Plaintiffs have explained, while a regulation of animals or articles that spread diseases may carry attendant economic effects, such a regulation is different in kind from the Eviction Moratorium's purely economic regulation of rental properties.  *See* Pls.' Mem. 23-24.

*Third*, the CDC failed to consider the costs that the Eviction Moratorium shifts to landlords. The government contends that the CDC had no obligation to consider the costs of measures it takes pursuant to Section 361 because the statute authorizes "necessary" measures instead of "appropriate and necessary" measures.  Defs.' Opp. 29.  But "appropriate and necessary" is not a magical statutory incantation.  To the contrary, "[a]gencies have long treated cost as a centrally relevant factor when deciding whether to regulate."  *Michigan v. EPA*, 576 U.S. 743, 752-53 (2015).  That is because cost assessment "reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions."  *Id.* at 753.  Indeed, agencies often give at least some consideration to the cost burdens of their regulations, even when authorizing statutes impose no express requirement to do so, as Defendants illustrate.  *See* Defs.' Opp. 30 (citing *Nicopure Labs, LLC v. FDA*, 266 F. Supp. 3d 360, 403 (D.D.C. 2017) ("[T]he administrative record reflects that the agency expressly considered both the burdens the decision would impose on the vaping industry

and the benefits to the public.")).  Here, the CDC made no effort to assess the disadvantages involved in forcing landlords alone to shoulder a significant swath of the pandemic's costs, ignoring a significant factor relevant to its decision.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The government claims that the Eviction Moratorium's burden on landlords will only be temporary.  Defs.' Opp. 30-31. That contention is not supported by any evaluation in the sparse administrative record and is factually wrong.  *See* Pls.' Mem. 34; ECF 6-2, Fordham Decl. ¶ 17; ECF 6-3, Gilstrap Decl. ¶ 12.  In any event, post hoc rationalizations of agency action offered in litigation are insufficient.  *See Clean Wis. v. EPA*, 964 F.3d 1145, 1163, 1167 (D.C. Cir. 2020).

*Fourth*, the CDC failed to reasonably explain key terms in the Eviction Moratorium.  Far from merely reflecting the agency's policy preferences, Defs.' Opp. 31-33, these failures demonstrate that the Eviction Moratorium is unreasonable, *see* Pls.' Mem. 28-30, because the CDC failed to give reasoned consideration to the moratorium's scope.  Here too, Defendants' post-hoc rationalizations in litigation fail to justify the Eviction Moratorium.  For example, the government justifies the CDC's failure to draw any connection between evictions and the *interstate* spread of communicable disease by arguing that the agency "has long recognized the obvious point that intrastate spread of a contagious disease typically leads quickly to interstate spread."  Defs.' Opp. 31.  Perhaps so, but those subject to the Eviction Moratorium would never know it, because the agency neither invoked this justification for its order nor included in the administrative record the sources counsel cites in reply.

The government's defense of perhaps the most critical term in the Eviction Moratorium—"evict"—illustrates most clearly how the CDC has not reasonably explained itself.  The government, relying on a definition invoked nowhere in the Eviction Moratorium itself or in the Frequently Asked Questions ("FAQ"), maintains that "[e]vict" means "[t]o expel" a tenant—the final step in an eviction proceeding.  *See* Defs.' Opp. 33.  But it offers no explanation of why or how the Eviction Moratorium justifies criminal penalties for "*any action*" by a landlord to "*cause the removal*" of a covered person,

phrases that on their face contemplate steps in the eviction process prior to actual eviction. 85 Fed. Reg. at 55,293 (emphasis added); *see also infra* p. 24. For all of these reasons, the Eviction Moratorium fails the basic requirement that agency decision-making be reasonable and reasonably explained.

## IV. The Government Fails To Show That Section 361(a) Of The Public Health Service Act Is Consistent With The Nondelegation Doctrine.

