**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALABAMA ASSOCIATION OF REALTORS, *et al.*, | |
| Plaintiffs, | No. 20-cv-3377 (DLF) |
| v. | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | |
| Defendants. | |

**DEFENDANTS' REPLY MEMORANDUM
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM OF POINTS AND AUTHORITIES
<u>IN SUPPORT OF PARTIAL MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

ADDITIONAL BACKGROUND ...............................................................................2

ARGUMENT .............................................................................................................3

I.   **Plaintiffs' APA, RFA, and Nondelegation Claims Should Be Dismissed in Light of the 2021 Appropriations Act.** ........................................................3

    A.   The 2021 Appropriations Act Moots Counts I–V of the Complaint. ...........................4

    B.   Alternatively, Counts I–V Must Be Dismissed Because Congress Has Ratified CDC's Regulatory Action. ...........................7

II.   **Plaintiffs' APA Claims Fail on the Merits.** ...............................................9

    A.   CDC's Original Action Fell Within Its Statutory and Regulatory Authority. ...............9

    B.   Plaintiffs' Notice-and-Comment Claim Fails on the Merits. ...........................12

    C.   The Arbitrary-and-Capricious Claim Fails on the Merits. ...........................13

III.   **Plaintiffs' Constitutional Claims Fail.** ..................................................15

    A.   Section 361(a) of the PHSA Contains an Intelligible Principle. ...................15

    B.   The Order Does Not Effect A Taking of Plaintiffs' Property. ...................16

    C.   Plaintiffs Have Identified No Due Process Violation. ...........................20

    D.   The Order Does Not Interfere With Plaintiffs' Access to Courts. ...............21

IV.   **Any Remedy Should Be Narrowly Tailored.** ...........................................23

CONCLUSION .........................................................................................................24

# TABLE OF AUTHORITIES

## Cases

*Already, LLC v. Nike, Inc.*,
   568 U.S. 85 (2013) ...................................................................................................4

*\*Am. Bar Ass'n v. FTC*,
   636 F.3d 641 (D.C. Cir. 2011) ......................................................................... 4, 5, 6

*Am. Fed. of Gov't Emps. v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*,
   (*AFGE*), 133 F. Supp. 2d 75 (D.D.C. 2001) ............................................................8

*Apartment Association of Los Angeles County, Inc. v. City of Los Angeles*,
   No. 20-5193, 2020 WL 6700568 (C.D. Cal. Nov. 13, 2020) ...................................19

*Arkansas v. Goldschmidt*,
   627 F.2d 839 (8th Cir. 1980) ...................................................................................5

*AT&T Info. Sys., Inc. v. GSA*,
   810 F.2d 1233 (D.C. Cir. 1987) ..............................................................................10

*\*Auracle Homes LLC v. Lamont*,
   --- F. Supp. 3d ---, No. 20-829, 2020 WL 4558682 (D. Conn. Aug. 7, 2020) ........... 17, 18

*\*Baptiste v. Kennealy*,
   --- F. Supp. 3d ---, No. 20-11335, 2020 WL 5751572 (D. Mass. Sept. 25, 2020) ............... 17, 18, 19

*Borger Mgmt., Inc. v. Hernandez-Cruz*,
   No. 2020 LTB 006637 (D.C. Super. Ct. Dec. 16, 2020) .........................................21

*Broudy v. Mather*,
   460 F.3d 106 (D.C. Cir. 2006) ................................................................................22

*\*Brown v. Azar*,
   No. 20-3702, 2020 WL 6364310 (N.D. Ga. Oct. 29, 2020) ............................*passim*

*Burke v. Barnes*,
   479 U.S. 361 (1987) ..................................................................................................4

*Chafin v. Chafin*,
   568 U.S. 165 (2013) ..................................................................................................4

*\*Chambless Enters., LLC v. Redfield*,
   No. 20-1455, 2020 WL 7588849 (W.D. La. Dec. 22, 2020) ...........................*passim*

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
   467 U.S. 837 (1984) ................................................................................................11

*Church of Scientology of Cal. v. United States,*
  506 U.S. 9 (1992) ........................................................................................................4

*\*Clarke v. United States,*
  915 F.2d 699 (D.C. Cir. 1990) ................................................................................ 4, 5

*\*Connolly v. Pension Ben. Guar. Corp.,*
  475 U.S. 211 (1986) ............................................................................................ 16, 19

*Dole Food Co. v. Patrickson,*
  538 U.S. 468 (2003) ..................................................................................................24

*\*Elmsford Apartment Assocs. v. Cuomo,*
  469 F. Supp. 3d 148 (S.D.N.Y. 2020) .......................................................... 17, 18, 22, 23

*Emory v. United Air Lines, Inc.,*
  821 F. Supp. 2d 200 (D.D.C. 2011), *aff'd*, 720 F.3d 915 (D.C. Cir. 2013) ..................20

*FCC v. Fla. Power Corp.,*
  480 U.S. 245 (1987) ..................................................................................................17

*Food & Water Watch, Inc. v. Vilsack,*
  808 F.3d 905 (D.C. Cir. 2015) ..................................................................................24

*Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.,*
  493 U.S. 331 (1990) ..................................................................................................24

*Friends of the Earth, Inc. v. Weinberger,*
  562 F. Supp. 265 (D.D.C. 1983) .................................................................................5

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,*
  460 F.3d 13 (D.C. Cir. 2006) ......................................................................................7

*Gundy v. United States,*
  139 S. Ct. 2116 (2019) ..............................................................................................15

*HAPCO v. City of Philadelphia,*
  No. 20-3300, 2020 WL 5095496 (E.D. Pa. Aug. 28, 2020) ......................................20

*Hartman v. Acton,*
  --- F. Supp. 3d ---, No. 2020 WL 1932896 (S.D. Ohio Apr. 21, 2020) ....................20

*\*Indep. Turtle Farmers of La. v. United States,*
  703 F. Supp. 2d 604 (W.D. La. 2010) ......................................................................10

*James v. Hodel,*
  696 F. Supp. 699 (D.D.C. 1988), *aff'd sub nom. James v. Lujan*, 893 F.2d 1404
  (D.C. Cir. 1990) ............................................................................................. 7, 8

*Jones v. Air Line Pilots Ass'n,*
  713 F. Supp. 2d 29 (D.D.C. 2010), *aff'd*, 642 F.3d 1100 (D.C. Cir. 2011) ......................... 20

*KC Tenants v. Byrn,*
  ---- F.3d ---, No. 20-784, 2020 WL 7063361
  (W.D. Mo. Nov. 30, 2020) ................................................................................ 15, 21

*Keystone Bituminous Coal Ass'n v. DeBenedictis,*
  480 U.S. 470 (1987) ............................................................................................. 17

*Kuster v. Veneman,*
  266 F. Supp. 2d 1190 (D.N.D. 2002) ................................................................... 20

*Mills v. Green,*
  159 U.S. 651 (1895) ............................................................................................... 4

*Mistretta v. United States,*
  488 U.S. 361 (1989) ............................................................................................... 7

*\*Mobil Oil Corp. v. EPA,*
  35 F.3d 579 (D.C. Cir. 1994) ............................................................................. 5, 6

*NAACP v. DeVos,*
  --- F. Supp. 3d ---, No. 20-1996, 2020 WL 5291406 (D.D.C. Sept. 4, 2020) ................... 11

*National Mining Association v. U.S. Army Corps of Engineers,*
  145 F.3d 1399 (D.C. Cir. 1998) ............................................................................ 23

