BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALABAMA ASSOCIATION OF REALTORS, .
et al.,                              .
                                     .   Case Number 20-cv-3377
          Plaintiffs,                .
                                     .
      vs.                            .
                                     .
UNITED STATES DEPARTMENT OF          .
HEALTH AND HUMAN SERVICES,           .   April 29, 2021
et al.,                              .   10:02 a.m.
                                     .
          Defendants.                .
- - - - - - - - - - - - - - - - -

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE DABNEY L. FRIEDRICH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:          BRETT SHUMATE, ESQ.
                             STEPHEN KENNY, ESQ.
                             MEGAN LACEY OWEN, ESQ.
                             CHARLOTTE TAYLOR, ESQ.
                             Jones Day
                             51 Louisiana Avenue Northwest
                             Washington, D.C. 20001

For the Defendants:          LESLIE COOPER VIGEN, ESQ.
                             STEVEN MYERS, ESQ.
                             ERIC BECKENHAUER, ESQ.
                             U.S. Department of Justice
                             Civil Division
                             Federal Programs Branch
                             1100 L Street Northwest
                             Room 11308
                             Washington, D.C. 20005

Official Court Reporter:     SARA A. WICK, RPR, CRR
                             United States District Court
                               for the District of Columbia
                             333 Constitution Avenue Northwest
                             Washington, D.C. 20001

Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

(All participants present via video conference.)

THE COURTROOM DEPUTY:  Your Honor, we are in Civil Action 20-3377, Alabama Association of Realtors, et al., versus the U.S. Department of Health and Human Services, et al.

If I can have the parties identify themselves for the record, beginning with the counsel for the plaintiff.

MR. SHUMATE:  Good morning, Your Honor.  This is Brett Shumate from Jones Day on behalf of the plaintiffs.

I also wanted to let the Court know we have several representatives from my client on the line today from the Alabama Association of Realtors, Georgia Association of Realtors, and the National Association of Realtors.

I also have a few colleagues of mine from Jones Day on the line:  Stephen Kenny, Megan Lacey Owen, and Charlotte Taylor.

THE COURT:  All right.  Thank you.  Good morning, Mr. Shumate.

MR. SHUMATE:  Good morning, Your Honor.

MS. VIGEN:  And Your Honor, I'm Lesley Vigen from the Department of Justice for the defendants.

I am joined by my Department of Justice colleagues Steven Myers and Eric Beckenhauer, as well as colleagues from the Department of Health and Human Services and Centers For Disease Control and Prevention.

THE COURT:  All right.  Good morning, Ms. Vigen.

1    So before the Court are the parties' cross-motions for

2    summary judgment and the defendants' motion to dismiss.  I will

3    hear first from the plaintiffs, but I would like both sides to

4    focus on the plaintiffs' argument that the CDC exceeded the

5    statutory authority and the defendants' argument, ratification

6    argument.

7    Mr. Shumate, you may begin.

8    MR. SHUMATE:  Thank you, Your Honor.  May it please

9    the Court.

10   The federal ban on eviction has been in place for more than

11   a year.  This means that my clients have some tenants that

12   haven't paid rent in over 12 months.  Property owners like my

13   clients still have to pay taxes, mortgages, and their insurance.

14   My clients are not Wall Street bankers or private equity funds.

15   Instead, they are small business owners in Alabama and Georgia

16   who own and manage rental properties for a living.

17   We all recognize that many renters have been struggling

18   financially throughout the pandemic.  The government shouldn't

19   be shifting the economic burdens of the pandemic from one group

20   to another unless Congress has given the government permission

21   to do so.  In fact, a number of courts, including the Sixth

22   Circuit Court of Appeals, have already held that the CDC lacks

23   statutory authority to ban evictions.

24   Today I would like to focus on four reasons why the CDC

25   lacks statutory authority for the eviction moratorium.  First is

1    that Congress spoke directly to the problem of evictions during

2    the pandemic in the CARES Act.  Congress enacted in March of

3    2020 a limited restriction on evictions that was supposed to

4    expire in the summer of 2020.  Of course, that's not what

5    happened.  Instead, the president issued an executive order

6    directing the CDC to take action, and within three weeks, CDC

7    issued the eviction moratorium.  In taking office, the new

8    administration has extended the eviction moratorium not once,

9    but twice.  The CDC's decision to extend the eviction moratorium

10   beyond the expiration date set by Congress conflicts with the

11   plain and unambiguous intent of Congress.

12        Second, the eviction moratorium is nothing like the other

13   sanitation measures described in the second sentence of Section

14   361(a) of the Public Health Service Act.  As the Sixth Circuit

15   explained, banning evictions is radically different from

16   sanitizing property that's been exposed to contagion.  If the

17   second sentence of the statute doesn't impose some limit on the

18   first sentence, as the government argues, then the second

19   sentence of the statute is entirely superfluous, and there is no

20   limit on the CDC's authority under this statute.

21        This brings me to my third point, Your Honor, which is that

22   if the CDC can regulate evictions, then the CDC can regulate any

23   human activity that could possibly contribute to the spread of a

24   communicable disease.  This means that CDC could ban all

25   foreclosures.  CDC could impose a nationwide lockdown.  CDC

could regulate businesses opening and closing throughout a
pandemic.  And CDC could even regulate and restrict religious
worship.

These are all measures that state and local governments
have taken throughout the pandemic, but there is no way that
Congress would have intended to give CDC a blank check to
regulate all human activity.  If the government -- if Congress
had given the CDC that amount of authority, as the Sixth Circuit
recognized, that would raise a significant problem under the
nondelegation doctrine.

Fourth, Your Honor, even if you think that the CDC has
reasonably interpreted the statute, that's not enough, because
there is no clear delegation of authority for the eviction
moratorium.  But there must be a clear delegation of authority
because CDC decided a major question with significant
constitutional implications, as the Sixth Circuit recognized.
But there is no clear delegation of authority for CDC to
regulate evictions or regulate landlord/tenant relationships.

By contrast, Congress knows how to expressly (distorted
audio) the eviction moratorium, because Congress did so in the
CARES Act.

Your Honor, you asked about ratification, and I have a
number of points in response to that concern.  We don't think
there is any ratification here of the CDC's eviction moratorium
for a couple of reasons.  The first is that the Appropriations

Act did not clearly ratify under this circuit's case law the eviction moratorium.  All Congress did was extend the moratorium for one month.

THE COURT:  But Mr. Shumate, why isn't the reference to Section 361 of the Public Health Service Act sufficient?

