**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALABAMA ASSOCIATION OF REALTORS®, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> Defendants. | Case No. 1:20-cv-03377-DLF |

*AMICUS CURIAE* **THIRD AMENDMENT LAWYERS ASSOCIATION'S**
**BRIEF IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION TO ENFORCE THE**
**SUPREME COURT'S RULING AND TO VACATE THE STAY PENDING APPEAL**

*Amicus curiae*, the Third Amendment Lawyers Association ("ÞALA"), hereby files their Brief in support of Plaintiffs' Emergency Motion.[1]  The CDC moratorium on evictions has the tendency to invade the Third Amendment rights of landlords.

**1.0    Introduction**

Amicus ÞALA is a national organization of attorneys who seek to protect and defend the Third Amendment from government incursion.  Because the Third Amendment is not frequently invoked in ordinary litigation, it is the "runt piglet" of the Bill of Rights and frequently overlooked.[2] The ÞALA's purpose, therefore, is to advocate respect for the Third Amendment wherever its implications are overlooked.

ÞALA's stated mission is to: (1) educate the public about the right to be free from quartering; (2) advocate for the right in court and in legislation; (3) foster scholarship on the third amendment; (4) provide a forum for debate and discussion about quartering, and (5) enable supporters of the third

---

[1] No party's counsel authored the brief in whole or in part; no party or their counsel, or any other person, contributed money intended to fund preparing or submitting this brief.

[2] Balko, Radley, "How Did America's Police Become a Military Force on the Streets", ABA Journal (Jul. 1, 2013), available at <https://www.abajournal.com/magazine/article/how_did_americas_police_become_a_military_force_on_the_streets>.

amendment to connect and assist each other.[3]  ÞALA membership is open to any attorney admitted to practice before any U.S. State or Territory who shows a commitment and passion for anti-quartering.

## 2.0   Argument

The parties to this case are litigating the primary issues regarding the CDC's extension of the eviction moratorium and Supreme Court ruling.  Plaintiffs seek to recover possession of their properties from tenants who have failed to pay their rent.  Ordinarily, the eviction process would play out in the courts.  The CDC eviction moratorium prevents this.  And, they cannot resort to "self-help".  *See, e.g., Mendes v. Johnson*, 389 A.2d 781, 783 (D.C. 1978) ("Under early common law, a landlord was privileged to enter upon his land and recover it by force, using violence if necessary. However, this privilege was modified as early as 1381, when a statute was passed making such forcible entry a criminal offense.  This criminal statute was accepted as part of the common law, or reenacted, by nearly all of our states.")  As a result, Plaintiffs are being forced to house individuals, *i.e.* quarter them, without their consent.  Given the size of the population at issue, some of these tenants are bound to be soldiers.  To the extent the CDC moratorium prohibits evicting a soldier, it runs afoul of the Third Amendment.  This Constitutionally significant issue warrants this Court's attention

### 2.1   The Third Amendment

The Third Amendment's mandate is short and elegant:

No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law.

U.S. Const. amend. III.

The Third Amendment protects fundamental rights of Americans to be free from military oppression and be master of one's domain.  As noted by the Second Circuit:

The Third Amendment was designed to assure a fundamental right to privacy. *Griswold v. Connecticut*, 381 U.S. 479, 484, 85 S. Ct. 1678, 1681, 14 L. Ed. 2d 510 (1965); *Poe v. Ullman*, 367 U.S. 497, 81 S. Ct. 1752, 6 L. Ed. 2d 989 (1961), at 552, 81 S. Ct. at 1781 (Douglas, J., dissenting), 549, 81 S. Ct. at 1779 (Harlan, J., dissenting).

---

[3]   *See* Third Amendment Lawyers Association, "About", available at <http://thirdamendmentlawyers.weebly.com/about.html>.

*Engblom v. Carey*, 677 F.2d 957, 962 (2d Cir. 1982).  "Its plain object is to secure the perfect enjoyment of that great right of the common law, that a man's house shall be his own castle, privileged against all civil and military intrusion. The billetting of soldiers in time of peace upon the people has been a common resort of arbitrary princes, and is full of inconvenience and peril..." J. Story, COMMENTARIES ON THE CONSTITUTION § 1003 at 709 (1833).  Notably, "[t]here is something in the American that repels the right of the sovereignty to take up quarters in his home or place of business. It was evidenced by Mr. Jefferson when he penned the Declaration of Independence and complained that the King was quartering soldiers in the homes of free people." *Wallace v. Ford*, 21 F. Supp. 624, 627 (N.D. Tex. 1937).

