**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALABAMA ASSOCIATION OF REALTORS®, *et al.*, <br><br>         *Plaintiffs*, <br>    *v.* <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br>         *Defendants*. | No. 1:20-cv-03377-DLF |

**REPLY IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION TO ENFORCE THE SUPREME COURT'S RULING AND TO VACATE THE STAY PENDING APPEAL**

The government has already conceded that the Centers for Disease Control and Prevention ("CDC") had no authority to extend the eviction moratorium and that the CDC is now using litigation delays as a political maneuver to keep an unlawful policy in place. This gamesmanship comes at the expense of the nation's property owners—who continue to suffer irreparable harm from the eviction moratorium every day this unlawful policy remains in effect. This Court should immediately vacate the fourth extension and the stay pending appeal.

In May, this Court issued a final judgment establishing that the eviction moratorium—then on its second extension—"is unambiguously foreclosed by the plain language of the Public Health Service." ECF 54, at 19. In June, on the eve of a third extension, five Justices of the Supreme Court agreed. According to the White House, "the Supreme Court has made clear that" the option of extending the moratorium "is no longer available" because in June, "when CDC extended the eviction moratorium until July 31st, the Supreme Court's ruling stated that 'clear and specific congressional authorization (via new legislation) would be necessary for the CDC to extend the moratorium past

1

July 31.'"[1]  As recently as yesterday—after Plaintiffs filed their emergency motion—the President reaffirmed that the CDC could not extend the moratorium: "The Court ruled by — and made it very clear — the Supreme Court said, 'You can't do that.  You don't have the authority to do that.'"  White House, *Remarks by President Biden on Strengthening American Leadership on Clean Cars and Trucks* (Aug. 5, 2021), https://bit.ly/3juwwZS.

The CDC appears to have acted in bad faith by extending the moratorium—concededly without a legal basis, in response to political pressure, and for the purpose of generating litigation delays to continue an unlawful policy.  Indeed, the President reaffirmed yesterday that the CDC issued the fourth extension as a delay tactic: "And I went ahead and did it, but here's the deal: I can't guarantee you the Court won't rule if we don't have that authority, but at least we'll have the ability, if we have to appeal, to keep this going for a month at least — I hope longer than that,'" so "by that time, we'll get a lot of (inaudible)."  *Id.*  That is consistent with the President's remarks in announcing the fourth extension, where he observed that "by the time it gets litigated, it will probably give some additional time while we're getting that $45 billion out to people who are, in fact, behind in the rent and don't have the money."  The White House, *Remarks by President Biden*, *supra.*  It is startling that the government is openly acknowledging its manipulation of the judicial process for the purpose of delay.

The government's meager defense of the fourth extension offers no response to—much less an acknowledgement of—any of this.  Instead, the government argues that: (1) this Court is bound by the D.C. Circuit motion panel's unpublished order denying Plaintiffs' emergency motion to vacate the

---

[1] The White House, *Statement by White House Press Secretary Jen Psaki on Biden-Harris Administration Eviction Prevention Efforts* (July 29, 2021), https://bit.ly/3jm0K17; *see* The White House, *Statement by Press Secretary Jen Psaki on Eviction Prevention Efforts* (Aug. 2, 2021),   https://bit.ly/3lwEt3o; The White House, *Press Briefing by Press Secretary Jen Psaki and White House American Rescue Plan Coordinator and Senior Advisor to the President Gene Sperling* (Aug. 2, 2021), https://bit.ly/3xoNzBt; The White House, *Press Briefing by Press Secretary Jen Psaki* (Aug. 3, 2021), https://bit.ly/2WX9vY0; The White House, *Remarks by President Biden on Fighting the COVID-19 Pandemic* (Aug. 3, 2021), https://bit.ly/3xszwea; *see also* ECF 67, at 6-8.

stay pending appeal in early June; (2) the Supreme Court's ruling should be ignored (despite the White House treating it as controlling for the Executive Branch); (3) the CDC issued a "new" and "more targeted" moratorium, not an extension of the same unlawful policy (even though it is the same thing in all material respects); and (4) the equities weigh in favor of extending the stay pending appeal (despite the CDC's unclean hands). None of these arguments has merit. Given that every day the moratorium remains in effect is another day the government is rewarded for its strategy, this Court should grant relief no later than Monday so that the status quo upended by the Executive Branch's reversal can be promptly restored.