Even assuming Section 361(a) authorizes the Eviction Moratorium, Congress's delegation of authority in Section 361(a) violates the nondelegation doctrine. Pls.' Mem. 30-32. Far from identifying an "intelligible principle," the government's reliance on the "general policy" authorizing the CDC to prevent the spread of communicable disease as "necessary" in its "judgment" underscores the breadth of the delegation. Defs.' Opp. 34. "[T]he degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman*, 531 U.S. at 475. "When the scope increases to immense proportions . . . the standards must be correspondingly more precise." *Michigan v. EPA*, 213 F.3d 663, 680 (D.C. Cir. 2000) (citation omitted); *see also Paul* (Kavanaugh, J., dissenting from the denial of certiorari) (explaining that "congressional delegations to agencies of authority to decide major policy questions—even if Congress expressly and specifically delegates that authority"—would violate the nondelegation doctrine). Under the government's interpretation of Section 361(a), Congress delegated regulatory authority over any activity that could potentially spread disease—any activity involving human interaction or movement. The vast scope of this power accordingly demands more specific limits on its exercise than the CDC's own "judgment" about what is "necessary."

None of the cases the government cites can sustain such a broad delegation. Defs.' Opp. 34. The statute in *Whitman* implicated only "a discrete set of pollutants" and required any EPA action to be "based on published air quality criteria that reflect the latest scientific knowledge." 531 U.S. at 473. In *Touby*, the Court recognized the "multiple specific restrictions on the Attorney General's discretion"

to temporarily designate a drug as a controlled substance.  500 U.S. at 167.  In *Industrial Union Department, AFL-CIO v. American Petroleum Institute*, 448 U.S. 607 (1980), the Court construed the statute at issue narrowly to avoid finding an "open-ended grant" of legislative power to the Executive Branch. *Id.* at 646.  And while courts have approved delegations to regulate in the public interest, Defs.' Mot. 34, they have not done so in a situation where, as here, the delegation could extend to all human interaction or movement—or really any measure the agency can think of that requires one group of citizens to shoulder a massive economic burden to prevent others from spreading disease.  The "immense proportions" of the CDC's claimed authority here require "more precise" standards for its exercise.  *Michigan*, 213 F.3d at 680.

## V.    The Government Fails To Show That The Eviction Moratorium Is Constitutional.

The Eviction Moratorium also violates the Constitution by taking Plaintiffs' property without just compensation, violating due process, and infringing on Plaintiffs' right of access to the courts.

### A.    The Government Fails to Show that the Eviction Moratorium is Not a Taking.

The Eviction Moratorium is a physical and regulatory taking.  Pls.' Mem. 32–35.  The government does not argue, nor could it, that Section 361(a) supplies a "clear warrant" for the CDC to take landlords' properties.  Pls.' Mem. 32 (quoting *Bell Atl. Tel. Cos. v. FCC*, 24 F.3d 1441, 1445–46 (D.C. Cir. 1994)).  Nor does it dispute that *Bell Atlantic*'s "clear warrant" rule applies.  It is left instead to argue that the Eviction Moratorium does not effect a taking.[1]

The Eviction Moratorium effects a physical taking—not a mere economic regulation of landlord-tenant relations, Defs.' Opp. 37, because it requires landlords to acquiesce to the physical

---

[1] The government asserts that "plaintiffs are required to litigate takings claims on the assumption the 'action was both authorized and lawful.'"  Defs.' Opp. 39 n.11 (quoting *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1366 (Fed. Cir. 2001)).  Not so here because Plaintiffs are not pursuing a takings claim for money damages in the Court of Federal Claims, nor have Plaintiffs "forgone [their] challenge to [the agency's] administrative actions."  *Rith*, 247 F.3d at 1366.