*Nevada v. Watkins,*
  943 F.2d 1080 (9th Cir. 1991) .............................................................................. 5

*New Mexico v. Goldschmit,*
  629 F.2d 665 (10th Cir. 1980) .............................................................................. 6

*Nicopure Labs, LLC v. FDA,*
  266 F. Supp. 3d 360 (D.D.C. 2017) ..................................................................... 14

*Norman v. Baltimore & Ohio R.R. Co.,*
  294 U.S. 240 (1935) ............................................................................................. 16

*\*Omnia Commercial Co. v. United States,*
  261 U.S. 502 (1923) ............................................................................................. 16

*Palmyra Pac. Seafoods, LLC v. United States*,
    561 F.3d 1361 (Fed. Cir. 2009).........................................................................................16

*Penn Cent. Transp. Co. v. City of New York*,
    438 U.S. 104 (1978)........................................................................................................19

*Piszel v. United States*,
    833 F.3d 1366 (Fed. Cir. 2016)......................................................................................16

*Pond Constructors, Inc. v. U.S. Gov't Accountability Office*,
    No. 17-881, 2018 WL 3528309 (D.D.C. May 30, 2018)...................................................6

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020)......................................................................................................12

*S. Bay Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020)..................................................................................................12

*\*Thomas v. Network Sols., Inc.*,
    176 F.3d 500 (D.C. Cir. 1999) .....................................................................................7, 8

*\*Touby v. United States*,
    500 U.S. 160 (1991)......................................................................................................15

*Trump v. Int'l Refugee Assistance*,
    138 S. Ct. 353 (2017)......................................................................................................4

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*,
    513 U.S. 18 (1994)..........................................................................................................4

*U.S. Dep't of Treasury, Bureau of Alcohol, Tobacco & Firearms v. Galioto*,
    477 U.S. 556 (1986)........................................................................................................5

*United States v. Fla. E. Coast Ry. Co.*,
    410 U.S. 224 (1973)......................................................................................................20

*United States v. Heinszen & Co.*,
    206 U.S. 370 (1907).....................................................................................................7, 8

*Verizon v. FCC*,
    740 F.3d 623 (D.C. Cir. 2014) ........................................................................................9

*Vermont v. Goldschmidt*,
    638 F.2d 482 (2d Cir. 1980) ...........................................................................................6

*Westernworld Servs., Inc. v. United States*,
    No. 91-2152, 1992 WL 52531 (D.D.C. Feb. 28, 1992)...................................................10

*Yee v. City of Escondido,
  503 U.S. 519 (1992) ................................................................................................ 16, 17

**Statutes**

5 U.S.C. § 551 ........................................................................................................................6

5 U.S.C. § 553 ......................................................................................................................13

5 U.S.C. § 604 ........................................................................................................................6

5 U.S.C. § 701 ................................................................................................................... 6, 8

5 U.S.C. § 702 ........................................................................................................................6

*42 U.S.C. § 264 ........................................................................................................2, 11, 14

50 U.S.C. § 3951 ..................................................................................................................23

*Consolidated Appropriations Act, 2021, Pub. L. No. 116-260 (2020) ........................................... *passim*

**Regulations**

*42 C.F.R. § 70.2 .........................................................................................................12, 13, 14

85 Fed. Reg. 55292 (Sept. 4, 2020) ...........................................................................2, 6, 13, 17

*The authorities upon which we principally rely are marked with asterisks.*

## INTRODUCTION

On December 27, 2020, the President signed into law the Consolidated Appropriations Act, 2021, in which Congress voted, by overwhelming majority, to extend the Order challenged here: a temporary eviction moratorium enacted by the Centers for Disease Control and Prevention (CDC) to control the spread of COVID-19.  Congress's decisive action comes at a time when the pandemic is raging:  nearly 1.5 million new cases were reported in the last week alone, and the United States death toll has topped 350,000.  CDC COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days (last visited Jan. 6, 2021).  And although COVID-19 vaccinations have begun, suggesting a light at the end of the tunnel, Congress has clearly ratified the judgment of CDC experts that, for the time being, a temporary eviction moratorium remains necessary to control the spread of this deadly disease.

Congress's extension of the CDC Order moots Plaintiffs' claims under the Administrative Procedure Act (APA), as the Order remains in effect today solely by operation of statute.  The procedural requirements of the APA and Regulatory Flexibility Act (RFA) therefore do not apply (Counts I and II); there is no question of statutory authority, as Congress itself extended the moratorium (Count III); and any arbitrariness claims under the APA will no longer lie (Count IV).  The Act likewise moots Plaintiffs' nondelegation claim (Count V) given Congress's own directive extending the Order.  Because none of these claims continues to present a live controversy, the Court should dismiss them for lack of subject matter jurisdiction.  And even if not moot, they should nonetheless be dismissed because Congress's extension of CDC's original action inescapably shows that it was within CDC's statutory authority in the first place, and that it was not arbitrary or capricious.

Although Plaintiffs' remaining constitutional claims (Counts VI, VII, and VII) could be raised to challenge an Act of Congress, they easily fail.  First, frustration of contract rights resulting from regulation is not a taking (Count VI).  Further, the Supreme Court has foreclosed the contention that

a regulation permitting a tenant to remain on a rental property is a physical taking; and now that Congress has appropriated $25 billion for emergency rental assistance for low-income households, for which Plaintiffs' tenants may be eligible, there is even less basis for the argument that a regulatory taking has occurred.  Second, generally applicable Acts of Congress do not trigger procedural due process rights (Count VII).  And third, as Defendants have shown, the Order does not take away any landlord's right to access courts (Count VIII).

For these reasons, as explained further below, the Court should dismiss this action for lack of subject matter jurisdiction or, in the alternative, grant summary judgment in favor of Defendants.

## ADDITIONAL BACKGROUND

The background to this action is set forth in Defendants' memorandum of points and authorities in support of their motion for summary judgment.  *See* Defs.' Mem. in Supp. of Mot. for Summ. J. 2–8 (Defs.' Mem.), ECF No. 26.  Since the filing of that brief, Congress passed on December 21, 2020, and the President signed into law on December 27, 2020, the Consolidated Appropriations Act, 2021 (2021 Appropriations Act).  As relevant here, that Act provides:

> The order issued by the Centers for Disease Control and Prevention under section 361 of the Public Health Service Act (42 U.S.C. 264), entitled "Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID–19" (85 Fed. Reg. 55292 (September 4, 2020) is extended through January 31, 2021, notwithstanding the effective dates specified in such Order.

Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. N, tit. V, § 502 (2020).  The Order as originally promulgated by CDC provided that it would "remain in effect unless extended, modified, or rescinded, through December 31, 2020."  Temporary Halt in Residential Evictions to Prevent Further Spread of COVID-19, 85 Fed. Reg. 55292, 55297 (Sept. 4, 2020).

The 2021 Appropriations Act also appropriates $25 billion for emergency rental assistance, which will be provided to state and local governments for the purpose of "provid[ing] financial assistance to eligible households, including the payment of rent [and] rental arrears."