MR. SHUMATE:  It's not sufficient, Your Honor, because it is merely descriptive, and (distorted audio) with a description of what CDC did.  The CDC took action pursuant to Section 361 of the statute.  When Congress ratifies agency action, we pointed to a number of cases where Congress does so expressly.  They say, "We hereby ratify and approve," or Congress appropriated money for an agency to take some action that it had previously not authorized.

But that's not what occurred here.  All Congress did was extend the moratorium for one month.  It didn't say anything about the legality of the agency's action before Congress had acted.

But even if you think --

THE COURT:  Mr. Shumate, sorry to interrupt, but in the *Skyworks* case, the judge there referred to what Congress did as just an extension to get past the change in administrations.

Is there anything in the record that supports that?

MR. SHUMATE:  Nothing more than common sense and timing, Your Honor, because given the timing, the original moratorium was supposed to have expired in December.  We had the

1    election, obviously, in November.  Congress acted in December,

2    and it extended the moratorium through the end of January.

3    Obviously, there was an inauguration on January 20th.  The new

4    administration came in, and I think this is a critical point,

5    they've extended the moratorium twice.

6         So even if you were to be persuaded that there was a

7    ratification of the moratorium for a one-month period of time,

8    CDC has again done exactly what they did last summer, last

9    September, by extending the moratorium again beyond the

10   expiration date set by Congress.

11        So originally you had the CARES Act moratorium that

12   expired, was supposed to expire in July of 2020.  CDC in

13   September extended that moratorium through executive action.  We

14   think that violates the statute.

15        Second, you have the statutory extension that was supposed

16   to last until January 31st of 2021.  But again, you have

17   executive action that extends beyond the expiration date set by

18   Congress.

19        So I think the government's ratification argument only gets

20   them so far.  And we are now in a place where the moratorium is

21   only in force pursuant to executive action.  So the ratification

22   that may have occurred, we don't concede it did happen,

23   ratification couldn't help the government in this point in time

24   when the executive -- the moratorium was only in force through

25   executive action.

1    Your Honor, I can shift to other arguments, but -- if you

2    have no other questions about ratification or the agency

3    statutory authority, I'm happy to --

4         THE COURT:  Let me back up on the agency statutory

5    authority.  So you argue in your brief that *Chevron* shouldn't

6    apply because the agency didn't follow notice and comment.

7    Given that there was a clear delegation from Congress to the HHS

8    to administer the Public Health Service Act, why isn't that not

9    enough to get us within *Chevron*?  Wasn't the order intended to

10   have the force of law, and isn't that really the question I

11   should be asking?

12        MR. SHUMATE:  Your Honor, it's a good question.  The

13   fact that the agency did not act pursuant to notice-and-comment

14   rulemaking we think is one of the factors why the *Chevron*

15   framework or *Chevron* deference wouldn't apply, because the first

16   sentence of Section 361(a) authorizes the agency to enact and

17   enforce regulations.  Of course, the agency didn't act pursuant

18   to regulation here.  They simply issued an order, what they call

19   an emergency action.

20   So certainly the fact that the agency didn't act pursuant

21   to notice-and-comment rulemaking is not dispositive of whether

22   *Chevron* applies or not, but it is one of the factors that courts

23   look to after *Mead* to look at the formality of the agency's

24   action to decide whether this is something that is entitled to

25   deference.  And here --

1          THE COURT:  Don't the other *Barnhart* factors cut the

2    other way?

3          MR. SHUMATE:  I don't think so, Your Honor.  I think

4    it's telling that there's not one lick of statutory analysis in

5    the order itself.  There's nothing for the Court to defer to

6    other than the Department of Justice's interpretation of the

7    statute in their briefs.  Instead, the moratorium was thrown

8    together in three weeks after President Trump issued his

9    executive order.  But typically, when courts defer to agency

10   action, they're deferring to the agency's interpretation of the

11   statute in a rule or preamble or some agency opinion where

12   there's an interpretation of the statute.

13      But you won't find a lick of that analysis anywhere in the

14   CDC's orders, not in the first order, the second order, or the

15   third order.  So what the government is asking you to do is to

16   defer to this rationalization of counsel.

17         THE COURT:  All right.  You made this point about the

18   CDC and the FDA being two separate agencies.  That really

19   doesn't matter here, does it, given these are both a part of

20   HHS?

21         MR. SHUMATE:  It's certainly not the dispositive

22   factor, Your Honor.  There is case law where the D.C. Circuit

23   cannot grant *Chevron* deference to an agency where there was a

24   split delegation of authority, I believe within Treasury.

25      But I wouldn't concede that the CDC is entitled to

deference because the statute is the government's authority

to -- the authority is split between the FDA and the CDC.  So it

is another one of many factors why the CDC is not entitled to

deference.  And I think the principal reason, Your Honor, is

because their interpretation of the statute is unreasonable.

That is the bottom-line reason why no deference is due here.

So we have a number of reasons why we should win our

statutory argument.  We have the major questions doctrine.  We

have constitutional avoidance.  We have *Chevron* step 1.  The

Court doesn't even need to get to *Chevron* step 2, but if you do,

look at this -- the breadth and the scope of the agency's

assertion of authority here.  The Sixth Circuit properly

recognized that if the CDC has authority to man evictions, there

is no limit to what the CDC could do in the name of public

health.  That would raise a significant concern under the

nondelegation doctrine.

THE COURT:  All right.  In terms of the major

questions doctrine in the D.C. Circuit, isn't that a canon of

construction that I should look at as to step 1?

MR. SHUMATE:  I think that's fair.  The D.C. Circuit

has done that a number of times, the *Loving* case and the *Merck*

case from last year.  A number of panels have looked at the

major questions doctrine as one of the factors at *Chevron* step

1.

So I think --

1        THE COURT:  Merck wasn't -- didn't the Court say

2    regardless of where it considered it, it suggested that Congress

3    didn't grant the authority to the agency?

4        MR. SHUMATE:  I think that's a fair description of the

5    case, Your Honor.  But there was a discussion in the opinion, I

6    think, citing *Brown & Williamson* and citing the *Loving* case

7    that, look, the bottom line principle of the major questions

8    doctrine is courts don't presume that Congress would have

9    ambiguously intended to delegate to an agency the power to

10    decide a major question.

11     And in a case like this one where the CDC is making a

12    decision that has a significant economic and nationwide impact,

13    it is a major question, and it's viewed with serious

14    constitutional implications, just like the other express

15    delegations to CDC in the statute.