Quartering is a thing to be justly feared.  "Consider, for instance, Joseph Galloway's plea, warning his fellow Americans that rebellion would bring war, that war would bring quartering, and that quartering would find soldiers 'travelling [sic] over your estates, entering your houses—your castles … seizing your property … ravishing your wives and daughters, and afterwards plunging the dagger into their tender bosoms.'" Bell, Tom W., "*'Property' in the Constitution: The View from the Third Amendment*", 20 WM. & MARY BILL RTS. J. 1243, 1274 (2012) (quoting B. Carmon Hardy, A FREE PEOPLE'S INTOLERABLE GRIEVANCE, IN THE BILL OF RIGHTS: A LIVELY HERITAGE 67, 67–68, 79–81 (Jon Kukla ed., 1987)).  Thus, there is "a traditional and strong resistance of Americans to any military intrusion into civilian affairs" which finds expression in the Third Amendment. *Laird v. Tatum*, 408 U.S. 1, 15, 92 S. Ct. 2318, 2326 (1972).

## 2.1    The CDC Moratorium Runs Afoul of the Third Amendment

The present moratorium states, in relevant part:

Accordingly, subject to the limitations under "Applicability," a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action, shall not evict any covered person from any residential property in any county or U.S. territory while the county or territory is experiencing substantial or high levels of community transmission of SARS-CoV-2.

Centers for Disease Control and Prevention, Department of Health and Human Services, Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations 70.2 (August 3, 2021) ("Moratorium").

Anyone "recognized and permitted by society as founded on lawful occupation or possession with a legal right to exclude others" is an "Owner" under the Third Amendment.[4] *Engblom, supra* at 962. This is, thus, coextensive with the "landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action" identified in the moratorium.

"Soldiers" under the Third Amendment includes National Guardsmen when federalized. *Id.* at 961. "Covered person" as that term is used in the moratorium, does not exclude any person on the basis of occupation, which would, then, include a Soldier within the meaning of the Third Amendment. *See* Moratorium at 2-3.

The Moratorium prohibits eviction by Owners of Soldiers. The use of a house by a soldier for more than 24 hours may be construed as "quartering". *Contrast Estate of Bennett v. Wainwright,* No. 06-28-P-S, 2007 U.S. Dist. LEXIS 39631, at *20 (D. Me. May 30, 2007) (finding that use by police for less than 24 hours was not quartering). The Moratorium is in effect until October 3, 2021—well beyond 24 hours. This is a quartering, and the very nature of a bar on evictions means it is without consent.

The only remaining questions are whether this is peacetime or, alternately, whether wartime quartering has been prescribed by law. For purposes of the Third Amendment, the distinction between "time of peace" and "time of war" requires a formal declaration of war by Congress. *See* Avery, Thomas L., "*The Third Amendment: The Critical Protections of a Forgotten Amendment*", 53 WASHBURN L.J. 179, 202-203 (2014); Bell, Tom W., "*The Third Amendment: Forgotten But Not Gone*", 2 WM. & MARY BILL RTS. J. 117, 131 (1993). Such is consistent with the other implications of being in a "time of war" once there is a formal declaration:

---

[4]    One court found, however, that this did not include navigable airspace. *See Custer Cty. Action Ass'n v. Garvey,* 256 F.3d 1024, 1043-44 (10th Cir. 2001). The Tenth Circuit did, however, view *Engblom* favorably.

> A congressional declaration of war carries with it profound consequences. The United States Code is thick with laws expanding executive power "in time of war." See OFFICE OF THE JUDGE ADVOCATE GENERAL, UNITED STATES AIR FORCE, DIGEST OF WAR AND EMERGENCY LEGISLATION AFFECTING THE DEPARTMENT OF DEFENSE 171-84 (1996) (listing statutes "effective in time of war"); *cf. id.* at 185-91 (listing statutes "effective in time of national emergency declared by the President"); *id.* at 192-98 (listing statutes "effective in time of national emergency declared by Congress"). Under these laws, the President's authority over industries, the use of land, and the terms and conditions of military employment is greatly enhanced.  A declaration of war may also have the effect of decreasing commercial choices and curtailing civil liberties.  *See* Willliam H. Rehnquist, ALL THE LAWS BUT ONE: CIVIL LIBERTIES IN WARTIME 218-19 (1998) ("Without question the government's authority to engage in conduct that infringes civil liberty is greatest in time of declared war--the *Schenck* and *Hirabayashi* opinions make this clear…. But from the point of view of governmental authority under the Constitution, it is clear that the President may do many things in carrying out a congressional directive that he may not be able to do on his own.").