    **1.** The D.C. Circuit motions panel's unpublished order is not controlling here because that court did not "resolv[e] the ultimate merits of the" CDC's statutory authority in its interlocutory stay order. *Ala. Ass'n of Realtors v. HHS*, No. 21-5093, 2021 WL 2221646, at *1 (D.C. Cir. June 2, 2021). An interlocutory ruling granting or denying preliminary relief has "no preclusive effect in the continuing litigation," *Sole v. Wyner*, 551 U.S. 74, 84 (2007), because "the findings of fact and conclusions of law made by a court granting [or denying] a preliminary injunction are not binding at trial on the merits," *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see Firearms Pol'y Coal., Inc. v. Barr*, 419 F. Supp. 3d 118, 123 (D.D.C. 2019) (Friedrich, J.) ("This Court's prior decision denying a preliminary injunction does not constitute binding precedent because it was an interlocutory ruling, not a final judgment."), *aff'd sub nom. Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 19-5304, 2020 WL 6580046 (D.C. Cir. Oct. 30, 2020).

    As the D.C. Circuit has explained, "[t]he decision of a trial or appellate court whether to grant or deny a preliminary injunction does not constitute the law of the case for the purposes of further proceedings and does not limit or preclude the parties from litigating the merits, unless there has been an order of consolidation pursuant to Rule 65(a)(2)." *Berrigan v. Sigler*, 499 F.2d 514, 518 (D.C. Cir.

1974).  Applying this principle in *Belbacha v. Bush*, 520 F.3d 452 (D.C. Cir. 2008), the D.C. Circuit rejected the government's contention that it "should affirm on the basis of the order of a motions panel of this court denying Belbacha a temporary stay pending this appeal" on the theory "that is the law of the case and precludes the relief Belbacha sought in the district court." *Id.* at 458.  As the court of appeals explained, "[a]n order denying preliminary relief … 'does not constitute the law of the case.'" *Id.*

*Berrigan* and *Belbacha* apply here because the motions panel did not "resolv[e] the ultimate merits of the" CDC's statutory authority in its interlocutory stay order denying Plaintiffs' emergency motion to vacate the stay. *Ala. Ass'n of Realtors*, 2021 WL 2221646, at *1.  That emergency decision was not only rushed, but the motions panel reviewed this Court's order granting the stay "under the deferential abuse-of-discretion standard of review." *Id.*  On its own terms, then, the motions panel's conclusion that this Court "did not abuse its discretion in granting a stay in this case" last May, *id.*, does not foreclose this Court from exercising its discretion differently *after* the motions panel issued its order, the Supreme Court issued its ruling, and the CDC issued a fourth extension of the moratorium.  As Plaintiffs have explained, the stay pending appeal must now be vacated because the Executive Branch has conceded (and the Supreme Court has made clear) that the government cannot make "a strong showing that [it] is likely to succeed on the merits" of its appeal, and the equities have significantly shifted in Plaintiffs' favor in light of the CDC's apparent bad faith.  *Nken v. Holder*, 556 U.S. 418, 434 (2009).

The D.C. Circuit departed from *Berrigan* and *Belbacha* in *Sherley v. Sebelius*, 689 F.3d 776 (D.C. Cir. 2012) (*Sherley II*), only because, "on the facts of th[at] case," the prior panel that decided the preliminary-injunction appeal had issued "[a] fully considered appellate ruling on an issue of law," *id.* at 781, 783.  But the D.C. Circuit's published preliminary-injunction opinion in *Sherley I*, 644 F.3d 388

(D.C. Cir. 2011), after full briefing and argument is nothing like the motions panel's unpublished order denying Plaintiffs' emergency motion to vacate the stay, *Sherley II*, 689 F.3d at 782. Here, the motions panel in this case made a "time-pressured decision," *id.* at 782, on an emergency motion without full briefing, argument, or a fully developed factual record. Where, as here, the motions panel "predicts, without making a definitive legal conclusion, that the plaintiffs *probably* or *likely* will or will not succeed on the merits, it cannot be said that the court 'affirmatively decided' the issue such that it would bind an appellate court at a later stage of the litigation." *Id.* at 782. That four Justices would have vacated the stay, and a fifth would do so after July 31 absent congressional authorization, only further confirms the point (and vindicates this Court's initial ruling on the merits).