possession of their properties by third parties, *see FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987) ("This element of required acquiescence is at the heart of the concept of occupation."). By contrast, the laws challenged in *Yee v. City of Escondido* expressly permitted landlords to evict tenants for nonpayment of rent. 503 U.S. 519, 524, 527–28 (1992) ("[N]either the city nor the State compels petitioners, once they have rented their property to tenants, to continue doing so."). And the law challenged in *Florida Power Corporation* similarly did not confer "any right to occupy space on utility poles" or "prohibit[] utility companies from refusing to enter into attachment agreements with cable operators." 480 U.S. at 251. The Eviction Moratorium, however, prohibits landlords from evicting tenants for nonpayment and thus "*requires* the landowner to submit to the physical occupation of his land." *Yee*, 503 U.S. at 527.

The Eviction Moratorium also effects a regulatory taking. The government offers no authority for its assertion that Plaintiffs must show "that the economic impact of the Order outweighs the value left in their property." Defs.' Opp. 38. Instead, courts have recognized that the proper basis for assessing economic impact can vary, and that one legitimate measure is "the[] lost opportunity to earn market-rate rental income." *Anaheim Gardens, L.P. v. United States*, 953 F.3d 1344, 1354 (Fed. Cir. 2020). Far from having a "necessarily limited" impact, Defs.' Opp. 38, Plaintiffs have shown that the Eviction Moratorium will impose extraordinary costs on landlords, Pls.' Mem. 34. This lost income is not a stand-alone cost recoverable at a later date. Indeed, landlords "risk losing their properties permanently through foreclosure unless they are able to continue paying their mortgages while they are forced to house tenants without due process or just compensation." Order at 5, *Spicliff Inc. v. Cowley*, No. 2020 CC 003778 (Cnty. Ct. of Escambia Cnty, Fla. Nov. 24, 2020) (attached as Ex. A).

The government cannot seriously dispute that the Eviction Moratorium interferes with Plaintiffs' investment-backed expectations. Defs.' Opp. 38. Landlords could "not have anticipated" a total ban "on evicting and replacing tenants who do not pay rent." *Baptiste v. Kennealy*, 2020 WL

5751572, at *22 (D. Mass. Sept. 25, 2020) (finding eviction moratorium interfered with investment-backed expectations); *cf. Apartment Ass'n of L.A. Cnty., Inc. v. Los Angeles*, 2020 WL 6700568, at *5 (C.D. Cal. Nov. 13, 2020) ("[N]o amount of prior regulation could have led landlords to expect anything like the blanket Moratorium.").

Although the Eviction Moratorium causes a government-authorized physical occupation of Plaintiffs' premises, the government contends that it "promote[s] the common good by preventing the spread of a potentially deadly disease." Defs.' Opp. 39. Perhaps so, but "the purpose of the Takings Clause . . . is to prevent the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) (internal quotation marks and citation omitted).

Finally, a taking of contractual rights is not so limited as the government contends. Defs.' Opp. 35. The key question is whether "the government has altered [plaintiffs'] contract rights in a way that affects their underlying property rights." *Palmyra Pac. Seafoods, L.L.C. v. United States*, 561 F.3d 1361, 1369 (Fed. Cir. 2009); *see also Cienega Gardens v. United States*, 331 F.3d 1319, 1330 (Fed. Cir. 2003). That is the case here, where the Eviction Moratorium has altered Plaintiffs' rights to evict tenants for nonpayment of rent and recover possession of their property.

## B.    The Government Fails to Show that the CDC Provided Due Process.

For similar reasons, the Eviction Moratorium violates due process. Pls.' Mem. 36-37. The government insists that Plaintiffs lack any due process rights because the Eviction Moratorium has general applicability (and thus qualifies as a legislative rule). Defs.' Opp. 40–41. But the government cannot shirk due process by comparing the Eviction Moratorium to policymaking decisions by state entities, *see id.* (citing cases involving state and local governmental entities), which define and alter property rights through legislative activity, *see Butner v. United States*, 440 U.S. 48, 55 (1979). Nor can Defendants compare the Eviction Moratorium to legislation to avoid due process requirements. *See*