2021 Appropriations Act, div. N, tit. V, § 501(c)(2).  This assistance may be provided for a period of up to 12 months, with the potential for a three-month extension "if necessary to ensure housing stability for a household" and if funds remain available.  *Id.*  Payments for rent and rental arrears may be made directly to landlords, *id.*, and landlords are permitted either to assist their tenants in applying for financial assistance under the Act, or to apply for such assistance on their renters' behalf, *id.* § 501(f).  "Eligible households" are those for which the state or locality distributing funds determines that the "household income . . . is not more than 80 percent of the area median income"; that at least one member of the household has either (i) "qualified for unemployment benefits" or (ii) "experienced a reduction in household income," "significant costs," or "other financial hardship due, directly or indirectly," to COVID-19; and that at least one household member has demonstrated "a risk of experiencing homelessness or housing instability," which can be shown by, among other things, "a past due utility or rent notice or eviction notice."  *Id.* § 501(k)(3)(A).  The House Committee on Financial Services explained that this rental assistance and the extension of the CDC Order are intended to work in tandem, stating that the Order's extension "will help ensure that millions of renters across America are not evicted while waiting to receive assistance."  U.S. House Comm. on Fin. Servs., COVID-19 Stimulus Package Temporary Extension of the CDC Eviction Moratorium & Emergency Rental Assistance, https://financialservices.house.gov/uploadedfiles/era_1-pgr_12.20.20.pdf.

## ARGUMENT

**I.      Plaintiffs' APA, RFA, and Nondelegation Claims Should Be Dismissed in Light of the 2021 Appropriations Act.**

Plaintiffs challenge CDC's compliance with the procedural requirements of the APA and RFA (Counts I, II); whether the Order was within CDC's statutory authority under section 361 of the Public Health Services Act (PHSA) (Count III); whether the Order was arbitrary or capricious under the APA (Count IV); and whether Congress provided an "intelligible principle" when delegating authority to regulate via section 361 (Count V).  But the temporary eviction moratorium at issue here now

remains in effect solely by operation of an Act of Congress.  Because neither the APA nor the Regulatory Flexibility Act applies to Congress, and Congress itself extended the CDC Order, Counts I–V of the complaint must be dismissed.

> **A.**     **The 2021 Appropriations Act Moots Counts I–V of the Complaint.**

A federal court may not "decide the merits of a legal question not posed in an Article III case or controversy." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 21 (1994).  In particular, a federal court lacks authority "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)).  There is "no case or controversy, and a suit becomes moot, 'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)).  "Even where litigation poses a live controversy when filed, the [mootness] doctrine requires a federal court to refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Am. Bar Ass'n v. FTC*, 636 F.3d 641, 645 (D.C. Cir. 2011) (quoting *Clarke v. United States*, 915 F.2d 699, 700–01 (D.C. Cir. 1990) (en banc)).

Two facets of mootness doctrine guide the analysis here.  First is the proposition that a challenge to governmental action becomes moot when the challenged law expires.  *See Clarke*, 915 F.2d at 700–01; *see also Trump v. Int'l Refugee Assistance*, 138 S. Ct. 353 (2017) (mem.) (vacating judgment with instructions to dismiss as moot where challenged provision of Executive Order "expired by its own terms" and thus "no longer present[ed] a live case or controversy" (quotation marks and citation omitted)); *Burke v. Barnes*, 479 U.S. 361, 363 (1987) (holding that petitioners' claims "were mooted" when bill at issue "expired by its own terms").  In *Clarke*, for example, the en banc D.C. Circuit found

that a challenge to the constitutionality of a provision of the D.C. Appropriations Act of 1989 was rendered moot when the Act expired and was superseded by the passage of the 1990 Appropriations Act. *See* 915 F.2d at 700–01.

Second is that "[t]hrough the passage of legislation which governs the lawsuit, Congress can effectively moot a controversy notwithstanding its pendency before the courts." *Friends of the Earth, Inc. v. Weinberger*, 562 F. Supp. 265, 270 (D.D.C. 1983). This occurs where congressional action "significantly alters the posture of [a] case." *U.S. Dep't of Treasury, Bureau of Alcohol, Tobacco & Firearms v. Galioto*, 477 U.S. 556, 559 (1986). In *Mobil Oil Corp. v. EPA*, 35 F.3d 579 (D.C. Cir. 1994), for example, the D.C. Circuit considered Congress's codification of two challenged Environmental Protection Agency (EPA) rules in an amendment to an EPA appropriations bill, which required that the agency maintain the rules until it promulgated revisions, *id.* at 581–82. As a result of Congress's action, the court held that the challenge to the agency's rules was "moot because [Congress] ha[d] enacted those rules as so interpreted into law," *id.* at 585. Likewise, in *American Bar Association v. FTC*, the plaintiffs' claims were mooted where Congress amended a statute under which a challenged rule was promulgated in a manner that necessitated revisiting of the rule and was "clearly aimed at the precise matter in dispute," 636 F.3d at 646; *see id.* at 647 ("[T]here is no 'live' case or controversy before this court. Why? Because the policy, rule, and statute that gave rise to this suit are no longer in the same posture."). Other circuits have similarly held that, where Congress specifies by law exactly how an agency should proceed, a challenge to the agency's original action, taken pursuant to more general statutory authority, is moot. *See, e.g.*, *Nevada v. Watkins*, 943 F.2d 1080, 1081–82 (9th Cir. 1991) (Congress's amendments to Nuclear Waste Policy Act requiring Secretary of Energy to proceed with site characterization for nuclear waste repository at specific location rendered challenge to Secretary's environmental assessment moot); *Arkansas v. Goldschmidt*, 627 F.2d 839, 842–43 (8th Cir. 1980) (per curiam) (Act of Congress setting formula by which Secretary of Transportation must allocate federal-

aid highway funds mooted challenge to agency's original formula); *Vermont v. Goldschmidt*, 638 F.2d 482, 485 (2d Cir. 1980) (same); *New Mexico v. Goldschmit*, 629 F.2d 665, 669 (10th Cir. 1980) (same).

Here, Plaintiffs' APA, RFA, and nondelegation challenges to the Order are moot because the original Order would have expired on its own terms, and its continued effectiveness is exclusively the product of congressional legislation, not agency action. As promulgated by CDC, the Order was to expire on December 31, 2020 "unless extended, modified, or rescinded." 85 Fed. Reg. at 55297. CDC did not extend the Order; it remains in effect today only because Congress extended it through January 31, 2021. *See* 2021 Appropriations Act, div. N, tit. V, § 502. As in *Mobil Oil*, this Act of Congress directs the extension of the action that Plaintiffs challenge here. *See* 35 F.3d at 585. And given that the Act has superseded the original Order, "there is no 'live' case or controversy before this court" with respect to the APA, RFA, and nondelegation counts based on the agency's promulgation of the Order "[b]ecause the policy . . . that gave rise to this suit [is] no longer in the same posture." *Am. Bar Ass'n*, 636 F.3d at 647.

Because the ongoing operation of the temporary eviction moratorium is the result of an Act of Congress, Plaintiffs' claims that CDC's original issuance of the Order was procedurally infirm, in excess of its statutory authority, and arbitrary and capricious, and that Congress's delegation of authority to CDC was unconstitutional, are all moot. First, the APA provides a cause of action for persons "aggrieved by agency action," 5 U.S.C. § 702, but neither it nor the RFA applies to Acts of Congress, 5 U.S.C. § 701(b)(1)(A); *see* 5 U.S.C. § 604(a) (RFA applies "[w]hen an *agency* promulgates a final rule" (emphasis added)); *id.* § 551(1)(A) (defining "agency" as used in the RFA to exclude Congress); *see also Pond Constructors, Inc. v. U.S. Gov't Accountability Office*, No. 17-881, 2018 WL 3528309, at *1 (D.D.C. May 30, 2018) (Friedrich, J.). Because the Order is now the result of congressional action, which is not subject to the procedural requirements of the APA or RFA, a decision as to whether the agency acted in concordance with those requirements at the outset would be merely

advisory.  Similarly, because there is now a separate law requiring the Order to remain in effect, a decision as to whether the Order originally fell within CDC's authority under section 361 of the PHSA or was the result of reasoned agency decisionmaking would be academic.  Second, any question as to whether Congress's delegation of authority to CDC in section 361 contained an "intelligible principle" is beside the point, *see, e.g.*, *Mistretta v. United States*, 488 U.S. 361, 372 (1989), as Congress has now itself directed that the Order remain in effect for a specific time period.