16     Now, Section 361 gives the CDC a lot of power, the power to

17    quarantine individuals, that implicates liberty interests, the

18    power to destroy personal property.  It's telling that Congress

19    gave the CDC express authority to do these specific measures,

20    but it said nothing about regulating evictions or

21    landlord/tenant relationships, because that's a significant

22    decision that in fact Congress made for itself in the CARES Act.

23        THE COURT:  All right.  The enumerated measures in

24    Section 361, is it your position that these are not exhaustive

25    but, rather, illustrative of what the CDC could do here?  In

1    other words, whatever actions they take, whatever other measures

2    the Secretary would take here need to be comparable in nature?

3    Is that your argument, or is it really that these are

4    exhaustive?

5              MR. SHUMATE:  The former, Your Honor.  I agree with

6    how you described our argument, that this list in the second

7    sentence is illustrative, not exhaustive.  There's a catchall at

8    the end of the list that says "other measures."

9         And as the Sixth Circuit, we think, correctly recognized,

10   the ejusdem canon applies here because you have a list of

11   measures followed by a general catchall.  So the canon of

12   construction you would apply is that you would expect "other

13   measures" to be other measures that are akin to things that are

14   in the list of measures, which are all about sanitizing

15   property, personal property, animals, or articles that have been

16   exposed to contagion.

17        As the Sixth Circuit said and we agree, banning evictions

18   is radically unlike dealing with property, real personal

19   property that has been exposed to a communicable disease.

20             THE COURT:  All right.  Let me ask you about the

21   remedy you seek.  In your complaint, you seek an injunction.

22   But as I understand your briefing, you're not pressing that

23   here.  Is that because you believe that an injunction would have

24   no independent legal effect here, that the Secretary would

25   follow any ruling of the Court?

1      MR. SHUMATE:  I would hope so, Your Honor.  I don't

2 think the Court needs to enter an injunction at this point.  We

3 think it would be -- for the Court to enter a judgment vacating

4 the eviction moratorium, but we think it's essential that the

5 Court be clear about the scope of the vacatur of the eviction

6 moratorium.

7      As you've seen from a number of our filings, other courts

8 have issued declaratory judgments.  And the government has taken

9 the position that those declaratory judgments only apply in that

10 particular case.

11      As you know from the *NAACP* case last year, circuit

12 precedent in this court is different from the National Mining

13 Congress which is that where a court vacates an agency's rule,

14 especially if the agency lacks statutory authority, the rule is

15 void, not just for the plaintiffs that brought the case but

16 because of -- but also for all affected parties.

17      And here, we're asking the Court to be very clear before it

18 vacates that the remedy applies not just for the property owners

19 in this case but for property owners across the country.  The

20 reason why, the Court explained in National Mining Congress why

21 this remedy is appropriate, especially in a case like this one,

22 because of the possibility of duplicative filings.

23      If the Court agrees with our arguments and vacates the

24 eviction moratorium only for the plaintiffs in this case, venue

25 and forum is proper in this court, as you know, for anyone

across the country, any property owner.  And as we've submitted
in the record, there's 10 to 11 million property owners across
the country who may be affected by the eviction moratorium.
They could be plaintiffs seeking the same relief in this court,
and that would be, I think, a waste of time for everybody.

So there are also a number -- to answer your specific
question about the injunction, the Court doesn't need to enter
an injunction at this point because we expect the government
will comply with a vacatur ruling.

And one other point on this is in the Supreme Court's
recent decision, I think, last term in the *DACA* case, Justice
Roberts explained in a footnote -- he affirmed Judge Bates's
vacatur decision in this court but said in a footnote we don't
need to decide the issue of the propriety of a nationwide
injunction because vacatur of a rule is different under the APA.

So bottom line, Your Honor, we ask the Court to vacate.  We
don't need to get into this debate about nationwide injunctions.

THE COURT:  All right.  Thank you, Mr. Shumate.

Ms. Vigen?

MS. VIGEN:  Good morning, Your Honor.  May it please
the Court.

Across two presidential administrations, public health
experts at the CDC have agreed a temporary eviction moratorium
is necessary and an appropriate tool to fight the ongoing spread
of a disease that has killed over half a million Americans.

1    This is based on clear scientific evidence that COVID-19

2    exacerbates the spread -- I'm sorry, that evictions exacerbate

3    the spread of COVID-19.  And as CDC noted in the most recent

4    extension, levels of transmission remain high, and even deadlier

5    and more contagious variants of the virus demonstrates this is

6    the appropriate action.

7         Contrary to plaintiffs' arguments, the CDC order is well

8    within the agency's authority under the Public Health Service

9    Act, as both the *Brown* and *Chambless* courts found.

10        The text of the Public Service Health Act is clear.  The

11   Secretary can, quote, make and enforce such regulations as in

12   his judgment are necessary to prevent the introduction,

13   transmission, or spread of communicable diseases, either into

14   the country or between the states.

15             THE COURT:  Ms. Vigen, let me stop you there.  Is it

16   the government's position that that's the only limitation on the

17   Secretary's authority?

18             MS. VIGEN:  Your Honor, the primary limitations on the

19   Secretary's authority are that the order be intended for disease

20   prevention purposes, that those disease prevention purposes be

21   directed towards either the spread into the country or among the

22   states.

23        But in addition to that, there are certain limits based on

24   the Secretary's ability to, for example, quarantine persons, and

25   that's in the Subsections (b) through (d) of the statute.

1          THE COURT:  What about the limitations, if you see

2     them that way, in the second sentence?  I take it you don't view

3     these as limitations but just examples of things that the

4     Secretary can do.

5          MS. VIGEN:  That's correct, Your Honor.  These are

6     just illustrations of measures the Secretary may take -- and

7     that's the language that the statute itself uses -- in the event

8     of communicable diseases that risk interstate spread.

9          THE COURT:  Under that reading, what is the

10    limitation?  As the plaintiffs have argued here, could the

11    Secretary put a ban on all foreclosures?  A nationwide lockdown?

12    Could the Secretary put out orders about attending church or

13    sporting events?  At what point is the Secretary's authority

14    constrained in some way?

15         MS. VIGEN:  Your Honor, I think it's really important

16    to look here at the language Congress has chosen and what

17    Congress intended in granting what we view as broad, flexible

18    authority to public health experts.  And the language Congress

19    has chosen to use is to refer to public health experts' judgment

20    as necessary.