*Campbell v. Clinton*, 203 F.3d 19, 29-30 (D.C. Cir. 2000) (Silberman, J., concurring).  Thus, notwithstanding any current Authorization for the Use of Military Force, such is not a "declaration of war".  *Compare Cedar & Wash. Assocs., LLC v. Port Auth. (In re September 11 Litig.),* 931 F. Supp. 2d 496, 510 (S.D.N.Y. 2013)(observing an AUMF "did not state explicitly that it was a declaration of war"). Thus, the peacetime quartering mandated by the Moratorium violates the Third Amendment's prohibition on quartering of soldiers without consent of the owner.

Assuming, *arguendo,* that the existence of a current AUMF constitutes a "time of war", the Moratorium was not propounded in a manner prescribed by law, as required by the Third Amendment.  Prescription by law requires legislative action. *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 139 (1866) (Chase, C.J.) ("The power to make the necessary laws is in Congress; the power to execute in the President … but neither can the President, in war more than in peace, intrude upon the proper authority of Congress."); see also U.S. Const., art. I, § 1 ("all legislative Powers herein granted shall be vested in a Congress of the United States").  The Framers rejected a tyrant of a king; they did not entrust the quartering power to the Executive branch.

The Moratorium was not a legislative act; it was regulatory.  Regulations may have the force of law, but their mandates and prohibitions are not themselves law.  *See United States v. Eaton*, 144 U.S. 677, 688, 12 S. Ct. 764, 767 (1892) ("Regulations prescribed by the President and by the heads of departments, under authority granted by Congress, may be regulations prescribed by law, so as lawfully

to support acts done under them and in accordance with them, and may thus have, in a proper sense, the force of law; but it does not follow that a thing required by them is a thing so required by law as to make the neglect to do the thing a criminal offence in a citizen, where a statute does not distinctly make the neglect in question a criminal offence."). The Third Amendment does not speak of non-consensual quartering in terms of a "regulation", but rather specifically requires prescription by law, *i.e.* Congressional direction. A mere regulatory, executive action, such as the quartering in *Engblom*, violates the Third Amendment (though it had not yet been clearly established that the right was incorporated and applied to the National Guardsmen). To hold otherwise would mean the Executive branch could run roughshod over the Constitution.

Moreover, the Moratorium does not actually make any prescription as to quartering—it is a blanket prohibition on evictions. It not only does not carve out soldiers, it does not mention them.[5] There is no "manner" as to the quartering because the CDC did not consider that it was quartering soldiers. Thus, even if this were a time of war, the Moratorium remains unconstitutional.

**3.0      Conclusion**

The COVID-19 pandemic has caused hardships for millions of Americans. What it should not cause is the deprivation of Constitutional liberties, chief among them the freedom from quartering without consent during peacetime. Thus, the Court should allow the Plaintiffs' motion, vacating the Moratorium, at least to the extent it applies to the evictions of soldiers.

---

[5]      Further, "any government impingement on a substantive fundamental right", here, the freedom from quartering "would be measured under a strict scrutiny standard and would be justified only if the infringement is narrowly tailored to serve a compelling state interest." *Hutchins v. District of Columbia*, 188 F.3d 531, 536 (D.C. Cir. 1999) (addressing free movement). The CDC has not shown a compelling interest in quartering soldiers and the moratorium is not narrowly tailored—there is not any consideration given to covered persons being soldiers. Thus, the Moratorium fails strict scrutiny.

Dated: August 6, 2021.                  Respectfully submitted,

                                        /s/ Jay M. Wolman
                                        Jay M. Wolman (D.C. Bar No. 473756)
                                        Marc J. Randazza (*admission pending*)
                                        RANDAZZA LEGAL GROUP, PLLC
                                        30 Western Avenue
                                        Gloucester, MA 01930
                                        Tel: (702) 420-2001
                                        ecf@randazza.com

                                        Attorneys for *Amicus Curiae*
                                        Third Amendment Lawyers Association (ÞALA)

Case No. 1:20-cv-03377-DLF

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 6, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I further certify that a true and correct copy of the foregoing document being served via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/Jay M. Wolman
Jay M. Wolman

RANDAZZA | LEGAL GROUP