Likewise, the statement in *Petties v. District of Columbia* that "a decision of the motions panel is the law of the case" does not apply here because the motions panel in this case did not definitively resolve the CDC's statutory authority in ruling on Plaintiffs' emergency motion to vacate the stay. 227 F.3d 469, 472 (D.C. Cir. 2000). In that case (and the case it cites), the motions panel definitively resolved the D.C. Circuit's appellate jurisdiction under Rule 54(b). *Id.* But the motions panel in this case did not decide its own jurisdiction, nor did the motions panel definitely decide the merits of the government's appeal in its unpublished order. *Cf. Taylor v. FDIC*, 132 F.3d 753, 761 (D.C. Cir. 1997) ("The order of the motions panel went unpublished and will bind no panel of this court in any other case."). The motion's panel's interlocutory ruling is not binding here.

Finally, the government's argument is incoherent even on its own terms. If, as the government incorrectly contends, the fourth extension is in fact a "new order" in response to changed "factual circumstances," ECF 69, at 1, then the motions panel's conclusions about a supposedly different moratorium are entirely beside the point. The government cannot have it both ways.

**2.**  The Supreme Court's ruling supersedes the motions panel's unpublished stay order and is controlling here.  The government contends otherwise, urging this Court to reach a decision contrary to how a majority of the Supreme Court would resolve this case.  In support of that remarkable position—a position that conflicts with the President's—the government now dismisses Justice Kavanaugh's opinion and the votes of the four dissenting Justices as irrelevant on the theory that the Supreme Court issued no "binding decision."  ECF 69, at 2; *see id.* at 6-7.  But as the government does not dispute, this Court is required to follow even Supreme Court dicta, which unquestionably does not constitute a binding decision either.  *See* ECF 67, at 15; *see, e.g.*, *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003) ("[T]he EPA's only real argument against treating footnote eight as controlling authority is to dismiss it as dictum.  For this inferior Court, however, that argument carries no weight since carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.") (cleaned up).  The government offers no compelling reason why the "carefully considered language" in Justice Kavanaugh's opinion and the votes of the four dissenting Justices should be treated any differently.

At most, the government invokes the rule set forth in *Marks v. United States*, 430 U.S. 188 (1977), and contends that under D.C. Circuit precedent, "the votes of dissenting Justices may not be combined with the vote of a concurring Justice to establish a binding decision."  ECF 69, at 2.  For that proposition, the government relies on the following language from *King v. Palmer*, 950 F.2d 771 (D.C. Cir. 1991) (en banc): "[T]he narrowest opinion must represent a common denominator of the Court's reasoning; it must embody a position implicitly approved by at least five Justices who support the judgment."  *Id.* at 781; *accord United States v. Epps*, 707 F.3d 337, 348 (D.C. Cir. 2013).  But as then-Judge Kavanaugh explained, there is no need to "read *King* to direct that we decide a case contrary to how a majority of the Supreme Court in the governing precedent would decide the case."  *United States*

6

*v. Duvall*, 740 F.3d 604, 617 n.8 (D.C. Cir. 2013) (Kavanaugh, J., concurring in denial of rehearing en banc). Rather, all that *King* establishes is that "looking to just the concurrence and dissent alone will never be enough to determine whether one of the opinions is the binding opinion under *Marks*." *Id.* That is because "an opinion is the binding opinion only when it will lead to results with which a majority of the Court would agree in all future cases," and "that analysis can be logically conducted only by looking at all of the opinions in the Supreme Court case at issue." *Id.* And here, that opinion is plainly Justice Kavanaugh's concurrence—as the White House itself has acknowledged. This Court should therefore "strive to reach the *result* that a majority of the Supreme Court would have reached under the opinions in the governing precedent." *Id.* at 616. Fortunately, that result accords with this Court's previous ruling on the merits.