22

Defs.' Opp. 40; *Emory v. United Air Lines, Inc.*, 821 F. Supp. 2d 200, 212 (D.D.C. 2011) (challenging a federal statute), *aff'd*, 720 F.3d 915 (D.C. Cir. 2013).  When elected officials act, citizens have recourse at the ballot box.  But the same is not true of federal agencies, which must comply with the APA and, at the very least, provide some iota of process.  And as already explained, the Eviction Moratorium is fatally vague because—especially in light of the FAQ—it does not adequately define the key term "evict."  *See supra* p. 19; Pls.' Mem. 36–37.

### C.     The Government Fails to Show that the Eviction Moratorium Permits Access to Courts.

The Eviction Moratorium also deprives landlords of their ability to access state courts to pursue evictions.  Pls.' Mem. 37-40.  D.C. Superior Court Judge Epstein recently held that D.C.'s moratorium on filing evictions violates this federal constitutional principle.  *Borger Mgmt., Inc. v. Hernandez-Cruz*, No. 2020 LTB 006637 (D.C. Sup. Ct. Dec. 16, 2020) (attached as Ex. B).

Although the government attempts to walk back the plain language of the Eviction Moratorium, the plain text imposes criminal penalties for "*any* action" that would bring about the removal of a covered tenant.  Pls.' Mem. 38 (citing 85 Fed. Reg. at 55,293 (emphasis added)).  The CDC's FAQs reiterate the Eviction Moratorium's broad definitions, *see* CDC, "HHS/CDC Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19 Frequently Asked Questions" ("FAQ") at 1, *available at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/eviction-moratoria-order-faqs.pdf (last visited Dec. 27, 2020) ("any action"), direct state courts "not to evict a covered person from rental properties," *id.*, highlight that violators may be prosecuted with "no [CDC] involvement," *id.* at 7, and encourage state courts to "take judicial notice of the CDC Order, and the associated criminal penalties," *id.* at 1.  State courts have heeded the CDC's

direction by closing the courthouse doors to eviction proceedings.  *See* ECF 6-3, Gilstrap Decl. ¶¶ 7, 9; ECF 6-2, Fordham Decl. ¶¶ 10–12.[2]

Nor can filing a subsequent action for unpaid rent vindicate Plaintiffs' rights of access to the courts.  The question is not whether the Eviction Moratorium forecloses *all* judicial relief but whether Plaintiffs have "an arguable underlying claim and present foreclosure of a meaningful opportunity to pursue *that* claim."  *Broudy v. Mather*, 460 F.3d 106, 121 (D.C. Cir. 2006) (emphasis added).  The Eviction Moratorium deprives landlords of their "primary avenue[] of relief": eviction.  *Id.* at 120.  Even if money damages were an adequate substitute for possession of property, "a landlord's ability to seek damages from a judgment-proof debtor is not a substitute for an action for possession," *Borger Mgmt.,* Ex. B at 18 n.16; *see also* ECF 6-3, Gilstrap Decl. ¶¶ 11–12; ECF 6-2, Fordham Decl. ¶ ¶ 16–17.  Nor can the Eviction Moratorium's temporary duration save it because landlords are presently denied an opportunity to litigate a meritorious claim.  *See Christopher v. Harbury*, 536 U.S. 403, 413 (2002); *Gibson v. Superintendent of NJ Dep't of Law & Pub. Safety-Div.*, 411 F.3d 427, 441 (3d Cir. 2005), *overruled on other grounds by Dique v. N.J. State Police*, 603 F.3d 181 (3d Cir. 2010); *ACA Int'l v. Healey*, 457 F. Supp. 3d 17, 31–33 (D. Mass. 2020).