Thus, because any harm to Plaintiffs is now caused not by agency action, but by an Act of Congress, there is no longer a live controversy with respect to their APA, RFA, and nondelegation claims, and the Court should dismiss Counts I, II, III, IV, and V as moot.

**B.      Alternatively, Counts I–V Must Be Dismissed Because Congress Has Ratified CDC's Regulatory Action.**

Even if the Court were to determine that Plaintiffs' APA, RFA, and nondelegation claims are not moot, it should nonetheless dismiss them because Congress has ratified CDC's action by extending the Order.

The D.C. Circuit has made clear that "Congress 'has the power to ratify the acts which it might have authorized' in the first place."  *Thomas v. Network Sols., Inc.*, 176 F.3d 500, 506 (D.C. Cir. 1999) (quoting *United States v. Heinszen & Co.*, 206 U.S. 370, 384 (1907)); *see also Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 n.7 (D.C. Cir. 2006) ("Congress may ratify an agency action through appropriation acts." (citation omitted)).  Where Congress has "ratified agency action by statute, even if that action had been arbitrary and capricious" or otherwise violated the APA, "judicial review requires a challenge to the statute itself."  *James v. Hodel*, 696 F. Supp. 699, 701 (D.D.C. 1988), *aff'd sub nom. James v. Lujan*, 893 F.2d 1404 (D.C. Cir. 1990) (per curiam).  And a suit challenging the action should be dismissed where Congress clearly intended to ratify the agency's action, could have authorized the action as an initial matter, and the congressional Act does not otherwise "interfere with

intervening rights."[1]  *Thomas*, 176 F.3d at 506 (quoting *Heinszen*, 206 U.S. at 384); *see also Am. Fed. of Gov't Emps. v. D.C. Fin. Resp. & Mgmt. Assistance Auth. (AFGE)*, 133 F. Supp. 2d 75, 78–84 (D.D.C. 2001) (dismissing complaint where Congress ratified otherwise unlawful D.C. Control Board order by statute).

Here, there can be no reasonable dispute that Congress ratified CDC's action.  The 2021 Appropriations Act plainly states that the Order "is extended . . . notwithstanding the effective dates specified in such Order."  2021 Appropriations Act, div. N, tit. V, § 502.  The Court need look no further than this explicit language to determine that Congress intended to ratify the CDC Order.  And Plaintiffs do not contest that Congress had the power to enact a temporary eviction moratorium in the first instance.  *See generally* Compl., ECF No. 1; *see also* Pls.' Mem. in Opp. to Defs.' Mot. for Summ. J. 9, 11 (Pls.' Opp.), ECF No. 28 (citing favorably the eviction moratorium included in the CARES Act).

Given this clear ratification, the issue is the validity of the Act, not the validity of the now-superseded CDC Order.  *See James*, 696 F. Supp. at 701.  And because the APA does not apply to Congress, *see* 5 U.S.C. § 701(b)(1)(A), even if there had originally been an APA violation—which there was not, *see* Defs.' Mem. 8–33; *infra* pp. 9–15—there is no longer any need for the Court to reach those issues.  *See James*, 696 F. Supp. at 701.  In any event, that Congress chose to extend the CDC Order, rather than enact new substantive authority for an eviction moratorium, demonstrates that the Order was necessarily within CDC's authority and is not arbitrary or capricious.  Moreover, Congress's plain directive to CDC to extend the Order cures any nondelegation issue that might have existed—though none did, *see* Defs.' Mem. 33–35; *infra* p. 15—as it can be hard to imagine any clearer instruction than the explicit directive in the Act.

---

[1] Defendants explain why the Act does not otherwise interfere with Plaintiffs' rights in Part II.  *See infra* pp. 15–23.

For these reasons, even if the Court determines Counts I–V remain live, it should nonetheless dismiss them given Congress's ratification of the CDC Order.

## II.     Plaintiffs' APA Claims Fail on the Merits.

For all the reasons given above, *see supra* pp. 3–8, there is no reason for the Court to reach the APA claims as they were presented in Plaintiffs' motion for summary judgment, since Congress's recent action both renders those claims moot and leaves zero doubt that they fail on the merits.  If the Court were to reach those claims, however, they would still fail.

### A.     CDC's Original Action Fell Within Its Statutory and Regulatory Authority.

Even if Congress had not unambiguously shown that CDC had statutory authority to issue the Order by extending it, section 361(a) of the PHSA clearly provided that authority in the first instance, as Defendants have explained.  *See* Defs.' Mem. 8–25.  Two federal courts have agreed.  *See Chambless Enters., LLC v. Redfield*, No. 20-1455, 2020 WL 7588849, at *3–9 (W.D. La. Dec. 22, 2020); *Brown v. Azar*, No. 20-3702, 2020 WL 6364310, at *6–10 (N.D. Ga. Oct. 29, 2020), *appeal filed*, No. 20-14210 (11th Cir. Nov. 9, 2020).  Plaintiffs' arguments to the contrary fail.

1.  Plaintiffs first contend that the Order's economic impact qualifies it as a "major rule" that Congress must explicitly authorize. Pls.' Opp. 4–9.  Not so.  Even if the Court were to put aside the fact that Congress itself has now extended the CDC Order (and appropriated $25 billion in emergency rental assistance for low-income tenants), Plaintiffs' argument is inconsistent with Circuit precedent. At the outset, Plaintiffs rely principally upon dissents in arguing for the existence of what they term the "major rules doctrine."  *Id.* at 4–6.  And they fail entirely to address the D.C. Circuit's holding that the fact that a regulation "involves decisions of great 'economic and political significance'" does not, without more, signify "that Congress could not have delegated some of those decisions" to an agency. Defs.' Mem. 13 (quoting *Verizon v. FCC*, 740 F.3d 623, 638 (D.C. Cir. 2014)).  Nor do Plaintiffs address the fact that none of their cited cases turns on the economic impact of a regulation alone, or that

multiple courts within this District have rejected the same argument they advance here. *See id.* at 13–14. And even Plaintiffs' attempt to show that the economic impact of the Order is significant enough to trigger any clear statement requirement relies upon a declaration outside of the administrative record.[2] *See id.* at 15. For all of these reasons, Plaintiffs' first argument fails.