21         And this type of measure was put into place knowing that

22    public health expertise is not -- it doesn't reside in Congress;

23    it resides in agency experts.  And Congress -- excuse me.  As

24    the Supreme Court said, Congress knows how to enlarge agency

25    discretion when it wishes to, and that's what it does here, is

1    grant a broad and flexible statute.

2         And that's not to say there is no limit --

3         THE COURT:  Sorry to interrupt, Ms. Vigen.  But under

4    that interpretation, doesn't that really push up against the

5    unconstitutional delegation, that Congress can just delegate the

6    authority to the experts without any limitation?

7         MS. VIGEN:  So I think it -- it's really not correct

8    that there's no limitation here.  That limitation for disease

9    control purposes is a real limitation.  This is not just a broad

10   statute that allows HHS or CDC to regulate in the interest of

11   public health.  There really needs to be a nexus to the control

12   of disease, and there is here very clearly.  You know, no one

13   disputes we have a global pandemic.  Plaintiffs don't dispute

14   that eviction moratoria are effective deterrents to the spread

15   of COVID-19.

16        And if you look at the history of the nondelegation

17   doctrine, the Supreme Court approved delegations that are much

18   broader than what Congress did here.  The Court noted in the

19   *Gundy* case that the courts often approved delegations that

20   merely instruct an agency to delegate in the public interest

21   within its realm of expertise.

22        So pointing to one of the specific cases we cite, *National*

23   *Broadcasting Co. versus the United States*, the Court in that

24   case approved an FEC -- FEC regulations issued under a statute

25   that required that those regulations be, quote -- I'm sorry,

1   where the touchstone provided by Congress was, quote, the public

2   interest convenience or necessity.  And the Supreme Court said

3   that's enough.  The Supreme Court specifically said this

4   criterion is not to be interpreted as setting up a standard so

5   indefinite as to confer an unlimited power.  When interpreted in

6   the context of -- in that case it was the communications

7   doctrine, and the FEC was the agency.

8       That's the same here.  In context, this grant of authority

9   to HHS, which has been delegated to CDC for disease control

10  purposes, provides a sufficient and intelligent principle, and

11  it's squarely in line with (distorted audio) holdings on the

12  nondelegation doctrine.

13      THE COURT:  Couldn't the CDC just shut down all travel

14  completely to stop the threat of disease under your

15  interpretation?

16      MS. VIGEN:  I think it's important here to look at

17  what -- what disease threat CDC is responding to and what CDC

18  has determined is necessary in its judgment.  What we have here

19  in COVID-19 is a pandemic that's proved, you know, extremely

20  easy to spread, extremely dangerous, and quite deadly.  But

21  there could be a future pandemic that is even worse that

22  requires even broader measures that require -- that require CDC

23  to take steps it hasn't had to take here.

24      Now, what CDC has down here is it's looked at what COVID-19

25  does, how COVID-19 spreads, and it's determined a response to

1    the COVID-19 pandemic.

2        So what I would say was -- is, in answer to your question,

3    Congress has purposely delegated broad authority to allow public

4    health experts to respond specifically to the threat of

5    communicable diseases.  There are limitations on that power.  It

6    has to be necessary in the judgment of those public health

7    experts, and it has to be targeted to the interstate spread of

8    disease or the spread of disease into the country.  And those

9    are really the limitations that Congress intended in granting

10   this type of broad power.

11       THE COURT:  What do I make of Congress's decision back

12   in -- last summer to have the moratorium that Congress placed in

13   effect?  Why did Congress need to do that if Congress intended

14   to delegate this entirely to the CDC?

15       MS. VIGEN:  So it's my understanding that the CARES

16   Act moratorium was implemented by Congress for different

17   purposes.  The CARES Act moratorium was a part of a

18   congressional economic package.  The CDC's moratorium is a

19   public health measure, and it's based on public health

20   conclusions included in each version of the order.

21       So Congress --

22       THE COURT:  It too has an economic impact.

23       MS. VIGEN:  It certainly has an economic impact.

24   We're not denying that.  But at bottom, this is a public health

25   measure that CDC determined was necessary in order to prevent

1     the spread of COVID-19.  So it's different in that way.

2          And in addition, the fact that Congress passed the CARES

3     Act for only a limited amount of time doesn't in any way affect

4     CDC's preexisting statutory authority.

5          As we pointed out in our brief, that would go against the

6     canon of -- the harmonious-readings canon.

7               THE COURT:  Ms. Vigen, at what stage do you think that

8     the Court should appropriately consider the major questions

9     doctrine?

10              MS. VIGEN:  The major questions doctrine, as the D.C.

11    Circuit recently talked about in the *American Lung Association*

12    case, appears to be a *Chevron* step 1 question and appears to be

13    a determination of whether or not it's appropriate to go to

14    *Chevron* step 2.  The D.C. Circuit noted in *American Lung*

15    *Association* that, you know -- I think they called it a so-called

16    doctrine was a -- has been used by the Supreme Court in a few

17    very extraordinary cases like the *Brown & Williamson* case where

18    there are significant reasons to believe that Congress wouldn't

19    have wanted an agency to interpret it as the U.S. segment.  In

20    *Brown & Williamson*, as we pointed out in our brief, there was

21    something like an 80-year history of FDA having interpreted a

22    specific term in its enabling statue a certain way and Congress

23    having relied upon that in subsequent legislation, and then FDA

24    changed its position.  We have nothing like that here.

25              THE COURT:  You don't disagree, do you, that the

1    moratorium has vast political and economic consequences here?

2          MS. VIGEN:  So I don't think that the consequences are

3    as vast as plaintiffs point to.  Important factors --

4          THE COURT:  The CDC -- sorry to interrupt.  The CDC

5    itself estimates that as many as 30 to 40 million people could

6    be at risk of eviction, and it also states, I believe, that it

7    is expected to have an annual effect on the economy of 100

8    million or more.

9       Is that --

10         MS. VIGEN:  So that's all in the order.  But I

11   specifically want to point out something, a few points about the

12   first number you cited to there.  So that number is total

13   persons at risk of eviction.  The CDC order specifically only

14   applies in jurisdictions that don't have equal or greater

15   protection.  So this order doesn't even apply everywhere.  The

16   order only applies to covered persons, and those figures aren't

17   covered persons under the CDC order.  Covered persons are

18   limited to, you know -- it says persons who meet a set of

19   criteria designed to reach persons who would be likely to become

20   homeless or move into new congregate settings where COVID-19

21   spreads easily.  So it wouldn't apply to all of those persons.