In all events, the government misses the forest for the trees. Whether or not Justice Kavanaugh's opinion is formally controlling under *Marks*—or whether *Marks* even applies with respect to Supreme Court rulings on emergency applications—there is no conceivable justification for any lower court to "decide a case contrary to how a majority of the Supreme Court … would decide the case." *Id.* at 617 n.8. Such a ruling does not respect "[v]ertical stare decisis"—either "in letter" or "in spirit." *Winslow v. FERC*, 587 F.3d 1133, 1135 (D.C. Cir. 2009) (Kavanaugh, J.).

The government therefore pivots to suggesting that no one knows how the Supreme Court would decide this case. It should have asked the White House. As the government now tells it, the four dissenting Justices may have voted to grant Plaintiffs' application solely because they thought that "the eviction moratorium was not 'necessary' to prevent" COVID-19's spread "under the circumstances then present." ECF 69, at 2. But the government never even presented such an reading of the Public Health Service Act to the Supreme Court; to the contrary, it repeatedly urged the Justices to "defer[]" to the CDC as the "'expert best positioned to determine the need for such preventative

measures.'"  S. Ct. Opp. 12, 24; *see id.* at 33-34.  Otherwise, the CDC's determinations of necessity under the Act would remain subject to perpetual judicial reexamination—a prospect the government presumably wishes to avoid.  Rather, the Executive Branch—at least until a few days ago—understood the position of the four dissenting Justices to be perfectly clear:  Those Justices (at a minimum) agreed with Justice Kavanaugh that "clear and specific congressional authorization (via new legislation) would be necessary for the CDC to extend the moratorium past July 31."  ECF 67, at 6 (internal quotation marks and citation omitted); *see id.* at 6-8 (collecting quotes).  Indeed, that remains the White House's position today, even after it extended the eviction moratorium for the fourth time.  *See* White House, *Remarks by President Biden on Strengthening American Leadership on Clean Cars and Trucks*, *supra*.  The only thing that has changed over the past few days is that the White House now believes that litigating a fourth extension of the moratorium will give it "the ability, if we have to appeal, to keep this going for a month at least – I hope longer than that."  *Id.*

    **3.**  In addition, the government's repeated representations that the fourth extension is a "new" moratorium, *e.g.*, ECF 69, at 3, 4, 5, are disingenuous—and beside the point.  When stripped of its fresh coat of linguistic paint, the fourth extension is the same moratorium that this Court declared (and a majority of the Supreme Court ruled) unlawful.  The fourth extension is the work of the *same* agency (the CDC) claiming the *same* authority (42 U.S.C. § 264) to prohibit the *same* persons ("a landlord, owner of residential property, or other person") from evicting the *same* persons ("any covered person").  *Compare* CDC Order at 1, *with Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19*, 86 Fed. Reg. 34010 (June 24, 2021) ("June Order"), *and Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19*, 86 Fed. Reg. 16731 (Mar. 31, 2021) ("March Order").  The key definitions of "covered person," "evict," and "eviction" are the *same*. *Compare* CDC Order at 2–3, *with* June Order, 86 Fed. Reg. 34010–11, *and* March Order, 86 Fed. Reg.

16731–32.  And the criminal penalties of up to $500,000 per event are the *same*.  *Compare* CDC Order at 17, *with* June Order, 86 Fed. Reg. 34017, *and* March Order, 86 Fed. Reg. 16738.  All of this merely extends what came before; it does not create anew.

The fact that the CDC allowed the moratorium to lapse for two days—before it concocted a tenuous legal theory—does not make the fourth extension a "new" agency action requiring the parties to start the litigation on a clean slate.  Nor can this about-face somehow advantage the government at the expense of the Plaintiffs.  The government's view would undermine the rule of law, too, because agencies could evade judicial review by issuing interim policies and extending them every few months—or by allowing an unlawful policy to lapse and then reissuing the same policy a few days later, saying it is "new" and "targeted."  It is thus unsurprising that even the government (perhaps mistakenly) framed the question in this case as whether "*the* moratorium *should remain* in effect."  ECF 69, at 6 (emphases added).  Whether labeled as the same moratorium or a new one, Plaintiffs' Complaint covers the fourth extension anyway.  *See* ECF 1, ¶ 116 ("A declaration, order, and judgment holding unlawful, enjoining, and setting aside the CDC's Eviction Moratorium.").