---

[2] *See, e.g.*, Administrative Order No. 2020-17 – Priority Treatment and New Procedure for Landlord/Tenant Cases, at 3 (Mich. Sup. Ct. Oct. 22, 2020) (Viviano, J., dissenting), https://courts.michigan.gov/Courts/MichiganSupremeCourt/rules/court-rules-admin-matters/Administrative%20Orders/2020-08_2020-10-22_FormattedOrder_AmendtAO2020-17.pdf ("Today, the Court suspends the statutory rules entitling property owners to recover their premises from tenants through summary proceedings in court. . . . The only basis for the extraordinary act . . . is [the Eviction Moratorium]." (citations omitted)); Administrative Order (Ala. Fifteenth Cir. Ct. Sept. 10, 2020), https://montgomery.alacourt.gov/media/1063/cdc-administrative-order.pdf ("[T]he Centers for Disease Control and Prevention (CDC) issued an Order . . . THEREFORE, any residential eviction action . . . shall include verification [of compliance with the Eviction Moratorium]."); Order, *In re Ongoing Provisions for Coronavirus/COVID-19 Impact on Court Servs.*, (Iowa Sup. Ct. Oct. 2, 2020), https://www.iowacourts.gov/static/media/cms/10220_supervisory_COVID_order_re_Ev_CE49 D9018939B.pdf ("*To implement the CDC Order* . . . the court shall continue the [eviction] action to a date after December 31, 2020 . . ." (emphasis added)).

## VI.     The Government Fails To Show That Vacatur Is Unwarranted.

The government's contention that certain Plaintiffs should be excluded from any remedy because they lack standing ignores the plain text of the Eviction Moratorium.  Defs.' Opp. 44 & n.15. The Eviction Moratorium applies to "a landlord, owner of a residential property, or other person with a legal right to pursue eviction."  85 Fed. Reg. at 55,293.  Both "person[s]" and "organization[s]" face the prospect of criminal liability.  *Id.* at 55,296.  Plaintiffs Gilstrap and Fordham are persons who could face criminal charges if they exercise their legal right to evict the nonpaying tenants in their properties. ECF 6-2, Fordham Decl. ¶ 5; ECF 6-3, Gilstrap Decl., Dkt. 6-3 ¶¶ 2, 4.  They—and by extension the Plaintiff Associations—have standing because they are the direct objects of the Eviction Moratorium. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992).  Even if these four Plaintiffs lack standing, the government does not dispute that two other Plaintiffs have standing to press the same claims and seek the same relief.  *J.D. v. Azar*, 925 F.3d 1291, 1323 (D.C. Cir. 2019).  The government's attempt to limit the scope of relief conflicts with controlling precedent.  *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see also NAACP*, 2020 WL 5291406, at *7.

## CONCLUSION

The Court should grant summary judgment to Plaintiffs, deny summary judgment to Defendants, vacate the Eviction Moratorium, and enjoin Defendants from enforcing it.

Dated: December 28, 2020                    Respectfully submitted,


                                            *s/ Brett A. Shumate*
                                            Brett A. Shumate (D.C. Bar No. 974673)
                                            Charlotte H. Taylor (D.C. Bar No. 1024658)
                                                (application pending)
                                            Megan Lacy Owen (D.C. Bar No. 1007688)
                                                (*pro hac vice*)
                                            Stephen J. Kenny (D.C. Bar No. 1027711)
                                            JONES DAY
                                            51 Louisiana Avenue, N.W.
                                            Washington, D.C. 20001
                                            Telephone:  (202) 879-3939
                                            Facsimile:  (202) 626-1700

                                            Autumn Hamit Patterson
                                                (Texas Bar No. 24092947)
                                                (*pro hac vice*)
                                            JONES DAY
                                            2727 N. Harwood St.
                                            Dallas, Texas 75201
                                            Telephone:  (214) 220-3939
                                            Facsimile: (214) 969-5100

                                            *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 28, 2020, a true and correct copy of the foregoing was filed using the Court's CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

December 28, 2020                              *s/ Brett A. Shumate*
                                                        Brett A. Shumate