2. Plaintiffs are also incorrect that Congress "unambiguously foreclosed" CDC from issuing a temporary eviction moratorium to prevent the spread of disease. Pls.' Opp. 10–14. To the contrary, other federal courts have held that "Congress' intent, as evidenced by the plain language of the delegation provision, is clear: Congress gave the Secretary of HHS broad power to issue regulations necessary to prevent the introduction, transmission or spread of communicable diseases." *Brown*, 2020 WL 6364310, at *7; *accord Chambless*, 2020 WL 7588849, at *5 ("This Court finds that the plain text of the statute is unambiguous and evinces a legislative determination to defer to the 'judgment' of public health authorities about what measures they deem 'necessary' to prevent contagion."). In so holding, both the *Brown* and *Chambless* courts rejected statutory interpretation arguments similar to those Plaintiffs raise here based on canons of construction. *See Brown*, 2020 WL 6364310, at *9–10; *Chambless*, 2020 WL 7588849, at *7–8. The only other federal court to have addressed the argument that the list of measures included in the second sentence of section 361(a) limited the authority granted in the first sentence likewise rejected it. *See Indep. Turtle Farmers of La. v. United States*, 703 F. Supp. 2d 604, 619–20 (W.D. La. 2010) (explaining that "the list does not act as a limitation upon the types

---

[2] Plaintiffs have not shown that the Court may look beyond the record to consider the declaration they claim demonstrates the economic effects of the Order. It is not responsive to Defendants' standing argument, *see* Defs.' Mem. 44 n.15, which focuses on the fact that certain individual plaintiffs do not enter into rental agreements with tenants. Furthermore, the case law to which Plaintiffs cite focuses on the ability of the *government* to supplement the administrative record under certain circumstances—not a plaintiff. Pls.' Opp. 8 (citing *AT&T Info. Sys., Inc. v. GSA*, 810 F.2d 1233, 1236 (D.C. Cir. 1987) (per curiam), and *Westernworld Servs., Inc. v. United States*, No. 91-2152, 1992 WL 52531, at *6 (D.D.C. Feb. 28, 1992)). Accordingly, even if it were not inaccurate, *see* Defs.' Mem. 15 n.4, and rendered obsolete by more recent legislation, *see* 2021 Appropriations Act, div. N, tit. V, § 501(c)(2), this Court should not rely upon Plaintiffs' declaration.

of regulations that may be enacted under Section 361 [of the PHSA]"). Plaintiffs provide no reason for this Court to depart from this unbroken line of authority.

Nor are Plaintiffs correct that D.C. Circuit precedent precludes CDC's reliance upon its general regulatory authority to issue the Order. *See* Pls.' Opp. 11–12. To be sure, the mere fact that an agency has general rulemaking authority does not automatically sanction any regulation it promulgates. *See NAACP v. DeVos*, --- F. Supp. 3d ---, No. 20-1996, 2020 WL 5291406, at *6 (D.D.C. Sept. 4, 2020) (Friedrich, J.). But here, the challenged regulation is undeniably targeted to the exact purpose for which Congress provided authority: "to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable disease." 42 U.S.C. § 264(a). It cannot be the case that Congress plainly foreclosed such a regulation by later listing certain measures the agency "may provide for," which includes "other measures." *See id.* This is particularly true because the statute makes the non-exhaustive nature of the list clear by going on to discuss in later subsections measures the agency may take that are *not* included in the list. *See Brown*, 2020 WL 6364310, at *8 ("limiting the authority of the Secretary of HHS in the way Plaintiffs suggest makes little sense when considering the subsequent subsections of [42 U.S.C.] § 264"); *Chambless*, 2020 WL 7588849, at *7 (same).

3.   Finally, even if section 361 did not plainly authorize the CDC Order, the agency's interpretation would be entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See* Defs.' Mem. 21–25. Plaintiffs do not meaningfully dispute that the Order is the type of agency action to which *Chevron* deference applies, regardless of whether the agency promulgated it through notice-and-comment rulemaking. *See id.* at 22–23. Instead, Plaintiffs' primary argument is that CDC's interpretation is unreasonable because it is novel and because CDC could hypothetically take other certain measures—which it has not—to curb the spread of disease. Pls.' Opp. 15–16. But Plaintiffs cannot contest that, in the statute's long history, the constraints on

11

agency authority have proved meaningful, *see* Defs.' Mem. 23–24, nor could they dispute that the current pandemic is a virtually unprecedented situation requiring creative responses from the governments at all levels, *see id.*  And Plaintiffs are mistaken that the appropriateness of deferring to the public-health judgments of CDC experts somehow lessens as the pandemic continues.[3]  *See* Pls.' Opp. 16.  To the contrary, the need for that public-health expertise is as great as ever as the pandemic surges, death tolls climb, and the citizenry braces itself for the last throes of the virus before vaccines become widely available.  *Accord Brown*, 2020 WL 6364310, at *11 ("where broad [statutory] limits are not exceeded, they should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people" (quoting *S. Bay Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (Roberts, J., concurring) (cleaned up)).

Accordingly, even if the Court were to consider Plaintiffs' statutory authority claim—which it need not do in light of Congress's extension of the Order—it should find that the Order falls within CDC's statutory and regulatory authority.

### B.   Plaintiffs' Notice-and-Comment Claim Fails on the Merits.

Should the Court reach it, Plaintiffs' notice-and-comment claim would fail for two reasons. First, as the *Chambless* court held, the Order is not a rule at all.  *See Chambless*, 2020 WL 7588849, at *11 (because "the very purpose of [42 C.F.R. § 70.2] is to enable the CDC to take swift steps to prevent contagion, the Court cannot conclude that the actions [it] authorize[s] are also rules that require yet another round of notice and comment before they can take effect").  Plaintiffs' citations to cases

---

[3] The concurrence in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020), upon which Plaintiffs rely, is distinguishable because it focuses squarely upon First Amendment rights, which are not at issue here.  *See id.* at 70 (Gorsuch, J., concurring) (opining that "courts must resume applying the Free Exercise Clause").

stating broad principles aside, they identify no case holding that action taken under 42 C.F.R. § 70.2 is a rule subject to notice and comment.

Second, even if the Order were a rule, CDC rightly found that there was good cause to issue it without notice and comment given the exigent circumstances. Plaintiffs' principal contention to the contrary—that CDC should have begun a months-long rulemaking process while the CARES Act moratorium was in effect on the basis of speculation about whether it would be renewed—was rightly rejected by the *Chambless* court. *See Chambless*, 2020 WL 7588849, at *12 ("Congress and many states implemented similar eviction moratoria early in the pandemic; the expiration of these measures directly informed the CDC's determination as to the inadequacy of state measures and the necessity of the Order."). That reasoning makes sense: while the CARES Act moratorium was in effect, CDC did not know whether Congress would extend the moratorium, nor did it know whether various states and localities would extend their own moratoria. CDC only acted once it had all the relevant facts before it. And because by the time CDC was in a position to act it had further determined that delay would lead to substantial additional deaths, the Order readily satisfies the APA's good cause exception. *See* 5 U.S.C. § 553(b)(B).

## C.     The Arbitrary-and-Capricious Claim Fails on the Merits.

Plaintiffs' arbitrary-and-capricious claim is equally infirm. First, contrary to Plaintiffs' assertions, *see* Pls.' Opp. 16–17, CDC did explain why state and local measures were inadequate; it spent pages explaining why a moratorium on evictions was reasonably necessary to prevent the spread of COVID-19 and further observed that "[p]ublicly-available compilations of pending measures indicate that eviction moratoria and other protections from eviction have expired or are set to expire in many jurisdictions," 85 Fed. Reg. at 55296 n.36 (citing Eviction Lab, *COVID–19 Housing Policy Scorecard,* available at: https://evictionlab.org/covid-policy-scorecard) (A.R. 966–72); *accord Brown*,

2020 WL 6364310, at *14; *Chambless*, 2020 WL 7588849, at *12 (expiration of state and local moratoria "directly informed the CDC's determination as to the inadequacy of state measures").