22      In addition, another really important thing to remember in

23   looking at the economic impact of this regulation that

24   Mr. Shumate neglected to mention is that Congress has now

25   appropriated over $46 billion in aid designed to reach

1   landlords.  And that's in the 2021 Appropriations Act and then

2   later also in the American Rescue Plan Act.  So that

3   certainly -- if you're considering the economic impact of the

4   federal government's actions on landlords, that has to be taken

5   into consideration.

6       And I think the other thing I would just point out with

7   respect to this major questions doctrine is that CDC's use of

8   its authority is novel because the COVID-19 pandemic is novel.

9   The Public Health Services Act was enacted in 1944.  There has

10  not been a pandemic on this scope or this scale since the time

11  the statute was enacted.  And it's not because the statute

12  doesn't provide the authority or the CDC suddenly found some new

13  authority in a statute that it previously interpreted a

14  different way.  What has happened is there is a new and great

15  threat of disease that CDC has responded to.

16          THE COURT:  I get the point, this is a novel pandemic

17  with extreme consequences.  But given the significance of this

18  issue, would you not expect Congress to state more clearly that

19  yes, this is what Congress intended here, that the CDC is acting

20  with lawful authority?

21          MS. VIGEN:  I think that Congress did speak clearly,

22  not only in the Public Health Services Act where it included a

23  broad delegation of authority to CDC for these exact type of

24  purposes, but then in extending the CDC's action in the 2021

25  Appropriations Act.  Congress didn't do what it showed us it

knows how to do in the CARES Act, which is to say there is an
eviction moratorium and here are the contours.  It says, CDC has
already passed an eviction moratorium under its statutory
authority, and we are simply extending that moratorium under
that authority.  So Congress really has spoken to this issue.

THE COURT:  But again, what do I make of the 30-day
extension rather than a longer extension?

MS. VIGEN:  You know, I can't speak to the motives of
Congress, but what I can point to is the rationale behind the
Public Service -- the delegation in the Public Service Health
Act in the first place.  The reason Congress would have
delegated such authority to public health experts, as the
Supreme Court has recognized, is that these are hard questions.
The pandemic is -- has been evolving.  Whether or not to impose
or continue an eviction moratorium for the purpose of protecting
the public and preventing the spread of disease is a question
best left to the experts.  And what Congress -- Congress did
just that.

And as we pointed out in our briefs, the state of the
pandemic at the time that the -- I'm sorry, that Congress
extended the CDC moratorium were such that Congress surely could
have anticipated that CDC would once again extend the moratorium
after the conclusion of that 30-day congressional extension.
And Congress could have said we are extending the moratorium for
this amount of time and then no further extensions are

permitted.  But it didn't say that.  It knew that CDC had this
authority, and it allowed the -- it allowed CDC the possibility
of further extension after --

THE COURT:  Doesn't the case law suggest that it's the
other way around, that Congress needs to be express in ratifying
the action of an agency?

MS. VIGEN:  So I don't think so.  The cases to which
the plaintiffs point in which Congress was very specific in
ratifying a certain action are cases in which courts have
already found those actions illegal and said the agency couldn't
take the actions they took.  And so Congress needed to be really
clear in those cases and say we are ratifying this agency
action.

That's not what we have here.  At the time of the
extension, no court -- two courts had found specifically that
CDC did have authority to issue a temporary eviction moratorium
under the Public Health Service Act.  And so Congress had no
need to do that in ratifying the order.  But the controlling
cases here, the *Heinszen* case in the Supreme Court and the
*Thomas* case in the D.C. Circuit, don't say anything about there
needs to be magic words.  And in fact, the *Thomas* case indicates
the exact opposite, for ratification, that is.

But I think there are -- while we're on this topic of
ratification, I think there are two really important things that
Congress's ratification of the CDC's order shows, and that's,

one, that Congress approved the CDC's actions in imposing a

temporary eviction moratorium and, two, that Congress agreed

that the order was within CDC's statutory authority.  And the

courts that have discounted the import of Congress's

ratification have really, in our view, erred by not recognizing

those two things.

So -- sorry.  Did Your Honor have a question?

THE COURT:  No.  Sorry.

MS. VIGEN:  So I just want to go back to our plain

language argument and touch upon a point about whether or not

the measures listed in the second sentence of 264(a) restrict

the authority granted in the first sentence of 264(a) such that

it precludes a -- the issuance of a temporary eviction

moratorium.

And a really important and easy way to see that it doesn't

is that the subsections of this statute, (b) through (d), all

deal with the quarantine of persons.  And there's nothing in

Subsection (a) that talks about the quarantine of persons.  And

the Sixth Circuit order to which Mr. Shumate referred gets that

wrong.  It doesn't recognize the fact that Subsections (b)

through (c) actually rely on authority that is implicit but not

stated in Subsection (a).

And I also did want to point out, Mr. Shumate kept

referring to the Sixth Circuit opinion.  There's actually just

an interlocutory order by a Sixth Circuit motions panel which

1    isn't even binding upon other -- it's not strictly binding at

2    least upon other panels in that circuit.  So there's not a Sixth

3    Circuit merits decision here.

4         THE COURT:  So just to be clear, the Sixth Circuit's

5    order in which it found that these two sections were

6    structurally distinct, the one applied to property interests and

7    the other to liberty interests?

8         MS. VIGEN:  I'm sorry.  You cut out for a second

9    there, Your Honor.

10        THE COURT:  I'm trying to understand what exactly you

11   disagree with about the Sixth Circuit's order.  Is it that the

12   Sixth Circuit found that these two provisions, these two

13   subsections, were structurally distinct and that one referred to

14   property interests and the other liberty interests?  Is that

15   what you're disagreeing about?

16        MS. VIGEN:  That's right, Your Honor.  They all refer

17   to the same grant of authority in Subsection (a) of the statute.

18        THE COURT:  All right.  But even if I accept your

19   point that the methods or the measures that are listed in the

20   second sentence of the statute, the Section 361, are not

21   limiting, they're just illustrative rather than exhaustive, even

22   if I accept that and I consider the fact that CDC does have the

23   authority to quarantine individuals, it seems very different

24   than what the CDC has done here, because even with the

25   quarantine provision it's directed at individuals, specific

1    individuals believed to be infected.  And I don't think you

2    could reasonably say that everyone who could be evicted is

3    infected.  The CDC hasn't done that kind of analysis that would

4    support that.  It's a possibility.