The government resists reality by insisting that, unlike the prior extensions of the *nationwide* eviction moratorium, the fourth extension "applies *only* in areas of substantial or high disease transmission."  *Id.* at 5 (emphasis added).  That is a semantic distinction without a difference.  The CDC has admitted that the fourth extension covered "*over 80%* of the U.S. counties" as of August 1.  CDC Order at 1 (emphasis added).  The President, moreover, placed the number at "close to *90 percent* of the American people who are renters."  The White House, *Remarks by President Biden on Fighting the COVID-19 Pandemic* (Aug. 3, 2021) https://bit.ly/3xszwea (emphasis added).  The CDC's most recent effort is nationwide and covers the country like a blanket.  As an empirical matter, therefore, the fourth extension is functionally and legally equivalent to the prior extensions because the CDC has claimed

authority to regulate evictions nationwide.  Just as no court would take seriously President Truman's attempt to nationalize "only" 90% of the Nation's steel mills after *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), this Court should not take seriously the government's portrayal of its latest extension of the eviction moratorium as "new."  This is especially so where (as here) the President has no inherent constitutional authority, the President has admitted that he needs congressional authorization, and Congress declined to create a statutory authorization.

Plaintiffs' own situation demonstrates that the government's distinction is cosmetic.  As of today, the CDC has designated 100% of the counties in both Alabama and Georgia as experiencing a "high" or "substantial" level of COVID-19 transmission.  *See* COVID-19 Integrated County View, COVID Data Tracker, Centers for Disease and Prevention, https://bit.ly/3lBreP1 (last visited August 6, 2021).  Alabama and Georgia are thus entirely covered by the fourth extension because they are "areas of substantial or high disease transmission."  ECF 69, at 5.  As far as Plaintiffs are concerned, therefore, the fourth extension has precisely the same legal effect as every other iteration of the moratorium.

Accordingly, the government's argument here is similar to the one the Supreme Court rejected in *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993).  In that case, Jacksonville attempted to moot out a challenge to an ordinance requiring "that 10% of the amount spent on city contracts be set aside each fiscal year for so-called 'Minority Business Enterprises,'" by replacing it with a new ordinance that contained a "Sheltered Market Plan" that was "virtually identical to the prior ordinance's 'set aside'" except for a difference in "the percentages."  *Id.* at 658, 662.  The Supreme Court dismissed the ploy, explaining that insofar as the new ordinance "accords preferential treatment to black- and female-owned contractors—and, in particular, insofar as its 'Sheltered Market Plan' is a 'set aside' by another name—it disadvantages

[petitioner's members] in the same fundamental way."  *Id.* at 662; *see Brockington v. Rhodes*, 396 U.S. 41, 42-43 (1969) (State's reduction of challenge "signature requirement from 7% to 4%" did not moot the case when "the appellant has consistently urged the unconstitutionality of any percentage requirement in excess of … 1%").

The government's characterization of the fourth extension as "new" also ignores the multiple modifications that the CDC made to the eviction moratorium *during this litigation*, none of which the government claimed resulted in new orders requiring new lawsuits.  The March extension, for example, contained an entire section entitled "Modifications."   86 Fed. Reg. 16735.   Among other modifications, the March extension "added a new section" requiring persons to complete and submit certain declaration forms "[t]o qualify as a covered person eligible for the protections of this Order." *Id.*  It also "modified" the "Findings and Action" section to "further explain that this Order is not a rule within the meaning of the Administrative Procedure Act." *Id.*  And perhaps most important given the government's emphasis on epidemiological assessments, ECF 69, at 2–3, the March Order "revised" the "Background" and related sections "to reflect updated epidemiological and other relevant information in support of this Order."  86 Fed. Reg. 16735.  Having litigated through the previous chapters of this case without ever claiming an extension was a "new" order, the government cannot now reasonably claim that the modifications in its fourth extension of the eviction moratorium result in a new moratorium now requires restarting the litigation.