Second, Plaintiffs continue to fault CDC for failing to "explain" *how* 42 C.F.R. § 70.2 authorizes an economic measure like the Order, *see* Pls.' Opp. 17, but it is now apparent that their real disagreement is with *whether* 42 C.F.R. § 70.2 authorizes the Order, *see id.* ("But the regulation does not authorize the Eviction Moratorium any more than the statute does."). Defendants have addressed that issue in detail elsewhere. *See* Defs.' Mem. 8–21; *see also supra* pp. 9–12.

Third, notwithstanding Plaintiffs' argument that CDC was obligated to address in detail the potential costs of the Order to landlords, *see* Pls.' Opp. at 17–18, they identify no case holding that 42 U.S.C. § 264 obligated CDC to assess the costs of public health measures deemed necessary to avoid the spread of disease—which is perhaps unsurprising in light of the statute's overriding goal to prevent contagion. That other agencies implementing other statutory schemes sometimes "'expressly consider[]'" costs and benefits, Pls.' Opp. 17 (quoting *Nicopure Labs, LLC v. FDA*, 266 F. Supp. 3d 360, 403 (D.D.C. 2017)), does not mean that they are required to do so or that their failure to do so violates the APA, as *Nicopure* itself held, *see* 266 F. Supp. 3d at 401 (holding that "the statutory provision at issue does not include the words that led the Supreme Court in *Michigan v. EPA* to call for some assessment of costs").

Fourth and finally, CDC adequately explained the Order's definitions. *Contra* Pls.' Opp. 18–19. Plaintiffs identify no case holding that arbitrary-and-capricious review requires agencies to state the obvious (such as the proposition that intrastate spread of a contagious disease inexorably leads to interstate spread). And despite Plaintiffs' continued attempt to muddy the waters as to what a prohibited "eviction" means under the Order, there is no ambiguity on this point, particularly in light of the FAQs: the Order bars the actual removal of covered tenants from their homes. *See infra* pp. 21–

22 (citing *Brown*, 2020 WL 6364310, at *15; *KC Tenants v. Byrn*, Case No. 20-784, 2020 WL 7063361, at *2 (W.D. Mo. Nov. 30, 2020); *see also Chambless*, 2020 WL 7588849, at *8).

## III.   Plaintiffs' Constitutional Claims Fail.

### A.   Section 361(a) of the PHSA Contains an Intelligible Principle.

Because Congress's extension of the CDC Order provides an unequivocally clear delegation of authority, the Court need look no further to reject Plaintiffs' nondelegation claim. *See supra* pp. 7–8. But even if the Court were to rely solely upon the authority Congress provided in section 361(a), Plaintiffs' nondelegation claim must be rejected for the reasons explained in Defendants' motion. *See* Defs.' Mem. 33–35.

Moreover, since Defendants filed their motion, the *Chambless* court rejected a substantively identical nondelegation challenge to section 361(a), finding that in the statute "Congress has permissibly chosen to delegate broad authority, within specified bounds, to public health experts regarding regulations in a fast-moving, complex, and technical area." 2020 WL 7588849, at *11. That court also held, contrary to Plaintiffs' assertions, that the statute's limitation of agency action to measures that are "necessary" "to prevent the introduction, transmission, or spread of communicable diseases" into the United States or among the states, provided a sufficient intelligible principle. *Id.* at *10. It further noted that "the Supreme Court has recognized on multiple occasions that the protection of public health and safety"—such as Congress provided for in the PHSA—"are intelligible principles sufficient to make a delegation constitutional." *Id.* Plaintiffs cite no case to the contrary, nor could they, as "Congress does not violate the Constitution merely because it legislates in broad terms," *Touby v. United States*, 500 U.S. 160, 165 (1991), and the Supreme Court has not invalidated a statute on nondelegation grounds since 1935, *see Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019).

Plaintiffs' nondelegation challenge to section 361 thus easily fails.

**B.     The Order Does Not Effect A Taking of Plaintiffs' Property.**

Nor have Plaintiffs shown that the Order is an unconstitutional taking.  As an initial matter, government regulation that interferes with private contractual rights does not constitute a taking where the government does not become the beneficiary of the agreement.  *See* Defs.' Mem. 35–36 (citing *Norman v. Baltimore & Ohio R.R. Co.*, 294 U.S. 240, 309–10 (1935) & *Omnia Commercial Co. v. United States*, 261 U.S. 502, 507, 511 (1923)).  Plaintiffs do not dispute that the effect of the Order is to temporarily limit one remedy for breach of a residential rental contract, not to put the government in the landlord's contractual place.  *See* Pls.' Reply 22.  And the Supreme Court has previously found that no taking occurred where "the United States ha[d] taken nothing for its own use, and only ha[d] nullified a contractual provision . . . by imposing an additional obligation that [was] otherwise within the power of Congress to impose."  *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 224 (1986); *accord Piszel v. United States*, 833 F.3d 1366, 1377 (Fed. Cir. 2016) (holding that no taking occurred "because, even after the government's action, [plaintiff] was left with the right to enforce his contract . . . in a breach of contract action").  So too here.

Even if Plaintiffs were correct that that a taking may occur when governmental regulation alters contractual rights in a way that "affects . . . underlying property rights," Pls.' Opp. 22 (quoting *Palmyra Pac. Seafoods, LLC v. United States*, 561 F.3d 1361, 1369 (Fed. Cir. 2009)), they are incorrect that a taking took place here simply because the Order "altered [their] rights to evict tenants for nonpayment of rent," *see id.*  Mere frustration of that contractual term is not a taking of Plaintiffs' underlying property rights.  *See Omnia*, 261 U.S. at 511 ("As a result of this lawful governmental action the performance of the contract was rendered impossible.  It was not appropriated, but ended.").

Nor is the Order a physical taking, as the Supreme Court's decision in *Yee v. City of Escondido*, 503 U.S. 519 (1992), makes plain.  Plaintiffs attempt to distinguish that case by pointing out that the regulations at issue there did not require the plaintiffs to submit to occupation of their land.  *See*

Pls.' Opp. 20–21. But neither does the Order. Indeed, the regulation at issue in *Yee* was not a physical occupation of the landlords' property because, just like Plaintiffs here, the landlords "voluntarily open[ed] their property to occupation by others." 503 U.S. at 531; *see also FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987) ("[I]t is the invitation, not the rent, that makes the difference."). In *Yee*, as in this case, the "tenants were invited by petitioners, not forced upon them by the government." 503 U.S. at 528. And although the landlords in *Yee* were not prohibited from evicting their tenants, they could only do so "with 6 or 12 months['] notice"—longer than the temporary eviction moratorium at issue here, even as recently extended by Congress. *Id.* Although the Supreme Court recognized that "a different case would be presented" were a regulation "to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy," those scenarios are not present here. *Id.* The Order does not force any landlord to rent his property. And the Order's eviction protections are temporary. Thus, what we have here is a "lessee" a landlord invited to rent being permitted to remain despite not paying that rent in full, not an "interloper with a government license." *Fla. Power Corp.*, 480 U.S. at 252–53; *accord Baptiste v. Kennealy*, --- F. Supp. 3d ---, No. 20-11335, 2020 WL 5751572, at *20 (D. Mass. Sept. 25, 2020); *Auracle Homes LLC v. Lamont*, --- F. Supp. 3d ---, No. 20-829, 2020 WL 4558682, at *13 (D. Conn. Aug. 7, 2020); *Elmsford Apartment Assocs. v. Cuomo*, 469 F. Supp. 3d 148, 162–68 (S.D.N.Y. 2020), *appeal filed*, No. 20-2565 (2d Cir. July 28, 2020).