5        So this does seem -- even accepting your argument that this

6    is -- CDC has gone a lot farther.  It's not just akin to a

7    quarantine.  Perhaps you could envision a situation where

8    there's an entire neighborhood that was infected, but that's --

9    you've basically applied it across the country.

10            MS. VIGEN:  And this point goes to again the fact that

11   Congress granted CDC flexible authority to respond to specific

12   threats.  So the CDC noted in its order, and I think it's widely

13   known now, that asymptomatic persons can transmit COVID-19.  So

14   it would be extraordinarily difficult to limit an order like

15   that to symptomatic persons -- or to persons who have COVID-19,

16   because, quite frankly, no one knows who has had it, and the

17   nature of the disease is such that it spreads very quickly and

18   easily.

19       So because of the widespread scope of COVID-19, a

20   widespread response was necessary given the science that shows

21   that evictions do exacerbate the spread and that eviction

22   moratoria work to lessen the spread and reduce mortality.

23            THE COURT:  But could the CDC use its authority to --

24   basically to force everyone to become vaccinated in order to

25   prevent the spread of disease?

1          MS. VIGEN:  So Your Honor, I don't mean to suggest

2    that CDC's statutory authority would overcome what may be

3    potential constitutional concerns, and that's something that I

4    haven't thought through with respect to concerns about, you

5    know, a person's body.

6          In addition, the CDC's order does -- I'm sorry.  The

7    statute does impose additional limits on quarantining a person,

8    which, you know, suggests that any measure involving specific

9    individuals may -- there may be additional considerations there.

10         But as a matter of statutory authority, that would be a

11   measure to prevent the spread of disease among the states.  And

12   so if CDC has made the proper findings and it would be necessary

13   within the judgment of the CDC director, then yes, it would fall

14   within CDC's statutory authority, and that's what Congress

15   intended.

16         Again, I don't mean to suggest there aren't other

17   considerations here or that CDC wouldn't be required to follow

18   the Constitution.  Obviously, it would be.

19          THE COURT:  You do agree that the enumerated examples

20   in the second sentence of the statute do inform what the CDC can

21   do?

22          MS. VIGEN:  I think they inform what the CDC can do

23   insofar as they're obviously included in the steps that CDC can

24   take.  I don't think they limit the other measures CDC could

25   take beyond what the statute provides, which is that measures

must be required to prevent the spread of disease, and that's specific to the interstate or -- spread of disease or spread of disease into the country.

THE COURT:  You don't think that the CDC has to act in a comparable way in looking at these enumerated measures?

MS. VIGEN:  I don't think that's what the statute requires.

THE COURT:  Why did Congress include it at all if it has no limitations, it doesn't inform what the agency can do at all?  What was the point?  Why not stop after the first sentence?  Why even include the quarantine provisions?  Why not just say -- the first sentence of the act?  I'm guessing you'll say because that could be -- I don't know.  I'm interested.

MS. VIGEN:  So --

THE COURT:  Why didn't Congress stop at sentence 1?

MS. VIGEN:  Your Honor is sort of referring to plaintiffs' surplusage argument, the canon of surplusage.  And I would like to point out first that when the statutory language is clear, as the first sentence of Section 264(a) is, there is no need to resort to those canons.  And that canon is also not -- it's not mandatory, as the D.C. Circuit has said and as we point out in our brief.

I would also point out that this is a list of inclusive measures.  So it wouldn't make sense that -- it is a list of inclusive measures that also include other measures.  So it

1    really wouldn't make sense that a list of inclusive measures

2    limited the initial grant of authority.

3         But even if Your Honor were to conclude that based on some

4    of the canons that plaintiffs have pointed to that the order

5    needed -- I'm sorry, that CDC's actions would somehow -- needed

6    to be somehow related to those measures listed in the statute,

7    it is of a kind related to those measures.  A temporary eviction

8    moratorium is an imposition on property.  The statute clearly

9    allows impositions on property, such as destruction of animals

10   and articles.  And looking at it, those are, in fact, much

11   more -- that's a permanent destruction of a person's property;

12   whereas, we're only talking about a temporary measure here.

13        And I want to point out, when -- I think when plaintiffs

14   point to those provisions in the statute, they're trying to

15   conjure up images of a single farm.  But really, something like

16   an order for destruction of animals can affect an entire

17   industry.  Let's say there was a disease that affected all hogs

18   in the country, and CDC, under the explicit language of this

19   statute, could order all hogs in the country to be destroyed to

20   prevent the spread of disease.

21        So really, there is no scope limitations there --

22             THE COURT:  Sorry to interrupt, but there is this

23   important qualifying phrase.  After animals and articles, it

24   says, "Found to be so infected or contaminated as to be sources

25   of dangerous infection to human beings."  So there does seem to

be a limitation there, and you say here in the pandemic we can't possibly know who is infected with COVID.

But if that is so, doesn't that mean this is a situation that Congress needs to step in and clearly legislate rather than the CDC rely on this statute that really doesn't address the situation before us now?

MS. VIGEN:  Well, again, as I pointed out, the act of destruction of animals and articles is a permanent depravation of property, and that's not what we have here.  So the limitation on that is directly correlated to the fact that that's a greater intrusion on property than the CDC has implemented here in this temporary eviction moratorium.

That said -- that said, you know, I would just go back to the plain language of the statute.  And it's only with respect to destruction of animals or articles that the statute requires -- that the statute refers to sources of infection. And so that type of limitation wouldn't be imposed on a temporary eviction moratorium.  And indeed, it wouldn't make sense here because of the nature of this disease and how easily interstate spreads happen.

And if you look at some of the -- the few cases that have analyzed this provision before the CDC's eviction moratorium, the two turtle ban cases from the Western District of Louisiana, the Courts in both of those cases considered the same type of argument, namely that a ban on the sale of small turtles should

1    only be limited to those turtles that are actually infected.

2    And both of those courts said no, that didn't make sense,

3    because the nature of commerce and the way people and goods move

4    in our modern society make such a limitation impossible to

5    implement.

6         THE COURT:  Thank you, Ms. Vigen.  If I were to

7    conclude that the agency did exceed its statutory authority, do

8    you agree that vacatur would be the appropriate remedy in this

9    case?

10        MS. VIGEN:  So Your Honor, we've argued in our brief

11   that any remedy should be limited to the plaintiffs that are

12   found to have standing.  And we think that's appropriate in line

13   with principles of Article III standing where plaintiffs have to

14   show standing for each type of relief they seek, as well as

15   principles of equity under which typically equitable relief,

16   which vacatur is essentially a form of it, it's very akin to it,

17   where equitable relief should be limited to the parties seeking

18   it.