Nor can the government claim that the rationale for the fourth extension differs from the rationale of the third (June) extension that CDC issued when the parties were before the Supreme Court.  The CDC knew about the Delta variant—including its transmissibility, the rise in the number of cases, and its seriousness—when it issued the third extension in June.  *See* 86 Fed. Reg. 34010, 34012 ("Variants of concern, including the variants Alpha, Beta, Gamma, Delta, and Epsilon, are

those for which there is evidence of an increase in transmissibility, more severe disease, reduction in neutralization by antibodies generated during previous infection or vaccination, reduced effectiveness of treatments or vaccines, or diagnostic detection failures.").  Despite then knowing about the risks of the Delta variant, the CDC informed the Supreme Court that the moratorium would expire on July 31.  *Id.* at 34015 ("This 30-day extension, intended to be the final iteration, will allow the assessment of natural changes to COVID-19 incidence, the influences of new variants, additional distribution of emergency rental assistance funds, and the expansion of COVID-19 vaccine uptake.").  The rise of the Delta variant is thus not a new rationale that distinguishes the fourth extension from the prior iterations of the moratorium in any material respect.

The government also belies its own assertion that the fourth extension is "new" with its claim that the D.C. Circuit's unpublished stay order is controlling.  It cannot be the case that the CDC issued a new order *and* that the D.C. Circuit's order reviewing the old moratorium is controlling here.  The government knows that the "new" order is for all material purposes the same, and that is why it (incorrectly) invokes the D.C. Circuit's order as controlling here.

In short, the fourth extension is exactly what the Speaker of the House and Chairwoman of the House Committee on Financial Services—the architect of the failed legislation that would have extended the eviction moratorium—has recognized it is: a fourth "*extension* of the moratorium."  Press Release, Maxine Waters, *Rep. Waters Statement on CDC Decision to Extend Eviction Moratorium* (Aug. 3, 2021), https://bit.ly/3Anc7gh (emphasis added); Press Release, Nancy Pelosi, *Pelosi Statement on White House Action on Eviction Moratorium* (Aug. 2, 2021), https://www.speaker.gov/newsroom/8221-0.  No head-scratching is necessary; "this wolf comes as wolf."  *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting).  Yet regardless of the label that the government attaches to the CDC's latest

action, the government lacks statutory authority to issue an eviction moratorium—whether it is labeled a new order or an extension.

4.   Finally, the equities weigh in favor of immediately blocking the fourth extension and vacating the stay pending appeal (and not entering an administrative stay).  The government barely engages with the effect of the Supreme Court's ruling on the equitable analysis, *see* ECF 67, at 14-15, urging this Court to instead conduct the analysis afresh given "recent trends," ECF 69, at 8.  That approach is improper for the reasons given in Plaintiffs' emergency motion, and in any event the equities favor an immediate vacatur of the stay even more strongly now than they did when the Supreme Court issued its ruling in June.

Here, the public interest alone overwhelmingly supports ending the stay.  It remains the case that there is "no public interest in the perpetuation of unlawful agency action," *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (brackets and citation omitted), even when COVID-19 is involved.  *Cf. Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) ("[E]ven in a pandemic, the Constitution cannot be put away and forgotten.").  The putative statutory authority for the supposedly new moratorium is the same that this Court previously held inadequate.  This order is just as unlawful as its predecessors.  And there is certainly no public interest in allowing the Executive Branch to take action that conflicts with a ruling of the Supreme Court.  The Executive Branch has been quite candid about what it seeks to accomplish with this latest extension:  Even though "the courts" had already "made it clear that the existing moratorium … wouldn't stand," "by the time it gets litigated, it will probably give some additional time while we're getting that $45 billion out to people who are, in fact, behind in the rent and don't have the money."  The White House, *Remarks by President Biden*, *supr*a; *see also* White House, *Remarks by President Biden on Strengthening American Leadership on Clean Cars and Trucks*, *supra* ("I can't guarantee you the Court won't rule if we don't have that authority, but at least we'll

have the ability, if we have to appeal, to keep this going for a month at least — I hope longer than that."). If the Executive Branch is allowed to engage in such conduct with impunity, the rule of law—and hence the public—will suffer, both now and in the long run.