The Order is also not a regulatory taking. As to the economic impact, the Supreme Court has explained that the proper inquiry is to "compare the value that has been taken from the property with the value that remains in the property," Defs.' Mem. 38 (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987)), which Plaintiffs concede they have not attempted to do here, *see* Pls.' Opp. 21. They do not contest that the economic effects of the Order are limited because it is temporary, does not excuse any tenant's obligation to pay rent, and does not preclude the charging of fees or penalties for late rent. *See* 85 Fed. Reg. at 55292, 55294. And the declaration to which Plaintiffs

17

point in order to demonstrate its economic impact is inadmissible in this APA action, not specific to the Plaintiffs here, and obviously flawed because it fails to take into account the fact that the CDC Order does not apply in all states or localities.  *See* Defs.' Mem. 15 n.4; *supra* p. 10 n.2.  Plaintiffs have thus not shown that the economic impact of the Order weighs in favor of finding a taking.[4]  *Accord Baptiste*, 2020 WL 5751572, at *21; *Auracle*, 2020 WL 4558682, at *15; *Elmsford*, 469 F. Supp. 3d at 165–66.  If this were not enough, Congress's appropriation of an additional $25 billion in emergency rental assistance, 2021 Appropriations Act, div. N, tit. V, § 501(c)(2), which Plaintiffs may apply for on behalf of their tenants and receive directly, *id.* § 501(f), potentially further reduces the economic impact.  *See also* U.S. House Comm. on Fin. Servs., COVID-19 Stimulus Package Temporary Extension of the CDC Eviction Moratorium & Emergency Rental Assistance, https://financialservices.house.gov/uploadedfiles/era_1-pgr_12.20.20.pdf (noting that the Order's extension "will help ensure that millions of renters across America are not evicted while waiting to receive assistance").

Multiple federal courts have held that state eviction moratoria similar to the one at issue here did not unduly interfere with landlords' investment-backed expectations.  *See Elmsford*, 469 F. Supp. 3d at 167 ("Because landlords understand that the contractual right to collect rent is conditioned on compliance with a variety of state laws, their reasonable investment-backed expectations cannot extend to absolute freedom from 'public program[s] adjusting the benefits and burdens of economic life to promote the common good' (citation omitted)); *accord Auracle*, 2020 WL 4558682, at *15 (same). But even the opinion Plaintiffs cite in which a federal court found a state eviction moratorium

---

[4] The Florida county court decision to which Plaintiffs cite is not persuasive.  *See* Pls.' Opp. 21; Ex. A to Pls.' Opp.  It cites virtually no case law and does not engage with the arguments raised in this litigation.  It is also a clear outlier, as every federal court to have addressed whether a state eviction moratorium imposed during the COVID-19 pandemic constituted a taking found that it did not.  *See Baptiste*, 2020 WL 5751572, at *20; *Auracle*, 2020 WL 4558682, at *13; *Elmsford*, 469 F. Supp. 3d at 162–68.

significantly interfered with landlords' investment-backed expectations, *see* Pls.' Opp. 21–22, ultimately determined that the moratorium did not constitute a regulatory taking after considering all factors.[5] *Baptiste*, 2020 WL 5751572, at *22.

The nature of the government's action confirms that no regulatory taking has occurred here. Courts typically decline to find a regulatory taking where the challenged regulation "arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). The Order is precisely that. Even Plaintiffs admit that the aim of the Order is to promote the common good by attempting to slow the spread of COVID-19. Pls.' Opp. 22. The benefits of the Order inure not only to tenants, but also to "members of the public, who elected officials found would be at greater risk of COVID-19 infection if displaced tenants caused or contributed to the overcrowding of other dwellings and homeless shelters, or were required to live on the streets." *Baptiste*, 2020 WL 5751572, at *22. Nor does the fact that the Order imposes burdens on landlords convert it into a taking. *See* Pls.' Opp. 22. As the Supreme Court has explained, "[g]iven the propriety of the governmental power to regulate, it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another." *Connolly*, 475 U.S. at 223. And once again, now that Congress has appropriated $25 billion in funds for emergency rental assistance, landlords' financial burdens should be significantly reduced.

---

[5] The other case Plaintiffs cite, *Apartment Association of Los Angeles County, Inc. v. City of Los Angeles*, No. 20-5193, 2020 WL 6700568, at *5 (C.D. Cal. Nov. 13, 2020) *appeal filed*, No. 20-56251 (9th Cir. Nov. 27, 2020), is distinguishable because it analyzes a Contract Clause challenge to Los Angeles's eviction moratorium. Moreover, that court found that the claim was unlikely to succeed, explaining that any impairment of landlord-tenant agreements "appear[ed], at this stage, to be eminently reasonable under the extraordinary circumstances." *Id.* at *8.

Finally, Plaintiffs do not dispute that, even if a taking had occurred, injunctive relief is not a proper remedy. *See HAPCO v. City of Philadelphia*, No. 20-3300, 2020 WL 5095496, at *12 (E.D. Pa. Aug. 28, 2020). Summary judgment in favor of Defendants is thus warranted.

### C.  Plaintiffs Have Identified No Due Process Violation.

Defendants have demonstrated that no due process violation exists here because "[i]t is well established that statutes or ordinances of general applicability may condition or even prohibit the right to conduct a business without running afoul of procedural due process." *Emory v. United Air Lines, Inc.*, 821 F. Supp. 2d 200, 222 (D.D.C. 2011) (quoting *Jones v. Air Line Pilots Ass'n*, 713 F. Supp. 2d 29, 36 (D.D.C. 2010), *aff'd*, 642 F.3d 1100 (D.C. Cir. 2011)), *aff'd*, 720 F.3d 915 (D.C. Cir. 2013); *see* Defs.' Mem. 40–41. Plaintiffs' only response is to contend that the Order was agency action, not a legislative act. Pls.' Opp. 22–23. But Plaintiffs fail to grapple with the fact that the Order is a *generally applicable* agency action, and that "procedural due process protections do not extend to general government actions." *Kuster v. Veneman*, 266 F. Supp. 2d 1190, 1198 (D.N.D. 2002) (holding procedural due process requirements did not apply to federal agency's generally applicable action); *see also Hartman v. Acton*, --- F. Supp. 3d ---, No. 2020 WL 1932896, at *7–8 (S.D. Ohio Apr. 21, 2020) (holding that state agency's COVID-19 closure order did not violate due process requirements because "[a] person adversely affected by a law of general applicability has no due process rights to a hearing"). *Cf. United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 244–46 (1973) (stating that order of federal Interstate Commerce Commission "applicable across the board to all of the common carriers" was the type of decision for which "no hearing at all was constitutionally required"). And Plaintiffs ignore that the Order has now been extended by an Act of Congress. *See* 2021 Appropriations Act, div. N, tit. V, § 502. Nor do Plaintiffs offer any response to Defendants' explanation as to why the Order is not void for vagueness. *See* Pls.' Opp. 23. Plaintiffs have thus failed to show any due process violation.