19        THE COURT:  Sorry.  But that's not an approach the

20   circuit has embraced, is it?  Aren't I bound by the *National

21   Mining* decision?

22        MS. VIGEN:  We recognize that in *National Mining* the

23   D.C. Circuit has admitted -- has decided that universal vacatur

24   is an available remedy under the ACA.  That said, it's not

25   required under *National Mining*.

1          THE COURT:  Can you give me a case -- I'm familiar

2     with Judge Moss's decision in *O.A.*  Can you cite any decision in

3     which a judge on this court has vacated a rule, an order and --

4     or has determined that a rule exceeds statutory authority and

5     has not vacated it?

6          MS. VIGEN:  So Your Honor, I don't know of such a case

7     off the top of my head.  But I would like to emphasize that

8     *National Mining* doesn't require universal vacatur.  It says it's

9     the ordinary remedy.

10         And I would like to submit that this is an extraordinary

11    case for two principal reasons.  First of all, the eviction

12    moratorium is a response to a wide-ranging global pandemic

13    that's killed over 500,000 Americans, and scientific studies

14    have shown that eviction moratoria like the CDC order helps to

15    prevent the spread of disease and death.

16         And then second, as Your Honor is well aware, there are

17    multiple other courts considering the same question that Your

18    Honor is considering here, including three courts of appeal, and

19    a nationwide remedy in this court would not be effective cutting

20    off that ongoing conversation in which courts have reached

21    different conclusions and which there obviously is a healthy

22    debate over CDC's authority under Section 264.

23         THE COURT:  Is it fair to assume that -- if I were to

24    disagree with you and I were to find that the agency exceeded

25    its authority and that the appropriate remedy is to vacate the

1    order, is it fair to assume that the government would ask for a

2    temporary stay so that it could determine whether to appeal my

3    ruling and to seek a stay?

4            MS. VIGEN:  So that would be a question for my

5    clients, but I wouldn't be -- I would assume that would be the

6    result, but I can't tell you without talking with my clients and

7    my --

8            THE COURT:  Understood.  On the standing point, the

9    government doesn't disagree, at least with respect to the

10   companies, that those companies have standing?  It's just the

11   individuals and the related associations that you think don't

12   have standing?

13           MS. VIGEN:  Yes.  So our argument with respect to

14   standing is that I believe the individuals are property

15   managers, not actual property owners, and so they haven't shown

16   injury from the order because they're not the ones who are not

17   being paid rent, they merely collect rent, in my understanding

18   of it.

19           THE COURT:  Thank you, Mr. Vigen.

20        Mr. Shumate, do you want to discuss the standing point, and

21   then if you can direct your argument to the government's

22   argument on the ratification issue.

23           MR. SHUMATE:  Sure.

24        So on the standing issue, Your Honor, on the standing

25   question, the government acknowledges that the CDC's order

applies to both individuals and organizations, and it's backed by criminal penalties enforced by the Department of Justice.  We have individual plaintiffs and organizational plaintiffs.  If my two individual clients were to file eviction notices, they would be squarely subject to the criminal penalties in the order.  The order identifies different criminal penalties for both organizations and individuals.  So they are the direct objects of the order.  There's no question that they are exposed to criminal penalties.  They have standing.  And from their membership in the associations, the associations also have standing.

So I don't think it's a hard question.  Even if it were, Your Honor, there's no dispute that the other -- the two organizational plaintiffs or the three organizational plaintiffs, the property management companies are proper plaintiffs.  They can raise all the same claims as the individuals.  And if the Court agrees with our arguments on the merits, the Court should, as you've noted, vacate the moratorium for all affected parties under *National Mining*.

As you consider the remedy, I just wanted to make two other points that I would ask the Court to consider in evaluating the remedy.  The first is that conditions have changed a lot since March of 2020 when the eviction moratorium was first put in place by Congress.  And I wanted to correct something that Ms. Vigen has said a couple of times, which is that this is just

a temporary eviction moratorium.  We're going on a year now that
this federal eviction ban has been in place.  Things are very
different now.  We are through the dark days of 2020.  We are
through the cold winter months of 2021.  Vaccines are rolling
out.  The economy is booming again.  Job numbers are going up.
Things are different now than they were before.

And the second point I would like you to consider, Your
Honor, when you're evaluating the appropriate remedy, is
consider the impact on my clients.  Not one time has CDC ever
considered, not once, the impact of its decision on small
businesses like my clients.  Three times the CDC issued an
eviction moratorium that's essentially the same but never once
considers the impact on small businesses.  All together, as we
put in the record, the moratorium will cost property owners like
my clients across the country approximately $200 billion.  The
CDC doesn't bat an eye at that impact.

So this thing needs to end, or it will continue
indefinitely.  It's telling that the initial eviction moratorium
from the CDC was for four months.  Then Congress extended it for
one month.  And then the new administration comes in and does a
two-month extension.  And now it's a three-month extension.
What's next?  A six-month extension?

It's also telling that a number of state and local
governments are now easing their restrictions.  Why?  Because
conditions have changed.  But the CDC doesn't change its

1   approach.  Instead, they're continuing to enforce an eviction

2   moratorium that most state and local governments have dropped.

3       Your Honor, going back to the statute, it's telling that

4   Ms. Vigen can't identify any limit in the statute and she can't

5   answer your hypothetical, because the answer to all of them is

6   yes.  If the second sentence of the statute imposes no limit on

7   the first sentence, then CDC has unbounded authority to do

8   whatever it wants in the name of public health.

9       I would like to walk the Court through the statute because

10   we've talked about language and we've talked about the

11   quarantine authority.  I think there are at least five textual

12   clues in Subsection (a) that supports our reading of the statute

13   that the second sentence must be a limitation on the first

14   sentence.

15       Let's start with the first sentence.  It says, "The

16   Secretary is authorized to make and enforce such regulations."

17   As you know and as the Court has mentioned a number of times,

18   that's a general grant of rulemaking authority.  That's a

19   starting point, but it's not an ending point.

20       The second sentence of the statute describes the means by

21   which the CDC is authorized to carry out that general rulemaking

22   authority.  The first textual clue is the opening clause, "For

23   purposes of carrying out and enforcing such regulations."  "Such

24   regulations" is the same phrase used in the first sentence.  You

25   have a tether right there from the first sentence to the second

1    sentence.