On top of that, the latest extension of the moratorium is causing irreparable damage to individual landlords throughout the country, Plaintiffs included. Aside from having their property unlawfully occupied for nearly a year now, *cf. Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021), the nation's landlords collectively have been losing between $13.8 and $19 billion in unpaid rent each month since the moratorium was adopted, ECF 6-4, at ¶¶ 15, 17, and the government has not, and cannot, provide any assurance that they will ever be made whole given the judgment-proof nature of tenants covered by the moratorium and the snails-pace rollout of federal rental assistance. So while "[n]ormally the mere payment of money is not considered irreparable, … that is because money can usually be recovered from the person to whom it is paid. If expenditures cannot be recouped, the resulting loss may be irreparable." *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in chambers); *see also Mori v. Int'l Bhd. Of Boilermakers*, 454 U.S. 1301, 1303 (1981) (Rehnquist, J., in chambers) ("The funds held in escrow … would be very difficult to recover should applicants' stay not be granted.").

Moreover, the Executive Branch's about-face has deprived the nation's landlords of the certainty necessary to maintain a successful business. Before last Tuesday, landlords across the country—Plaintiffs included—could rely on the certainty of the Supreme Court's decision and the Executive Branch's repeated acknowledgements to plan their affairs. Indeed, between August 1 and late August 3, they were free to commence eviction proceedings. Yet at a moment's notice, landlords across the country once again found themselves subject to federal criminal penalties for exercising their right to exclude based on executive action that not even the President now thinks is "likely to

14

pass constitutional muster."  The White House, *Remarks by President Biden, supra*.  Unless this Court makes clear that no more extensions will be tolerated, landlords will have the threat of federal criminal liability dangling over their heads in perpetuity, as they now know the government has no compunction about reviving the moratorium through tinkering and then trying to characterize it as a "new" one immune from this Court's reach.  ECF 69, at 1.

As for the government's purported injuries, its insistence that the eviction moratorium remains necessary for public health is pretextual.  As the Executive Branch has made quite clear, the point of the fourth extension is to give the government "some additional time while we're getting that $45 billion out to people who are, in fact, behind in the rent and don't have the money."  The White House, *Remarks by President Biden, supra*.  In an attempt to downplay that economic motive, the government seeks to leverage the Delta variant as a justification for equitable relief, *see* ECF 69, at 8, but again, that threat is nothing new.  *See supra* (discussing CDC's acknowledgment of Delta variant in the June extension).  Yet despite being fully aware of the looming Delta variant at the time, the CDC announced that the third extension was "intended to be the final iteration" of the moratorium.  *Id.* at 12.  The Supreme Court had all of these facts before it when it issued its June 29 order, *see* Letter from Elizabeth B. Prelogar, Acting Solicitor General (June 24, 2021), https://bit.ly/3xtZuOy, and Justice Kavanaugh relied on that representation by the government in voting to deny Plaintiffs' application at that time, *see Alabama Ass'n of Realtors*, 141 S. Ct. at 2321 (Kavanaugh, J., concurring).  And since the Supreme Court's June 29 order, more rental assistance has been distributed and vaccination rates have continued to improve.  Today, over 58% of the country's eligible population is fully vaccinated, over 68% of that population has received at least one dose, and over 80% of American seniors are now fully immunized.  CDC, *COVID Data Tracker: Vaccinations in the United States*, https://bit.ly/3s0DklV (last visited Aug. 6, 2021).  Especially in light of these circumstances, the only

thing that the end of the moratorium will ensure is that housing providers will finally be able to take back control of their properties.

*        *        *

The Court should immediately enforce the Supreme Court's ruling by clarifying that this Court's vacatur order covers the CDC's August 3 extension of the moratorium or setting aside that extension, vacating this Court's May 14 order granting a stay pending appeal, and issue any other relief the Court deems just and proper.

Dated: August 6, 2021                   Respectfully submitted,

*s/ Brett A. Shumate*

Brett A. Shumate (D.C. Bar No. 974673)
Charlotte H. Taylor (D.C. Bar No. 1024658)
Stephen J. Kenny (D.C. Bar No. 1027711)
J. Benjamin Aguiñaga (D.C. Bar No. 1708051)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

*Counsel for Plaintiffs*