### D.     The Order Does Not Interfere With Plaintiffs' Access to Courts.

Defendants' motion demonstrated that the Order does not unlawfully deny Plaintiffs access to the courts for three independent reasons:  it does not prohibit landlords from pursuing actions seeking eviction judgments so long as tenants are not actually removed from their homes while the Order is in effect, *see* Defs.' Mem. 42, it does not prohibit landlords from suing their tenants for unpaid rent, *see id.* 43, and it is temporary, *see id.*

As to the first point, Plaintiffs' principal strategy is to attack a straw man, continuing to advance an interpretation of the Order that would prevent landlords from even filing eviction actions. Both CDC and DOJ (which is responsible for enforcing the Order) have rejected that interpretation. *See* CDC/HHS Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, Frequently Asked Questions, *available at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/eviction-moratoria-order-faqs.pdf (FAQs) at 1, 6.  So has every federal court to grapple with the issue.  *See Brown*, 2020 WL 6364310, at *15; *KC Tenants*, 2020 WL 7063361, at *2; *see also Chambless*, 2020 WL 7588849, at *8 ("[A]s the *Brown* court found, 'because [landlords] are still permitted to file breach of contract actions and begin eviction proceedings, and are only merely delayed in enforcing eviction orders,' any claim that the Order violates a landlord's access to courts is unlikely to succeed." (quoting *Brown*, 2020 WL 6364310, at *15)).  Indeed, Plaintiffs' principal authority on this issue, *see Borger Mgmt., Inc. v. Hernandez-Cruz*, No. 2020 LTB 006637 (D.C. Super. Ct. Dec. 16, 2020), expressly distinguished the CDC Order from the District of Columbia moratorium at issue there because the CDC Order does *not* bar the filing of eviction actions.  *See id.* at 3 n.1; *see also id.* at 18 n.16 (explaining that the CDC Order is "substantially more limited in scope and duration than the D.C. moratorium").  And even if Plaintiffs were right that the Order could theoretically be read more expansively, there is no reason for the Court to adopt a reading of the Order that (1) would cause

Plaintiffs greater alleged injury; (2) has been disclaimed by the government; and (3) would require the Court unnecessarily to grapple with Plaintiffs' constitutional claim.

Nor do Plaintiffs meaningfully dispute that landlords remain able to pursue other remedies during the Order's pendency, such as a suit seeking unpaid rent. To the contrary, the principal case upon which Plaintiffs rely makes clear that a plaintiff does not state a denial-of-access claim if "relief on the underlying claims is still available." *Broudy v. Mather*, 460 F.3d 106, 120 (D.C. Cir. 2006); *see also id.* at 121 (rejecting access claim where "FOIA provides a potential remedy"). But that is exactly the point: "the Order merely limits, on a temporary basis, landlords' ability to invoke *one remedy* for non-payment of rent." *Chambless*, 2020 WL 7588849, at *14 (emphasis added). Thus, as both the *Brown* and *Elmsford* courts found, a damages action provides a sufficient remedy for the underlying claim of breach of the lease agreement. *See Brown*, 2020 WL 6364310, at *16; *Elmsford*, 469 F. Supp. 3d at 174. And while Plaintiffs make passing reference to their tenants being judgment-proof, *see* Pls.' Opp. 24, there is nothing in the record to support that assertion beyond Plaintiffs' unsubstantiated "belief and understanding." Fordham Decl. ¶ 17; *see also* Gilstrap Decl. ¶ 12. Such a vague assertion is patently insufficient. *See Brown*, 2020 WL 6364310, at *20 (explaining in detail that present inability to pay rent is not equivalent to permanent inability to pay a court judgment for unpaid rent); *Chambless*, 2020 WL 7588849, at *13 (same). And in any case, the potential difficulty of *enforcing* a judgment does not mean that Plaintiffs lack access to a forum in which to *seek* one. *Cf. Elmsford*, 469 F. Supp. 3d at 174 ("It is not the case that Plaintiffs will some day have no way to hale their tenants into court . . . — it is merely the case that it will generally not be worth a landlord's while to do so.").

Finally, Plaintiffs give short shrift to the Order's temporary nature. Plaintiffs' cases do not hold that a brief delay in pursuing a legal remedy necessarily amounts to a constitutional violation, *see* Pls.' Opp. 24, and Plaintiffs do not grapple with the decisions from other courts that have rejected access-to-courts challenges to temporary eviction moratoria on the basis of their temporary nature,

*see Brown*, 2020 WL 6364310, at \*16; *Elmsford*, 469 F. Supp. 3d at 175; *Baptiste*, 2020 WL5751572, at \*27; *see also Chambless*, 2020 WL 7588849, at \*15 (no irreparable injury because "the Order does not bar Plaintiffs from evicting their tenants forever; it merely postpones that remedy for a limited time in furtherance of urgent public health goals").  And Plaintiffs do not explain why their theory would not cast doubt on a longstanding provision of the Soldiers' and Sailors' Civil Relief Act of 1940, which generally requires judges to temporarily stay eviction actions upon the request of a servicemember, *see* 50 U.S.C. § 3951(b).

## IV.   Any Remedy Should Be Narrowly Tailored.

Defendants' motion demonstrated that should the Court enter any relief in favor of Plaintiffs, that relief should be narrow:  any procedural errors should result in remand, not vacatur, and any injunction or vacatur should redound to the benefit of only those Plaintiffs with standing to sue. *See* Defs.' Mem. 43–45.  Plaintiffs present no argument on the first issue, apparently agreeing that remand would be the appropriate remedy for any procedural error.

As to the second point, D.C. Circuit precedent does not require deviating from core principles of equity and Article III by entering a remedy that extends beyond plaintiffs with standing.  Unlike *National Mining Association v. U.S. Army Corps of Engineers*, 145 F.3d 1399 (D.C. Cir. 1998), this is not a case where entering a limited vacatur would lead to "a flood of duplicative litigation" in this Court. *See id.* at 1409.  In any event, *National Mining* itself recognized that a court's decision to grant the equitable relief of vacatur is discretionary rather than mandatory, *id.* at 1408, meaning there is no basis to conclude that vacatur must always be nationwide.  To the extent *National Mining* could be read otherwise, we respectfully disagree and preserve the issue for further review.[6]

---

[6] Finally, even though Plaintiffs Gilstrap and Fordham do not themselves own rental property or enter into lease agreements, Plaintiffs maintain that they (and therefore the two associations of which they are members) have standing because they could face criminal liability under the Order because they are "person[s] with a legal right to pursue eviction."  Pls.' Opp. 25.  But while Plaintiffs submit that Gilstrap and Fordham could face prosecution if they *violated* the Order, they point to no personal,

## CONCLUSION

The Court should dismiss Counts I–V of the Complaint, grant Defendants' motion for summary judgment on Counts VI–VIII, and terminate this case.

Dated:  January 6, 2021

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ERIC BECKENHAUER
Assistant Director, Federal Programs Branch

*/s/ Leslie Cooper Vigen*
LESLIE COOPER VIGEN
Trial Attorney (DC Bar No. 1019782)
STEVEN A. MYERS
Senior Trial Counsel (NY Bar No. 4823043)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel:  (202) 305-0727
Fax:  (202) 616-8470
E-mail:  leslie.vigen@usdoj.gov

*Counsel for Defendants*

---

concrete injury that they would face if they *complied* with the Order; any such injury would be felt exclusively by the corporate entities that they own, since it is those entities that own the relevant properties and enter into lease agreements.  *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003); *Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990).  To the extent that Plaintiffs Gilstrap and Fordham anticipate voluntarily exposing themselves to criminal liability to prevent injuries to separate legal entities, that is a self-inflicted injury that cannot be laid at Defendants' feet. *See, e.g.*, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015).  Nor is it the injury alleged in Plaintiffs' complaint.  *See* Compl. ¶ 17 ("Fordham has standing because he has suffered, and continues to suffer, significant economic damages in the form of unpaid rent, lost opportunity to rent or use the properties at their fair market value, and regular maintenance and utilities costs as a result of the Eviction Moratorium."); *id.* ¶ 21 (similar, as to Gilstrap).