2         Going on, you have a list starting with "inspection" and

3    ending with "articles."  And then you have, as you pointed

4    out, "Found to be infected or contaminated."  That's another

5    limit.  And then finally, you have "and other measures," the

6    catchall phrase at the end of the list.  As the Sixth Circuit

7    said, that's a signal that you should apply the ejusdem canon,

8    that the other measures that CDC may do have to be similar in

9    kind to the measures in the list.  And the measures in the list

10   refer to personal property, animals, articles, things like

11   clothing, garments that have been infected by a contaminated

12   disease as found by the CDC.  It doesn't say anything about real

13   property.

14        And you would expect Congress to speak clearly, given the

15   point that Ms. Vigen made that this is a very powerful statute.

16   The CDC could tell a farmer you need to destroy your entire

17   flock, all your cattle.  That presents serious Fifth Amendment

18   takings problems, that Congress has clearly authorized a takings

19   claim to recover money for that property.  But there is nothing

20   in the statute about real property at all.  If the government is

21   right, there's not only no limit on the CDC's authority pursuant

22   to the first sentence, the second sentence is entirely

23   superfluous.

24        The government has mentioned this quarantine authority.

25   I'm glad Ms. Vigen brought it up.  Obviously, quarantine fits

nowhere in the list in the second sentence.  So it can't be
authorized by Subsection (a).  It's not related to personal
property.  It's not related to articles.  As the Sixth Circuit
said, Subsection (a) is limited to property.  It doesn't affect
liberty interests.  The only reference to quarantine authority
in the statute is (b), (c), and (d).  If you look at (b)(1),
that's the grant of authority to impose a quarantine.  (b)(1)
says, "Regulations prescribed under this section may provide for
the apprehension and examination of anyone reasonably believed
to be infected with a communicable disease."  The next sentence
goes on to say that "such regulations may provide that if upon
examination any individual is found to be infected, he may be
detained."  That's the quarantine delegation.  It doesn't come
from Subsection (a).  It can't because the statute doesn't
encompass liberty restrictions.  Then you have (b) and (c) which
also impose limits on the quarantine authority.

In terms of the nondelegation doctrine, Your Honor, you
don't need to decide that as a separate claim.  You can do what
the Sixth Circuit did, which is to find that as a matter of
constitutional avoidance there has to be a limit on the statute
or else it violates the nondelegation doctrine.  If there is no
limit, this is the most powerful statute that I have ever seen.

Yes, the courts have upheld broad language and found
intelligible principles in language like the public interest.
But I don't think I've ever seen a statute with a staggering

delegation of power like Section 361 under the CDC's interpretation.  It can regulate all human activity, any economic activity, any human interaction, worship limits. That's a lot like the National Recovery Act struck down by the Supreme Court in 1935.

You don't need to go there.  It's enough to recognize that this is an extremely broad statute with a very weak intelligible principle.  According to Ms. Vigen, the only limit is the CDC director's own imagination as to what might be necessary or appropriate to limit the spread of communicable disease, and that's anything.

In terms of ratification, Your Honor, again, you're right, the case law requires that a ratification be done clearly, and that's really a matter of common sense.  We don't assume that Congress blesses agency action unless they say so, because there's the APA.  There's judicial review of unlawful agency action.  If a court is going to defer to unlawful agency action and upheld it, we expect Congress to speak clearly.  And the ways in which this court and the circuit have upheld ratification in the past is where Congress has said we hereby ratify and approve.  We quoted a lot of that language in our ratification supplemental briefing.  Congress appropriates money.  Congress did none of that.  All Congress did is describe and extend.

And the Sixth Circuit recognized that.  That's exactly what

the Sixth Circuit held in the *Skyworks* case as well, that the extension was just that.  The government can't point to a single case where a court has found ratification in the form of an extension of an agency action.  It's unprecedented what they're asking the Court to do.

I think that's all I have, Your Honor, unless Your Honor has more questions.

THE COURT:  Thank you, Mr. Shumate.

Ms. Vigen, do you want to respond to any of his points?

MS. VIGEN:  Yes, Your Honor.

I point out with respect to Mr. Shumate's argument about the changing situation, CDC did take that into consideration in issuing the March order.  CDC acknowledged that fact and has begun rolling out.  The CDC also pointed to the fact that rates of transmission remain high and that variants of the virus that are more easily transmissible and more deadly are increasing in -- are increasing in circulation.  So CDC did take the ongoing developments of the pandemic into effect and in its scientific and public health expertise determined that keeping the order in place was required.

In response to Mr. Shumate's entirely new argument that he's just raised right now as to the meaning of Subsection (d)(1), the language in Subsection (d)(1) is the same as the language in Subsection (b) and (c).  It says, "The regulations prescribed under this section."  "The regulations prescribed

1    under this section."  "Under this section" means under

2    Subsection (a).

3         And I would also point out that the *Brown* and *Chambless*

4    courts both agreed with our interpretation of the language in

5    Subsection (a).

6         And then finally as to the rest of the authorities provided

7    here, Congress knows how to provide an agency with broad

8    authority where it needs to, and the Supreme Court has

9    recognized that broad delegations of authority are appropriate

10   where areas of technical or scientific expertise are at issue.

11        And that's what we have here.  We have Congress providing

12   expert public health agencies with the ability to respond

13   liberally and flexibly to new situations, and that includes this

14   pandemic, and that includes a future pandemic that could be even

15   worse.

16        So this authority is important.  Congress intended it.  And

17   Congress showed us that it intended it by expressly approving of

18   CDC's action and extending CDC's action issued under the statute

19   that it passed in the 2021 Appropriations Act.

20            THE COURT:  All right.  Thank you both.  This was very

21   helpful.  The briefing was outstanding.  I'm very appreciative

22   for your time and your arguments today.  I will take this under

23   advisement, and I hope to issue a decision in the next week or

24   two.

25        Is there anything else we need to address now?

1    Mr. Shumate?

2            MR. SHUMATE:  No, Your Honor.  Thank you for your time

3    today.  We really appreciate it.

4            THE COURT:  Of course.

5        Ms. Vigen?

6            MS. VIGEN:  No, Your Honor.

7            THE COURT:  All right.  Thank you all.

8        (Proceedings adjourned at 11:08 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER

        I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

        Please Note:  This hearing occurred during the COVID-19 pandemic and is, therefore, subject to the technological limitations of court reporting remotely.

/s/ Sara A. Wick                    May 6, 2021
SIGNATURE OF COURT REPORTER          DATE